UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

ANTHONY PACHECO, individually and
on behalf of all others similarly situated,

                                    Plaintiff,

                v.

FORD MOTOR COMPANY, a
Delaware Limited Liability Company,

                                    Defendant.

Case No.

**<u>JURY TRIAL DEMANDED</u>**

**<u>CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................... 1

II.     JURISDICTION ..................................................................... 6

III.    VENUE .................................................................................... 6

IV.     PARTIES ................................................................................. 7

    A.    Plaintiff ......................................................................... 7

        1.    Anthony Pacheco (California) ................................. 7

    B.    Defendant ..................................................................... 9

V.      FACTUAL ALLEGATIONS ................................................ 10

    A.    Ford marketed the Fire Defect Vehicles as safe and reliable, and Ford knew that these attributes were material to consumers. .................................................................... 10

    B.    Ford's Vehicle Warranties ........................................ 17

    C.    The Spontaneous Fire Defect ................................... 18

    D.    Ford knew or should have known of the Spontaneous Fire Defect before it disclosed the defect to Plaintiff. .............................. 21

        1.    Ford's durability testing should have uncovered the Spontaneous Fire Defect. ....................................... 21

        2.    Ford knew about the Spontaneous Fire Defect from warranty claims for Fire Defect Vehicles and its own investigation. ........................................................... 23

    E.    All class members could have been made aware of the Spontaneous Fire Defect at the point of sale. ................. 25

VI.     TOLLING OF THE STATUTE OF LIMITATIONS ................ 26

    A.    Discovery Rule Tolling ............................................. 26

011111-11/2011885 V1

B.     Estoppel ............................................................................ 27

VII.   CLASS ALLEGATIONS ................................................... 27

VIII.   CLAIMS .......................................................................... 31

     A.     Nationwide Claims ................................................ 31

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY
     ACT (15 U.S.C. § 2301, *et seq.*)...................................... 31

COUNT II FRAUDULENT CONCEALMENT (COMMON LAW)
     (Alleged by Plaintiff Pacheco on behalf of the Nationwide Class)............. 36

COUNT III UNJUST ENRICHMENT (COMMON LAW) ................................ 40

     B.     State-Specific Claims ........................................ 41

         1.     California ................................................. 41

COUNT IV VIOLATION OF THE CALIFORNIA CONSUMER
     LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) ..................... 41

COUNT V VIOLATIONS OF THE CALIFORNIA UNFAIR
     COMPETITION LAW (Cal. Bus. & Prof. Code § 17200)......................... 45

COUNT VI VIOLATIONS OF CALIFORNIA FALSE ADVERTISING
     LAW (Cal. Bus. & Prof. Code § 17500, et seq.).......................... 47

COUNT VII VIOLATION OF SONG-BEVERLY CONSUMER
     WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY
     OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal.
     Civ. Code §§ 1791.1 & 1792)....................................... 50

REQUEST FOR RELIEF ................................................... 53

DEMAND FOR JURY TRIAL ............................................ 54

011111-11/2011885 V1

Plaintiff files this lawsuit individually and on behalf of proposed nationwide and statewide classes. Plaintiff alleges the following based on personal knowledge as to his own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.      INTRODUCTION

1.      The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to promptly warn consumers and fix or replace a car where the manufacturer learns of a defect that implicates serious safety issues. And when a car cannot be safely used by its owner while a car manufacturer is developing a fix for a safety defect, the car manufacturer should not shift the risk of a dangerous fire event on to the owner, but instead should provide or reimburse for comparable replacement transportation. Finally, when a car manufacturer recalls a vehicle to institute a "fix," the "fix" should address the defect at issue, and not just kick the can down the road through a hasty, jerry-rigged approach that actually fixes nothing and creates new potential safety and environmental issues.

2.      Ford Motor Company ("Ford") breached these fundamental duties by selling Ford Escapes, Ford Mavericks, and Lincoln Corsairs that were dangerously defective and prone to catching fire while in operation. Then, though Ford knew or should have known of the fire risk prior to launching the vehicles, it did nothing to

promptly warn owners and lessees, instead waiting over a year to announce a safety recall. And while Ford now is implementing a "fix" to prevent these vehicles from catching on fire, it has chosen not to design or issue a *bona fide* fix that addresses the leaking engine blocks, but rather to maintain the risk of engine block leaks while only mitigating the risk that engine fluids and vapors will ignite.

3.      Model year 2020–2022 Ford Escapes, 2022 Ford Mavericks, and 2021–2022 Lincoln Corsairs (the "Fire Defect Vehicles") contain a defect in their 2.5-liter hybrid electric vehicle ("HEV") and 2.5-liter plug-in hybrid electric vehicle ("PHEV") engines that can cause significant quantities of engine oil and/or fuel vapor to accumulate near ignition sources, resulting in under hood smoke and fires (the "Spontaneous Fire Defect").

4.      The Spontaneous Fire Defect exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle catches fire while in operation. The Spontaneous Fire Defect also exposes passengers, other drivers on the road, and other bystanders to an unreasonable risk of accident, injury, death, and property damage.

5.      This catastrophic fire risk is the direct result of a defect that was known or should have been known to Ford and is still unremedied by Ford. Not only did Ford fail to disclose the Spontaneous Fire Defect to consumers both before and after their purchases of Fire Defect Vehicles, but it also misrepresented

- 2 -

the vehicles' safety, reliability, functionality, and quality by this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Spontaneous Fire Defect—e.g., damage to a vehicle and injury or death to persons in the vehicle or another vehicle in proximity should the Fire Defect Vehicle catch on fire.

6.      Warranty claims relating to the Spontaneous Fire Defect were made to Ford as early as April 5, 2021.[1] Yet Ford continued to sell the Fire Defect Vehicles and did nothing to warn purchasers of the Spontaneous Fire Defect until it issued its stop-sale order on June 8, 2022.

7.      To date, Ford has admitted that there have been at least 23 reports of under-hood fires or smoke in a vehicle population of 100,689. The fires have all occurred in the engine compartment of the Fire Defect Vehicles.

8.      Ford has recalled the Fire Defect Vehicles and instituted a "fix," but the fix Ford is using to resolve the dangerous Fire Defect—drilling drain holes in the under-engine shield and removing four blinds from the active grille shutter system—does not address the manufacturing defects in the 2.5L HEV/PHEV engines that are causing flammable fluids and vapors to buildup in the engine compartment. Instead, Ford's proposed solution is to make it easier for dangerous

---

[1] **Exhibit 1**, National Highway Traffic Safety Administration, Part 573 Safety Recall Report No. 22V-484 at 4 (July 7, 2022) (https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V484-6430.PDF).

fluids and vapors to leak out of the Fire Defect Vehicles, creating an environmental hazard and setting the stage for future property damage and possible injury.

9.      A vehicle that has a risk of spontaneously catching on fire while in operation is not fit for its ordinary purpose. And a "fix" that does nothing to *fix* a defect, and instead just mitigates the worst possible manifestation of the defect, is not a fix at all. Ford is placing an unfair burden on class members who are unable to safely operate their vehicles and will have the same risk of flammable fluids and vapors seeping from the engines of their Fire Defect Vehicles after the recall work is completed.

10.      Ford knew or should have known about the Spontaneous Fire Defect before the Fire Defect Vehicles went to market, and certainly knew well before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Fire Defect Vehicles; (2) the direct and public reports of smoke or fires in 23 Fire Defect Vehicles; and (3) Ford's own investigation of fires in the Fire Defect Vehicles.

11.      Ford offers no reimbursement to Fire Defect Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Because a *bona fide* repair to the 2.5L HEV/PHEV engines is not being made, putative class members are left without a safely operable vehicle for an unknown and potentially lengthy period.

12.     To add further insult to injury, rather than do the right thing and globally offer every consumer a buy back of their Fire Defect Vehicle at a fair price—e.g., the Blue Book value on the day before the recall was announced—or at least offer to provide a comparable loaner, Ford has done nothing of the sort.

13.     Because of Ford's omissions regarding the Spontaneous Fire Defect and failure to act more quickly in disclosing and providing a remedy, it has violated state consumer protection acts, been unjustly enriched, and breached implied warranties of merchantability. Plaintiff and other owners and lessees of the Fire Defect Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiff and the putative class members known of the Spontaneous Fire Defect, then they would either not have purchased or leased those vehicles or would have paid substantially less for them. Fires in the Fire Defect Vehicles also necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use, and other miscellaneous costs.

14.     Plaintiff brings this class action to redress Ford's misconduct. Plaintiff seeks damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, state consumer protection acts, state implied warranty acts, and unjust enrichment at common law.

## II.   JURISDICTION

15.     This Court has original jurisdiction over this lawsuit under the Class

Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiff

and Defendant are citizens of different states; there are more than 100 members of

the Nationwide Class and the California Subclass (as defined herein); the aggregate

amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest,

and costs; and class members reside across the United States. The citizenship of

each party is described further below in the "Parties" section.

16.     This Court has personal jurisdiction over the Defendant by virtue of

its transactions and business conducted in this judicial district, and because

Defendant is headquartered in Michigan. Defendant has transacted and done

business, and violated statutory and common law, in the State of Michigan and in

this judicial district.

## III.   VENUE

17.     Venue is proper in this judicial district under 28 U.S.C. § 1391

because Defendant transacts substantial business and is headquartered in this

district.

011111-11/2011885 V1

## IV.    PARTIES

**A.    Plaintiff**

**1.    Anthony Pacheco (California)**

18.    Plaintiff and proposed class representative Anthony Pacheco

("Plaintiff" for purposes of this Section) is a resident and citizen of Elk Grove,

California. Plaintiff purchased a Ford Maverick on April 23, 2022, from a

dealership in Corning, California. Plaintiff's Ford Maverick is a Fire Defect

Vehicle that suffers from the Spontaneous Fire Defect.

19.    Plaintiff purchased his Fire Defect Vehicle as his primary, day-to-day

vehicle. He regularly uses it for his own transportation needs. He also uses the

vehicle to take his two children to school and to run errands.

20.    Through exposure and interaction with Ford, Plaintiff was aware of

Ford's uniform and pervasive marketing messages of reliability, safety, and the

vehicle's benefits for use by families, including capacity and cargo room; these

were the primary reasons Plaintiff purchased the Fire Defect Vehicle. However,

despite touting the safety, reliability, and family-friendly aspect of the Fire Defect

Vehicle, at no point did Ford or its agents or other representatives disclose the

Spontaneous Fire Defect to Plaintiff before his purchase.

21.    Although Plaintiff's vehicle has been "fixed" in accordance with

Ford's recall, Plaintiff is still concerned about driving the Fire Defect Vehicle. The

following image is of Plaintiff's vehicle's under-engine shield after the "fix":



22.     Plaintiff does not consider the additional holes drilled into his vehicle's under-engine shield or the blinds removed from his vehicle's active grille shutter to be an adequate "fix" because it does not address the underlying manufacturing problems with the engine. If a manufacturing defect renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that defect, and not just provide an escape route for those fluids and vapors to end up on the roadway, or on the floor of Plaintiff's garage.

23.     Plaintiff would not have purchased a Fire Defect Vehicle if he had been aware of the Spontaneous Fire Defect.

- 8 -

**B.     Defendant**

24.     Defendant Ford Motor Company ("Ford") is a Delaware limited liability company organized and existing under the laws of the State of Delaware. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

25.     Ford is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Ford and Lincoln motor vehicles. The Ford brand is one of the "Big Three" American automobile brands. Lincoln is Ford's luxury automobile brand. Ford engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Ford and Lincoln brands.

26.     Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its agents designed and manufactured the Fire Defect Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Fire Defect Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

27.     Ford- and Lincoln-authorized automobile dealerships sell automobiles under the Ford and Lincoln brand names and disseminate vehicle information

- 9 -

provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Ford's manufacturer warranty under the contracts between Ford and its nearly 10,000 authorized dealerships worldwide.

## V.    FACTUAL ALLEGATIONS

**A.    Ford marketed the Fire Defect Vehicles as safe and reliable, and Ford knew that these attributes were material to consumers.**

28.    The Ford and Lincoln Fire Defect Vehicles are marketed to consumers as safe, reliable vehicles, and Ford knew these qualities were material to consumers in marketing them in this manner. These qualities were in fact material to Plaintiff.

29.    For example, in the sales brochure for the 2020 Ford Escape, Ford touted various safety features like pre-collision assist, blind spot alerts, lane-keeping system, and rear-view cameras in the Fire Defect Vehicles.[2]

---

[2] *Id.*; *see also* **Exhibit 2**, MY 2020 Ford Escape brochure, at 11; **Exhibit 3**, MY 2021 Ford Escape brochure, at 9, 14.

- 10 -

MAKE YOUR WAY.
# CONFIDENTLY.

Changing lanes. Keeping your distance. Parallel and perpendicular parking. Our extensive well-rounded collection of standard and available Ford Co-Pilot360™ Technology features can help you with these everyday situations and so many more. Our advanced technologies are about supplementing your driving skills.¹ Helping you feel confidently in command on the road.

## FORD CO-PILOT360™ TECHNOLOGY

### FORD CO-PILOT360

*Standard on every 2022 Ford Escape® SUV*

· Pre-Collision Assist with Automatic
  Emergency Braking (AEB)
· BLIS® (Blind Spot Information System)
  with Cross-Traffic Alert
· Lane-Keeping System
· Auto High-Beam Headlamps
· Rear View Camera
· Autolamp
  (Automatic On/Off Headlamps)
· Post-Collision Braking

### FORD CO-PILOT360 ASSIST+

*Standard on Titanium;*
*Available on SE and SEL*

· Intelligent Adaptive Cruise Control
  with Stop-and-Go and Lane
  Centering includes Speed Sign
  Recognition
· Evasive Steering Assist
· Voice-Activated Touchscreen
  Navigation System



**SCAN TO LEARN MORE**
or visit
Ford.com/Technology
*Data rates may apply.*

- 11 -



30.     In the sales brochure for the 2022 Ford Maverick, Ford again focused on safety features. Knowing safety is material to Plaintiff and putative class members, Ford told consumers that the Maverick's built-in Ford Co-Pilot 360 Technology can help drivers "feel confidently in command behind the wheel."[3]

---

[3] **Exhibit 5**, MY 2022 Ford Maverick brochure, at 7.





31.    In the brochure given to dealership personnel to inform consumers
about the vehicle, Ford noted among the available safety features the inclusion of a
LATCH system (lower anchors and tether anchors for children), which is
specifically designed to safely secure children's car seats in the car.[4]

---

[4] **Exhibit 5**, MY 2022 Ford Maverick dealership brochure, at 11. $

32.     In addition to emphasizing the safety of the car, the dealership

brochure also highlighted the Maverick's engine performance, saying "the Ford

Maverick pickup offers an available 2.0L EcoBoost gas engine – mated to a quick

and refined shifting 8-speed automatic transmission – that offers impressive

amounts of horsepower and torque for pulling and passing power."[5]

33.     Ford also emphasizes the Maverick's overall reliability, noting the

truck is "engineered for extremes" and has undergone "durability testing."[6]



ENGINEERED FOR EXTREMES
The Maverick™ pickup architecture has endured
19 million miles of customer equivalent durability
testing in real world, lab and proving ground
environments. It's been tested in extreme weather,
taken over off-road durability tests, endured harsh
chassis tuning, and much more. After these tests,
it's more than ready for yours.

34.     Ford makes similar claims about safety and reliability in its sales

brochures for the 2021–2022 Lincoln Corsairs. As with the Ford Maverick, the

Lincoln Corsair safety features list includes a LATCH system,[7] appealing to

consumers with young children whose car seats need to be safely secured in the

vehicle.

---

[5] *Id.* at 4.
[6] *Id.* at 10.
[7] **Exhibit 6**, MY 2021 Lincoln Corsair brochure, at 9; **Exhibit 7**, MY 2022
Lincoln Corsair brochure, at 13.

35.     Both the 2021 and 2022 sales brochures for the Ford Maverick highlight a host of other safety features, including blind spot detection, a lane-keeping system, pre-collision assist, and a rearview camera.[8] The 2022 brochure further boasts that drivers will experience "all-season confidence."[9]



36.     As with the Escape and the Maverick, Ford also highlights the Corsair's engine's performance and reliability. The 2022 brochure notes that even the base model "smoothly responds" and offers a "thrilling drive," and that the

---

[8] **Exhibit 6**, MY 2021 Lincoln Corsair brochure, at 4; **Exhibit 7**, MY 2022 Lincoln Corsair brochure, at 11.
[9] **Exhibit 7**, MY 2022 Lincoln Corsair brochure, at 8.

higher-end 2.3-liter engine offers "an energetic and polished driving experience,"[10] leading consumers to believe that the engine is of high quality and reliable.



37.     Plaintiff and putative class members, believing in the safety and reliability of the Fire Defect Vehicles as touted by Ford, paid thousands of dollars for the vehicles. The Manufacturer's Suggested Retail Price ("MSRP") for the 2022 Ford Escape starts at $28,520 for the S base-level trim and goes up to $38,640 for the Titanium trim;[11] the MSRP for the 2022 Ford Maverick starts at $21,490 for the base-level trim and goes up to $27,355;[12] and the MSRP for the 2022 Lincoln Corsair starts at $37,775 for the base-level trim and goes up to $53,005.[13]

---

[10] *Id.* at 8.
[11] **Exhibit 8**, *2022 Ford Escape*, EDMUNDS.COM, https://www.edmunds.com/ford/escape.
[12] **Exhibit 9**, *2022 Ford Maverick*, EDMUNDS.COM, https://www.edmunds.com/ford/maverick.
[13] **Exhibit 10**, *2022 Lincoln Corsair*, EDMUNDS.COM, https://www.edmunds.com/lincoln/corsair.

38.     Plaintiff and putative class members would not have paid these prices for Fire Defect Vehicles if they had known that the vehicles were not, in fact, safe and reliable.

**B.     Ford's Vehicle Warranties**

39.     Ford's New Vehicle Limited Warranty for model years 2020, 2021, and 2022 of the Ford Escape provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[14] Ford's Powertrain Warranty for the Escape provides coverage for 5 years/60,000 miles, whichever comes first.[15] On information and belief, this warranty coverage includes manufacturing defects like the Spontaneous Fire Defect in the Fire Defect Vehicles.

40.     Ford's New Vehicle Limited Warranty for the model year 2022 Ford Maverick provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[16] Ford's Powertrain Warranty for the Maverick provides coverage for 5 years/60,000 miles, whichever comes first.[17] On information and belief, this warranty coverage includes manufacturing defects like the Spontaneous Fire Defect in the Fire Defect Vehicles.

---

[14] **Exhibit 2**, MY 2020 Ford Escape brochure, at 16; **Exhibit 3**, MY 2021 Ford Escape brochure, at 16; **Exhibit 4**, MY 2022 Ford Escape brochure, at 16.

[15] **Exhibit 2**, MY 2020 Ford Escape brochure, at 16; **Exhibit 3**, MY 2021 Ford Escape brochure, at 16; **Exhibit 4**, MY 2022 Ford Escape brochure, at 16.

[16] **Exhibit 5**, MY 2022 Ford Maverick brochure, at 16.

[17] *Id.*

- 17 -

41.     Ford's New Vehicle Limited Warranty for model years 2021 and 2022 of the Lincoln Corsair provides "bumper-to-bumper" coverage for 4 years/50,000 miles, whichever comes first.[18] Ford's Powertrain Warranty for the Escape provides coverage for 6 years/70,000 miles, whichever comes first.[19] On information and belief, this warranty coverage includes manufacturing defects like the Spontaneous Fire Defect in the Fire Defect Vehicles.

42.     Because the Fire Defect Vehicles are all model year 2020, 2021, or 2022 vehicles sold or leased to putative class members in the fall of 2019 or later,[20] virtually all Fire Defect Vehicles—if not all of them, including Plaintiff's vehicle—are still covered under Ford's new vehicle and powertrain warranties.

## C.     The Spontaneous Fire Defect

43.     As Ford now admits in a July 7, 2022, safety recall notification to the National Highway Traffic Safety Administration ("NHTSA"), engine

---

[18] **Exhibit 6**, MY 2021 Lincoln Corsair brochure, at 11; **Exhibit 7**, MY 2022 Lincoln Corsair brochure, at 14.

[19] **Exhibit 6**, MY 2021 Lincoln Corsair brochure, at 11; **Exhibit 7**, MY 2022 Lincoln Corsair brochure, at 14.

[20] **Exhibit 11**, Joey Capparella, *The 2020 Ford Escape Looks to Fill a Car-Shaped Hole in the Lineup*, CAR & DRIVER, Apr. 2, 2019, https://www.caranddriver.com/news/a26996233/2020-ford-escape-photos-info; **Exhibit 12**, *2022 Ford Maverick: Release Date & Key Features*, BLUE SPRINGS FORD, https://www.bluespringsford.com/research/maverick.htm; **Exhibit 13**, Brett Foote, *2021 Lincoln Corsair Grand Touring PHEV Production Dates Revealed*, FORD AUTHORITY, Dec. 29, 2020, https://fordauthority.com/2020/12/2021-lincoln-corsair-grand-touring-phev-production-dates-revealed.

manufacturing issues resulting engine block or oil pan breaches, combined with fluid dynamics induced by Ford's under engine shield and active grille shutter, have caused certain Fire Defect Vehicles to catch on fire.[21]

44.     Ford further admits that the issues in the Fire Defect Vehicles can lead to "under hood fire, localized melting of components, or smoke."[22]

45.     Ford's recall, number 22V-484, affects 100,689 total vehicles, including all model year 2020–2022 Ford Escapes built between January 19, 2019, and June 13, 2022, all model year 2022 Ford Mavericks built between February 3, 2021, and June 8, 2022, and all 2021–2022 Lincoln Corsairs built between October 24, 2019, and June 13, 2022.[23]

46.     As of June 22, 2022, Ford reported twenty-three (23) warranty and field reports globally of under hood fire or smoke on 2.5L HEV/PHEV engines after a suspected block or oil pan breach.[24] The date range of identified reports is April 5, 2021, through May 19, 2022.[25]

47.     Included in the 573 Report is Ford's "Description of the Cause: Isolated engine manufacturing issues have resulted in 2.5L HEV/PHEV engine

---

[21] **Exhibit 1**, National Highway Traffic Safety Administration, Part 573 Safety Recall Report No. 22v-484 at 3-4 (July 7, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V484-6430.PDF.
[22] *See id*. at 3.
[23] *See id*. at 1-2.
[24] *See id*. at 4.
[25] *See id.*

011111-11/2011885 V1

failures involving engine block or oil pan breach. The fluid dynamics induced by the Under Engine Shield and Active Grille Shutter system could increase the likelihood of engine oil and/or fuel vapor expelled during an engine block or oil pan breach accumulating near sources of ignition, primarily expected to be the exhaust system."[26]

48.    Thus, Ford admits that the Fire Defect Vehicles suffer from engine manufacturing issues that can cause engine failures involving engine block or oil pan breach. But Ford's fix is wholly silent as to this admittedly affected component. Ford is leaving the engines exactly as they are and instead drilling holes into the under-engine shield and removing blinds from the active grille shutter to prevent oil and gas from pooling in the car. This "fix" does not live up to its name because the engines in the Fire Defect Vehicles may still leak flammable fluids—a problem Ford does not address.

49.    On information and belief, Ford failed to adequately research, design, test, and manufacture the Fire Defect Vehicles before warranting, advertising, promoting, marketing, and selling the Fire Defect Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

50.    On information and belief, Ford knew or should have known the Fire Defect Vehicles contained the Spontaneous Fire Defect and should have warned or

---

[26] *See id*. at 3.

disclosed this fact to Plaintiff and putative class members before selling or leasing the vehicles.

51.     Ford also plainly knows that the "fix" it is implementing with its recall will not fix the manufacturing defect that is causing the discharge of flammable fluids and vapors from the engines of the Fire Defect Vehicles.

52.     Plaintiff's counsel continues to investigate whether additional manufacturing periods and model years of the Ford Escape, Ford Maverick, and Lincoln Corsair are also plagued with the Spontaneous Fire Defect.

**D.    Ford knew or should have known of the Spontaneous Fire Defect before it disclosed the defect to Plaintiff.**

53.     On information and belief, Ford knew or should have known about the Spontaneous Fire Defect before the Fire Defect Vehicles went to market, and it certainly knew well-before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Fire Defect Vehicles; (2) the direct and public reports of fires or smoke in 23 Fire Defect Vehicles; and (3) Ford's own investigation of fires in the Fire Defect Vehicles.

**1.    Ford's durability testing should have uncovered the Spontaneous Fire Defect.**

54.     Ford claims to conduct comprehensive and rigorous testing on all its vehicles, saying, "Ford's comprehensive lineup of testing facilities around the

world puts vehicles through everything from the extreme, to the everyday, to ensure that only world-class vehicles roll off the production line."[27]

55.      According to Ford, at their facilities across Thailand, India, Australia, the Middle East, and China, "Ford vehicles and components are 'shaken, rattled and rolled' in a variety of tests, some conducted in temperatures ranging from an arctic minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees Celsius."[28] These tests include stresses on the engines, moving parts, suspension, and electrical components.[29]

56.      Ford even puts its vehicles through a Total Durability Cycle, described by Ford as "sped-up evaluation runs around the clock, day and night, to simulate 10 years, or 240,000km, of severe customer usage in just a few weeks."[30] "Gravel roads, cobblestones, pot-holes, curbs and water baths feature in this grueling test" and, "[j]ust for good measure, environmental factors like dust, water and mud are thrown in, while dynamometers simulate towing heavy loads in traffic and over mountain passes."[31]

─────────────────────

[27] **Exhibit 14**, *Testing in the Extremes: How Ford's Multiple Testing Facilities Push Vehicles to the Limit*, October 7, 2019, FORD.COM, https://media.ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes--how-fords-multiple-testing-facilities-p.html.
[28] *See id.*
[29] *See id.*
[30] *See id.*
[31] *See id.*

57.     On information and belief, the Fire Defect Vehicles were put through similar durability testing or were designed and built in accordance with the findings of such durability testing. Indeed, as already described, Ford specifically advertised to Maverick consumers with the promise that the Maverick pickup architecture "has endured 19 million miles of customer equivalent durability testing in the real world, lab and proving ground environments."[32] Ford further explains that the pickup has "been tested in extreme weather, taken over off-road durability tests, endured harsh chassis turning, and much more."[33] On information and belief, the Ford Escape and Lincoln Corsair were put through equally stringent testing.

58.     Based on such durability testing, Ford should have uncovered the Spontaneous Fire Defect before the Fire Defect Vehicles were sold to Plaintiff and the putative class members.

**2.     Ford knew about the Spontaneous Fire Defect from warranty claims for Fire Defect Vehicles and its own investigation.**

59.     According to its recall chronology, an issue pertaining to 2.5L HEV and PHEV under hood fires was brought to Ford's Critical Concern Review Group

---

[32] **Exhibit 5**, MY 2022 Ford Maverick brochure, at 10.
[33] *See id.*

for review on May 4, 2022.[34] During the Review Group's analysis from May 4 through June 8, 2022, the Group included data from 19 field reports of under hood fire or smoke for 2.5L HEV/PHEV vehicles.[35]

60.     Ford's investigation continued up until the July 7, 2022, recall and uncovered four more reports of under hood smoke or fires in the Fire Defect Vehicles.

61.     Ford did not disclose the dates of the 23 fires in the Fire Defect Vehicles, but on information and belief, Ford learned of at least some of these fires on or before the May 4, 2022, investigation launch.

62.     All vehicle manufacturers, including Ford, also routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, Ford has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Fire Defect Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

63.     Ford also receives complaints directly from consumers and its dealers, and thus, on information and belief, has knowledge of all complaints lodged to it or

---

[34] **Exhibit 1**, National Highway Traffic Safety Administration, Part 573 Safety Recall Report No. 22v-484 at 4 (July 7, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V484-6430.PDF.
[35] *Id.*

its agents regarding the Fire Defect Vehicles and the Spontaneous Fire Defect. At a

minimum, Ford received complaints from terrified and angry owners and lessees

such as Plaintiff after learning about the Fire Defect.

64.     However, Ford has yet to address the manufacturing issues associated

with the 2.5L HEV/PHEV engines involving engine block or oil pan breach.

Instead, Ford has directed that the under-engine shield and active grille shutter of

Fire Defect Vehicles be modified to redirect and/or purge the engine compartment

of the engine oil or fuel vapor.[36] After the modifications are complete, Plaintiff and

class members will be left with vehicles that may still leak highly flammable oil

and vapors if their engines succumb to the manufacturing issues identified. And

Ford is not globally offering to buy back the vehicles or even provide loaner or

rental vehicles until it can actually fix the problem.

65.     All owners and lessees of the Fire Defect Vehicles have suffered

ascertainable loss.

**E.     All class members could have been made aware of the Spontaneous Fire Defect at the point of sale.**

66.     Plaintiff and all putative class members were necessarily exposed to

Ford's omissions before purchasing the Fire Defect Vehicles because they each

interacted with an authorized Ford dealer at the point of sale. These dealers could

---

[36] *Id.* at 5.

have disclosed the omitted information to each class member, but they failed to do

so. As a district court affirmed in another consumer class action case against Ford,

all class members in that case would have "been aware of a disclosure" from Ford

about the defect at the point of sale because class members "interact[ed] with an

authorized Ford dealer prior to purchase." *Daniel v. Ford Motor Co.*, 2016 WL

8077932, at *8 (E.D. Cal. Sept. 23, 2016). The same is true here.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

67.    Because Ford omitted the existence of the Spontaneous Fire Defect,

class members had no way of knowing about the unreasonable fire risk of the Fire

Defect Vehicles.

68.    Within the period of any applicable statutes of limitation, Plaintiff and

members of the proposed Classes could not have discovered through the exercise

of reasonable diligence that Ford was omitting the defect complained of herein.

69.    Plaintiff and putative class members did not discover, and did not

know of, facts that would have caused a reasonable person to suspect that Ford did

not report information within its knowledge to federal and state authorities, its

dealerships, or consumers; nor would a reasonable and diligent investigation have

disclosed that Ford had omitted information about the unreasonable fire risk of the

Fire Defect Vehicles, which was discovered by Plaintiff only shortly before this action was filed.

70.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Fire Defect Vehicles.

**B.     Estoppel**

71.     Ford was under a continuous duty to disclose to Plaintiff and putative class members the true character, quality, and nature of the fire risk of the Fire Defect Vehicles.

72.     Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fire risk of the Fire Defect Vehicles.

73.     Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

74.     Plaintiff brings this action on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Nationwide Class and California Subclass:

> **Nationwide Class**: All persons or entities who purchased or leased model year 2020-2022 Ford Escape, 2022 Ford Maverick, or 2021-2022 Lincoln Corsair vehicles (the "Fire Defect Vehicles").

- 27 -

**California Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of California.

75.    Plaintiff asserts claims under the laws of each state set forth below.

76.    Excluded from the definitions of the Nationwide Class and California Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Fire Defect Vehicles. Also excluded from the Nationwide Class and California Subclass are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiff's Counsel. Plaintiff reserves the right to revise the class definitions based upon information learned through discovery.

77.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

78.    This action has been brought and may be properly maintained on behalf of the Nationwide Class and California Subclass proposed herein under Federal Rule of Civil Procedure 23.

79.    **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Nationwide Class and California Subclass are so numerous and

- 28 -

geographically dispersed that individual joinder of all class members is impracticable. For purposes of this complaint, Plaintiff alleges that there are estimated to be at least 100,689 or more Fire Defect Vehicles in the Nationwide Class. The precise number of class members is unknown to Plaintiff but may be ascertained from Ford's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and published notice.

80. **Commonality and Predominance**: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual class members, including, without limitation:

    a.    Whether Ford engaged in the conduct alleged herein;

    b.    Whether the Spontaneous Fire Defect creates an unreasonable risk of fires in the Fire Defect Vehicles;

    c.    When Ford first knew about the Spontaneous Fire Defect;

    d.    Whether Ford designed, manufactured, marketed, and distributed the Fire Defect Vehicles with defective component(s) that cause under hood fire;

    e.    Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

    f.    Whether Ford has been unjustly enriched at the expense of Plaintiff and class members;

- 29 -

      g.     Whether Plaintiff and class members overpaid for their vehicles at the point of sale; and

      h.     Whether Plaintiff and class members are entitled to damages and other monetary relief and, if so, in what amount.

81.    **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the other class members' claims because, among other things, all class members were comparably injured through Ford's wrongful conduct as described above.

82.    **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate class representative because his interests do not conflict with the interests of the other members of the classes he seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the classes will be fairly and adequately protected by Plaintiff and his counsel.

83.    **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Nationwide Class and

011111-11/2011885 V1

California Subclass to individually seek redress for Ford's wrongful conduct. Even

if Nationwide Class and California Subclass members could afford individual

litigation, the court system could not. Individualized litigation creates a potential

for inconsistent or contradictory judgments and increases the delay and expense to

all parties and the court system. By contrast, the class action device presents far

fewer management difficulties and provides the benefits of single adjudication,

economy of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.   Nationwide Claims**

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

**(Alleged by Plaintiff Pacheco on behalf of the Nationwide Class)**

84.     Plaintiff re-alleges and incorporates by reference all paragraphs as

though fully set forth herein.

85.     Plaintiff brings this claim on behalf of the Nationwide Class.

86.     This Court has jurisdiction to decide claims brought under 15 U.S.C.

§ 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

87.     The Fire Defect Vehicles are "consumer products" within the meaning

of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiff and

Nationwide Class members are consumers because they are persons entitled under

applicable state law to enforce against the warrantor the obligations of its implied warranties.

88.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

89.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

90.    Ford provided Plaintiff and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Fire Defect Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

91.    Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiff under 15 U.S.C. § 2310(d)(1). Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a defect in the engine compartment that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles, as well as an

- 32 -

unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Defect rendered the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

92.     As discussed herein, on information and belief, Ford knew or should have known about the Spontaneous Fire Defect from its own durability testing of the Fire Defect Vehicles before launching the Fire Defect Vehicles. Ford omitted information about the Defect and its consequences from Plaintiff and class members, misrepresented the qualities of the Fire Defect Vehicles, and has failed to provide a fix for the Defect.

93.     Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Fire Defect Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

94.     Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiff, because, at the time of purchase and lease, Plaintiff had no other options for purchasing warranty coverage other than directly from Ford.

95.     Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Fire Defect Vehicles were defective and that the Fire Defect Vehicles could catch on

- 33 -

fire when used as intended long before Plaintiff and class members knew or should have known. Ford failed to disclose this defect to Plaintiff and class members. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

96.    Plaintiff Pacheco has had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiff. Nonetheless, privity is not required here because Plaintiff is an intended third-party beneficiary of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Fire Defect Vehicles and have no rights under the warranty agreements provided with the Fire Defect Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Fire Defect Vehicles are dangerous instrumentalities due to the aforementioned defect, as under hood smoke and fires present an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles.

97.    Under 15 U.S.C. § 2310(e), Plaintiff Pacheco is entitled to bring this class action and is not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff Pacheco under Rule 23 of the Federal Rules of Civil Procedure.

- 34 -

98.     Plaintiff would suffer economic hardship if he returned his Fire Defect Vehicle but did not receive the return of all payments made by him. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiff Pacheco has not re-accepted his Fire Defect Vehicle by retaining it.

99.     The amount in controversy of Plaintiff Pacheco's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of all other Nationwide Class members, seeks all damages permitted by law, including diminution in value of the Fire Defect Vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiff is entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and Nationwide Class members in connection with the commencement and prosecution of this action.

100.    Plaintiff also seeks the establishment of a Ford-funded program for Plaintiff and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Spontaneous Fire Defect in their Fire Defect Vehicles.

- 35 -

**COUNT II**

**FRAUDULENT CONCEALMENT**
**(COMMON LAW)**
**(Alleged by Plaintiff Pacheco on behalf of the Nationwide Class)**

101.    Plaintiff Pacheco realleges and incorporate by reference all paragraphs as though fully set forth herein.

102.    Plaintiff Pacheco asserts this claim on behalf of himself and the Nationwide Class, or, in the alternative, on behalf of the California Subclass.

103.    A nationwide class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Defect Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Defect Vehicles; or (b) knowingly concealed material information in connection with the sale or lease of the Fire Defect Vehicles; or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Defect Vehicles; and (iii) as a result of Ford's conduct, Plaintiff Pacheco suffered economic damages.

104.    Ford concealed and suppressed material facts concerning the serious safety defects in Plaintiff Pacheco's vehicle.

- 36 -

105. Ford sold the Fire Defect Vehicle to Plaintiff Pacheco without disclosing the Fire Defect and concealed and suppressed the defect from regulators and consumers.

106. Ford concealed and suppressed the Fire Defect with the intent to deceive Plaintiff Pacheco.

107. Ford did so in order to falsely assure purchasers, lessees, and owners of the Fire Defect Vehicles that the vehicles they were purchasing or leasing were safe and reliable and would live up to the performance characteristics associated with the Ford brand, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality, safety, and performance of the Fire Defect Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

108. Ford had a duty to disclose the Fire Defect because it was known and only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff Pacheco. Ford also had a duty to disclose because it made many affirmative representations about the safety, high performance, and quality of the Fire Defect Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Fire Defect. Finally, once the Fire Defect

- 37 -

Vehicles were on the road, Ford had a duty to monitor the Fire Defect Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

109.   Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff Pacheco and the Nationwide Class.

110.   On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff Pacheco and the Nationwide Class and conceal material information regarding the Fire Defect. This is especially true in the context of Ford's purported "fix," which does not actually fix the defective leaky engines but appears instead to simply allow highly flammable oil to leak out of the car.

111.   Plaintiff Pacheco was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and/or suppressed facts, in that he would not have purchased his Fire Defect Vehicle if he knew of the Fire Defect. Plaintiff Pacheco's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff Pacheco.

112.    Because of the concealment and/or suppression of the facts, Plaintiff Pacheco and other class members sustained damage. In purchasing his Fire Defect Vehicle, Plaintiff Pacheco did not get the benefit of his bargain since the vehicle was worth less than it would have been without the defect, and because he owns a vehicle that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Nationwide Class members who sold their dangerous Fire Defect Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff Pacheco been aware of the concealed defects that existed in the Fire Defect Vehicles, Plaintiff Pacheco would have paid less for his vehicle or would not have purchased it at all.

113.    Accordingly, Ford is liable to Plaintiff Pacheco and the Nationwide Class for damages in an amount to be proven at trial.

114.    Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Pacheco's and class members' rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### UNJUST ENRICHMENT
### (COMMON LAW)

**(Alleged by all Plaintiff Pacheco on behalf of the Nationwide Class)**

115.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

116.   Plaintiff Pacheco asserts this claim on behalf of himself and the Nationwide Class, or, in the alternative, on behalf of the California Subclass. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all states.

117.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff Pacheco and the Nationwide Class.

118.   Ford has received and retained a benefit from Plaintiff Pacheco and Nationwide Class members and inequity has resulted.

119.   Ford has benefitted from selling, leasing, and distributing the Fire Defect Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiff Pacheco and putative class members have overpaid for the Fire Defect Vehicles and been forced to pay other costs.

120.   Thus, Plaintiff Pacheco and the Nationwide Class conferred a benefit on Ford.

121.   It is inequitable for Ford to retain these benefits.

122.    Plaintiff Pacheco and Nationwide Class members were not aware of the true facts about the Fire Defect Vehicles and did not benefit from Ford's conduct described herein.

123.    Ford knowingly accepted the benefits of its unjust conduct.

124.    As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**B.      State-Specific Claims**

**1.      California**

**COUNT IV**

**VIOLATION OF THE CALIFORNIA
CONSUMER LEGAL REMEDIES ACT
(Cal. Civ. Code § 1750, *et seq.*)**

**(Alleged by Plaintiff Pacheco on behalf of the California Subclass)**

125.    Plaintiff Pacheco and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

126.    Plaintiff Pacheco brings this claim on behalf of himself and the California Subclass.

127.    Ford is a person as defined in California Civil Code § 1761(c).

128.    Plaintiff Pacheco and California Subclass members are consumers as defined in California Civil Code § 1761(d).

129.    Ford engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act ("CLRA") through the practices

- 41 -

described herein, and by omitting the Spontaneous Fire Defect and misrepresenting and misleading Plaintiff Pacheco and the California Subclass about the Fire Defect Vehicles, along with omitting the risks, costs, and monetary damage resulting from the defect. These acts and practices violate, at a minimum, the following sections of the CLRA: (a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which they do not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised.

130.    Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

131.    Ford knew or should have known that its conduct violated the CLRA.

132.    Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Pacheco and California Subclass members based on (i) its own pre-sale durability testing;

(ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and

(iii) Ford's own investigation of fires in the Fire Defect Vehicles.

133.   In the course of its business, Ford violated the CLRA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Pacheco and the California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

134.   Ford owed Plaintiff Pacheco and the California Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

     a.    Possessed exclusive knowledge about the Spontaneous Fire Defect;

     b.    Omitted the foregoing from Plaintiff Pacheco and the California Subclass;

     c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Pacheco and the California Subclass that contradicted these representations; and/or

     d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

- 43 -

135.   In failing to disclose the Spontaneous Fire Defect and associated safety risks and repair costs that result from it, Ford has misrepresented the Fire Defect Vehicles, omitted disclosure the Spontaneous Fire Defect, and breached its duty to disclose.

136.   The facts omitted and misrepresented by Ford to Plaintiff Pacheco and California Subclass members, as described herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Fire Defect Vehicles or to pay a lesser price. Had Plaintiff Pacheco and California Subclass members known about the defective nature of the Fire Defect Vehicles, they would not have purchased or leased the Fire Defect Vehicles or would have paid less for them.

137.   On or about August 15, 2022, Plaintiff's undersigned counsel provided Ford written notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Fire Defect Vehicles.

138.   Plaintiff Pacheco and California Subclass members' injuries were proximately caused by Ford's deceptive business practices.

139.   Plaintiff Pacheco and California Subclass members seek all relief available under the CLRA, including equitable relief, damages, and attorneys' fees.

- 44 -

**COUNT V**

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200)**

**(Alleged by Plaintiff Pacheco on behalf of the California Subclass)**

140.   Plaintiff Pacheco and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

141.   Plaintiff Pacheco brings this claim on behalf of himself and the California Subclass.

142.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

143.   In the course of its business, Ford engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Pacheco and California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

- 45 -

144.   Ford engaged in unfair competition and unfair, unlawful, or fraudulent business practices through the conduct, statements, and omissions described herein, and by omitting the Spontaneous Fire Defect in the Fire Defect Vehicles from Plaintiff Pacheco and California Subclass members, along with omitting the risks, costs, and monetary damage resulting from the defect. Ford should have disclosed this information because it was in a superior position to know the true facts related to the Spontaneous Fire Defect, and Plaintiff Pacheco and California Subclass members could not reasonably be expected to learn or discover the true facts related to the Spontaneous Fire Defect.

145.   The Spontaneous Fire Defect causes catastrophic fire in the Fire Defect Vehicles, and this constitutes a safety issue that triggered Ford's duty to disclose the safety issue to consumers.

146.   Ford's acts and practices misled and deceived Plaintiff Pacheco and are likely to deceive the public. In failing to disclose the Spontaneous Fire Defect and omitting other material facts from Plaintiff Pacheco and California Subclass members, Ford breached its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiff Pacheco and California Subclass members. Ford's omissions and misrepresentations concerned information that was material to Plaintiff Pacheco and California Subclass members, as it would have been to all reasonable consumers.

147.   The injuries suffered by Plaintiff Pacheco and California Subclass members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff Pacheco and California Subclass members could or should have reasonably avoided.

148.   Ford's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. Ford knew or should have known its conduct violated the UCL.

149.   Plaintiff Pacheco and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's unfair, unlawful, and deceptive practices.

150.   Plaintiff Pacheco seeks to enjoin further unlawful, unfair, and fraudulent acts or practices by Ford, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT VI

### VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, et seq.)

### (Alleged by Plaintiff Pacheco on behalf of the California Subclass)

151.   Plaintiff Pacheco and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 47 -

152.   Plaintiff Pacheco brings this claim on behalf of himself and the California Subclass.

153.   California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

154.   Ford caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or through the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff Pacheco and California Subclass members.

155.   Ford violated Section 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Fire Defect Vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

- 48 -

156.   Plaintiff Pacheco and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's deceptive advertising. In purchasing or leasing their Fire Defect Vehicles, Plaintiff Pacheco and California Subclass members relied on Ford's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. Ford's representations and omissions were untrue because the Fire Defect Vehicles were sold or leased with the Fire Defect. Had Plaintiff Pacheco and California Subclass members known this, they would not have purchased or leased their Fire Defect Vehicles or paid as much for them. Accordingly, Plaintiff Pacheco and California Subclass members overpaid for their Fire Defect Vehicles and did not receive the benefit of their bargain.

157.   All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

158.   Plaintiff Pacheco, individually and on behalf of the California Subclass members, requests this Court enter such orders or judgments as necessary to enjoin Ford from continuing its unlawful and deceptive advertising, to restore to Plaintiff Pacheco and California Subclass members any money Ford acquired by

- 49 -

its deceptive advertising, including restitution and restitutionary disgorgement, and for such other relief permitted.

## COUNT VII

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792)

**(Alleged by Plaintiff Pacheco on behalf of the California Subclass)**

159.   Plaintiff Pacheco and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

160.   Plaintiff Pacheco brings this claim on behalf of himself and the California Subclass.

161.   Plaintiff Pacheco and California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

162.   The Fire Defect Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

163.   Ford is the "manufacturer" of the Fire Defect Vehicles within the meaning of Cal. Civ. Code § 1791(j).

164.   Ford impliedly warranted to Plaintiff Pacheco and the California Subclass that the Fire Defect Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Fire Defect Vehicles do not

011111-11/2011885 V1

have the quality that a buyer would reasonably expect and were therefore not

merchantable.

165.   Cal. Civ. Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied
> warranty that goods are merchantable" means that the
> consumer goods meet each of the following:
>
> (1)   Pass without objection in the trade under the
>        contract description.
>
> (2)   Are fit for the ordinary purposes for which such
>        goods are used.
>
> (3)   Are adequately contained, packaged, and labeled.
>
> (4)   Conform to the promises or affirmations of fact
>        made on the container or label.

166.   The Fire Defect Vehicles were not merchantable when sold or leased

because they contain the Fire Defect and pose an unreasonable risk of fires due to

the Spontaneous Fire Defect as described herein. Without limitation, the Fire

Defect Vehicles share a common defect in that they are all equipped with the

Spontaneous Fire Defect that makes the vehicles susceptible to a risk of

spontaneous combustion, causing an unreasonable risk of death, serious bodily

harm, and property damage to lessees and owners of the Fire Defect Vehicles. This

Defect renders the Fire Defect Vehicles when sold or leased and at all times

thereafter, unmerchantable and unfit for their ordinary use of driving.

167.   Ford breached the implied warranty of merchantability by selling Fire

Defect Vehicles containing a defect leading to under hood fires during ordinary

operating conditions. This defect has deprived Plaintiff Pacheco and California

Subclass members of the benefit of their bargain.

168.   Notice of breach is not required because Plaintiff Pacheco and

California Subclass members did not purchase their automobiles directly from

Ford. Nonetheless, Plaintiff's counsel sent notification to Ford on or about August

15, 2022.

169.   Plaintiff Pacheco and California Subclass members were and are

third-party beneficiaries to Ford's contracts with Ford-certified/authorized retailers

who sold or leased the Fire Defect Vehicles to Plaintiff Pacheco and California

Subclass members.

170.   As a direct and proximate result Ford's breach of the implied warranty

of merchantability, Plaintiff Pacheco and California Subclass members received

goods whose dangerous condition now renders them at least partially inoperable

and substantially impairs their value. Plaintiff Pacheco and California Subclass

members have been damaged as they overpaid for their vehicles, and now suffer

the partial or complete loss of use of their Fire Defect Vehicles.

171.   Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff Pacheco and

California Subclass members are entitled to damages and other legal and equitable

relief including, at their election, the purchase price of their Fire Defect Vehicles, or the overpayment or diminution in value of their Fire Defect Vehicles.

172.   Under Cal. Civ. Code § 1794, Plaintiff Pacheco and California Subclass members are entitled to costs and attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Pacheco, individually and on behalf of members of the Nationwide Class and California Subclass, respectfully requests that the Court enter judgment in their favor and against Ford, as follows:

A.   Certification of the proposed Nationwide Class and California Subclass, including appointment of Plaintiff's counsel as Class Counsel;

B.   Restitution, including at the election of Nationwide Class and California Subclass members, recovery of the purchase price of their Fire Defect Vehicles, or the overpayment for their vehicles;

C.   Damages, costs, and disgorgement in an amount to be determined at trial;

D.   An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E.   An award of costs and attorneys' fees; and

F.   Such other or further relief as may be appropriate.

011111-11/2011885 V1

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.


DATED: August 17, 2022                Respectfully Submitted,

                                      */s/ Steve W. Berman*
                                      Steve W. Berman
                                      Thomas E. Loeser
                                      Abigail D. Pershing
                                      **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                      1301 Second Avenue, Suite 2000
                                      Seattle, WA 98101
                                      Telephone: (206) 623-7292
                                      Facsimile: (206) 623-0594
                                      steve@hbsslaw.com
                                      toml@hbsslaw.com

                                      E. Powell Miller (P39487)
                                      Sharon S. Almonrode (P33938)
                                      Dennis A. Lienhardt (P81118)
                                      **THE MILLER LAW FIRM PC**
                                      950 W. University Drive, Suite 300
                                      Rochester, MI 48307
                                      Telephone: (248) 841-2200
                                      epm@millerlawpc.com
                                      ssa@millerlawpc.com
                                      dal@millerlawpc.com

                                      *Attorneys for Plaintiff*

011111-11/2011885 V1