UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ANTHONY PACHECO, BRICE MURRAY, JENNIFER ALVARADO, DAVID PETTY, SAWYER SPACKMAN, JOHN ARMANI, RONALD FINKLESTEIN, CHRISTOPHER DUNNING, CHRISTOPHER LAPPAS, EVERETT GARRETT, BRIAN SUTTON, JEFFREY KING, HEYWARD DRUMMOND, VICTORIA ADAMS, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>FORD MOTOR COMPANY, a Delaware Limited Liability Company,<br><br>     Defendant. | Case No. 2:22-cv-11927<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**<u>AMENDED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................ 1

II.   JURISDICTION ................................................................ 10

III.  VENUE ........................................................................... 11

IV.   PARTIES ......................................................................... 11

    A.    Plaintiffs ................................................................. 11

        1.    Anthony Pacheco (California) ............................ 11

        2.    Brice Murray (California) .................................. 13

        3.    Jennifer Alvarado (California) ............................ 14

        4.    David Petty (Illinois) ....................................... 16

        5.    Sawyer Spackman (Nevada) .............................. 18

        6.    John Armani (New York) .................................. 19

        7.    Ronald Finklestein (Ohio) ................................. 21

        8.    Christopher Dunning (Oregon) ........................... 22

        9.    Christopher Lappas (Pennsylvania) ..................... 24

        10.   Everett Garrett (Tennessee) .............................. 26

        11.   Brian Sutton (Texas) ....................................... 27

        12.   Jeffrey King (Texas) ....................................... 29

        13.   Heyward Drummond (Virginia) .......................... 30

        14.   Victoria Adams (Washington) ............................ 31

    B.    Defendant ................................................................ 33

V.    FACTUAL ALLEGATIONS .............................................. 35

A.    Ford marketed the Fire Risk Vehicles as safe, reliable, and fuel-efficient, and Ford knew that these attributes were material to consumers............................................................ 35

B.    Ford marketed the Fire Risk Vehicles as fuel-efficient, and Ford knew this attribute was material to consumers. ........................ 41

C.    Plaintiffs and class members paid thousands of dollars for the Fire Risk Vehicles because they thought the vehicles were safe, reliable, and fuel-efficient. ................................ 44

D.    Ford's Vehicle Warranties ................................................ 45

E.    The Spontaneous Fire Risk ................................................ 46

F.    Ford knew or should have known of the Spontaneous Fire Risk before it disclosed the risk to Plaintiffs. ................................... 49

        1.    Ford's durability testing should have uncovered the Spontaneous Fire Risk. ........................................... 50

        2.    Ford knew about the Spontaneous Fire Risk from warranty claims for Fire Risk Vehicles and its own investigation. ........................................... 52

G.    After instituting the "fix," Ford failed to conduct new mileage tests to ensure that its mileage estimates were not adversely affected. ............................................... 54

H.    Class members could have been made aware of the Spontaneous Fire Risk at the point of sale. ....................... 56

VI.    TOLLING OF THE STATUTE OF LIMITATIONS ................................. 57

    A.    Discovery Rule Tolling ................................................ 57

    B.    Estoppel ................................................................ 58

VII.    CLASS ALLEGATIONS ................................................ 58

VIII.    CLAIMS ................................................................ 64

    A.    Nationwide Claims ................................................ 64

011111-11/2044975 V2

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY
  ACT (15 U.S.C. § 2301, *et seq.*) ..................................................... 64

COUNT II FRAUDULENT CONCEALMENT (COMMON LAW)
  (Alleged by all Plaintiffs other than Plaintiff Christopher Dunning
  on behalf of the Nationwide Class) ................................................ 69

COUNT III UNJUST ENRICHMENT (COMMON LAW) .................................. 73

  B.     State-Specific Claims ........................................................ 75

     1.     California .................................................................. 75

COUNT IV VIOLATION OF THE CALIFORNIA CONSUMER
  LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) ..................... 75

COUNT V VIOLATIONS OF THE CALIFORNIA UNFAIR
  COMPETITION LAW (Cal. Bus. & Prof. Code § 17200)........................ 79

COUNT VI VIOLATIONS OF CALIFORNIA FALSE ADVERTISING
  LAW (Cal. Bus. & Prof. Code § 17500, et seq.).......................... 82

COUNT VII VIOLATION OF SONG-BEVERLY CONSUMER
  WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY
  OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal.
  Civ. Code §§ 1791.1 & 1792)...................................................... 84

     2.     Illinois .................................................................... 88

COUNT VIII VIOLATION OF ILLINOIS CONSUMER FRAUD AND
  DECEPTIVE BUSINESS PRACTICES ACT (810 ILCS 505/1,
  *et seq.*, and 720 ILCS 295/1A) ................................................ 88

COUNT IX BREACH OF IMPLIED WARRANTY OF
  MERCHANTABILITY UNDER ILLINOIS LAW (810 ILCS 5/2-
  314) .................................................................................. 92

     3.     Nevada .................................................................. 95

COUNT X VIOLATION OF THE NEVADA DECEPTIVE TRADE
  PRACTICES ACT (Nev. Rev. Stat. § 598.0903, *et seq.*) .................... 95

011111-11/2044975 V2

COUNT XI BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NEVADA LAW (Nev. Rev. Stat.
§ 104.2314) ................................................................................. 99

    4.    New York ...................................................................... 102

COUNT XII VIOLATION OF NEW YORK'S DECEPTIVE ACTS
AND PRACTICES (N.Y. Gen. Bus. Law § 349, *et seq.*) ......................... 102

COUNT XIII VIOLATION OF NEW YORK'S FALSE ADVERTISING
ACT (N.Y. Gen. Bus. Law § 350) ............................................... 106

COUNT XIV BREACH OF NEW YORK'S IMPLIED WARRANTY
OF MERCHANTABILITY (N.Y. U.C.C. Law §§ 2-314; 2A-212) ......... 108

    5.    Ohio ........................................................................... 111

COUNT XV VIOLATION OF OHIO CONSUMER SALES
PRACTICES ACT (Ohio Rev. Code § 1345.01, *et seq.*) ......................... 111

COUNT XVI IMPLIED WARRANTY IN TORT UNDER OHIO LAW ........ 117

    6.    Oregon ...................................................................... 119

COUNT XVII VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT (Or. Rev. Stat. §§ 646.605, *et seq.*) ........................... 119

    7.    Pennsylvania .......................................................... 123

COUNT XVIII VIOLATION OF THE PENNSYLVANIA UNFAIR
TRADE PRACTICES AND CONSUMER PROTECTION LAW
(73 P.S. § 201-1, *et seq.*) ............................................................. 123

COUNT XIX BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER PENNSYLVANIA LAW (13 Pa.
Cons. Stat. Ann. § 2314) ............................................................. 127

    8.    Tennessee ................................................................ 130

COUNT XX VIOLATION OF TENNESSEE CONSUMER
PROTECTION ACT (Tenn. Code Ann. § 47-18-101, *et seq.*) ................. 130

COUNT XXI BREACH OF IMPLIED WARRANTY OF
  MERCHANTABILITY UNDER TENNESSEE LAW (Tenn. Code
  Ann. §§ 47-2A-212, 47-2-314)................................................... 134

       9.       Texas ....................................................................... 137

COUNT XXII VIOLATION OF TEXAS'S DECEPTIVE TRADE
  PRACTICES ACT (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)............... 137

COUNT XXIII BREACH OF IMPLIED WARRANTY OF
  MERCHANTABILITY (Tex. Bus. & Com. Code § 2.314) ..................... 142

       10.      Virginia ................................................................. 144

COUNT XXIV VIOLATION OF VIRGINIA CONSUMER
  PROTECTION ACT (Va. Code Ann. §§ 59.1-196, *et seq.*)..................... 144

COUNT XXV BREACH OF IMPLIED WARRANTY OF
  MERCHANTABILITY UNDER VIRGINIA LAW (Va. Code
  Ann. § 8.2-314)............................................................................ 149

       11.      Washington ............................................................ 151

COUNT XXVI VIOLATION OF THE WASHINGTON CONSUMER
  PROTECTION ACT (Rev. Code Wash. §§ 19.86.010, *et seq.*) ............... 151

COUNT XXVII BREACH OF IMPLIED WARRANTY OF
  MERCHANTABILITY UNDER WASHINGTON LAW (Rev.
  Code Wash. § 62A.2-314) ....................................................... 155

REQUEST FOR RELIEF ................................................................. 158

DEMAND FOR JURY TRIAL ......................................................... 158

011111-11/2044975 V2

Plaintiffs file this lawsuit individually and on behalf of proposed nationwide and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.     INTRODUCTION

1.     The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to promptly warn consumers and fix or replace a car where the manufacturer learns of an issue that implicates serious safety concerns. And when a car cannot be safely used by its owner while a car manufacturer is developing a fix, the car manufacturer should not shift the risk of a dangerous event to the owner, but instead should provide or reimburse for comparable replacement transportation. Finally, when a car manufacturer recalls a vehicle to institute a fix, the fix should address the risk involved and should not create new safety, environmental, or performance problems.

2.     Ford Motor Company ("Ford") breached these fundamental duties by selling Ford Escapes, Ford Mavericks, and Lincoln Corsairs equipped with faulty engines that are prone to leaking highly flammable fluid and vapors, presenting a serious fire risk. Then, though Ford knew or should have known of the fire risk prior to launching the vehicles, it did nothing to promptly warn owners and lessees, instead waiting over a year to announce a safety recall. And while Ford now is

- 1 -

implementing a "fix" to prevent these vehicles from catching on fire, it has chosen not to design or issue a *bona fide* fix that addresses the leaking engine blocks. Instead, Ford has focused only on mitigating the risk that fluids and vapors leaked from the defective engines will ignite, while leaving the vapors and fluids themselves to run onto the roadways, or onto vehicle owners' driveways and garages. What is more, Ford's perfunctory "fix" creates new safety, environmental, and performance issues that Ford has not addressed.

3.      Model Year 2020–2022 Ford Hybrid Escapes, 2022 Ford Hybrid Mavericks, and 2021–2022 Lincoln Hybrid Corsairs (the "Fire Risk Vehicles") contain 2.5-liter hybrid electric vehicle ("HEV") and 2.5-liter plug-in hybrid electric vehicle ("PHEV") engines that can leak and cause significant quantities of engine oil and/or fuel vapor to accumulate near ignition sources, resulting in under hood smoke and fires (the "Spontaneous Fire Risk").

4.      The Spontaneous Fire Risk exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle leaks such fluids and vapors or catches fire while in operation. The Spontaneous Fire Risk also exposes passengers, other drivers on the road, and other bystanders to an unreasonable risk of accident, injury, death, and property damage.

5.      This fire risk was known or should have been known to Ford and is still unremedied by Ford. Not only did Ford fail to disclose the Spontaneous Fire

- 2 -

Risk to consumers both before and after their purchases of Fire Risk Vehicles, but it also misrepresented the vehicles' safety, reliability, functionality, and quality by this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Spontaneous Fire Risk—e.g., damage to a vehicle and injury or death to persons in the vehicle or another vehicle in proximity should the Fire Risk Vehicle catch on fire and/or damage to property from engine oil and fuel vapor leaking onto roadways and driveways, and into garages.

6.      Warranty claims relating to the Spontaneous Fire Risk were made to Ford as early as April 5, 2021.[1] Yet Ford continued to sell the Fire Risk Vehicles and did nothing to warn purchasers of the Spontaneous Fire Risk until it issued a stop-sale order on June 8, 2022.

7.      To date, Ford has admitted that there have been at least 23 reports of under-hood fires or smoke in a vehicle population of 100,689. The fires have all occurred in the engine compartment of the Fire Risk Vehicles.

8.      Ford has recalled the Fire Risk Vehicles and instituted a "fix," but the fix Ford is using to resolve the Fire Risk does not address the manufacturing flaws

---

[1] **Exhibit 1**, National Highway Traffic Safety Administration, Part 573 Safety Recall Report No. 22V-484 at 4 (July 7, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V484-6430.PDF.

in the 2.5L HEV/PHEV engines. Instead, Ford's solution is to drill drainage holes in the Fire Risk Vehicles' under-engine shields and to remove four blinds from the vehicles' active grille shutter systems to allow pooled fluid and vapors to escape from the Fire Risk Vehicles' engine compartments.[2] Ford has not even attempted to resolve the underlying engine issue.

9.     To enable its dealers across the country to perform this "fix," Ford sent a detailed letter to the dealers explaining the modifications required on all Fire Risk Vehicles.[3]

10.    One half of the "fix," as described in this letter, requires dealers to remove the under-engine shield, drill a series of five holes measuring one-and-three-quarters of an inch in diameter, and cut out one slightly larger section from near the center of the shield.[4] These modifications are highlighted in the image below.

---

[2] A blind is a segment of the grille shutter system that opens and closes to change air flow through the engine. *See, e.g.*, **Exhibit 2**, Letter from David J. Johnson, Ford's Director of Service Engineering Operations, to all U.S. Ford and Lincoln Dealers, at 7 (July 8, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V484-1315.pdf.

[3] *See id.*

[4] *Id.* at 9–15.

- 4 -



*Figure 1:* Image from Ford's letter to its dealers demonstrating the under-engine shield modification, with additional drainage holes highlighted in blue, as part of the required "fix" on all Spontaneous Fire Vehicles.[5]

11.     The other half of the "fix" requires dealers to remove four shutter blinds from the active grille shutter system by bending the blinds at the center, pulling them toward the front of the vehicle, and removing the side tabs to dislodge the blinds.[6] The images below show an active shutter grille system before and after the four blinds are removed, as well as a closer view of the blinds removed from one Fire Risk Vehicle.

---

[5] *Id.* at 15.

[6] *Id.* at 7–9.





*Figure 2:* Images from Ford's letter to its Dealers showing the Active Grille Shutter System before and after four blinds are removed as part of the "fix."[7]

---

[7] *Id.* at 7, 9.



*Figure 3:* Image of four blinds removed from a Ford Maverick active grille shutter system as part of Ford's "fix" for the Fire Risk Vehicles.[8]

12.     Aside from being an inadequate solution, Ford's "fix" creates new problems. First, allowing fluids and vapors to leak out of the Fire Risk Vehicles creates an environmental hazard and sets the stage for future property damage and possible injury. Furthermore, removing several of the blinds from the active grille

---

[8] **Exhibit 3**, "u/Ford_Trans_Guy," *22S47 Underhood Fire Recall*, Reddit (Jul. 27, 2022), https://www.reddit.com/r/FordMaverickTruck/comments/w9jadp/22s47_underhood_fire_recall.

011111-11/2044975 V2

shutter increases aerodynamic drag on the vehicles, resulting in decreased fuel efficiency.

13.     A vehicle that has a risk of spontaneously catching on fire while in operation is not fit for its ordinary purpose. And a "fix" that does nothing to actually address an underlying issue, and in fact creates additional problems, is not a fix at all. Ford is placing an unfair burden on class members whose vehicles are still powered by engines that may leak flammable fluids and vapors, and who may now additionally face the risk of flammable fluids and vapors leaking onto their garages or driveways. Moreover, class members must also contend with paying for additional gas to make up for the lost fuel efficiency from removing the active grille shutters.

14.     Ford knew or should have known about the Spontaneous Fire Risk before the Fire Risk Vehicles went to market. At the very least, Ford certainly knew about the Spontaneous Fire Risk well before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Fire Risk Vehicles; (2) the direct and public reports of smoke or fires in 23 Fire Risk Vehicles; and (3) Ford's own investigation of fires in the Fire Risk Vehicles.

15.     Ford offers no reimbursement to Fire Risk Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Because a *bona fide* repair to the 2.5L HEV/PHEV engines is not being made, putative class members

are left without a safely operable vehicle for an unknown and potentially lengthy period.

16.     To add further insult to injury, rather than do the right thing and globally offer every consumer a buy back of their Fire Risk Vehicle at a fair price—e.g., the Blue Book value on the day before the recall was announced—or at least offer to provide a comparable loaner, Ford has done nothing of the sort.

17.     Because of Ford's omissions regarding the Spontaneous Fire Risk and failure to act more quickly in disclosing and providing a remedy, it has violated state consumer protection acts, been unjustly enriched, and breached implied warranties of merchantability. Plaintiffs and other owners and lessees of the Fire Risk Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiffs and putative class members known of the Spontaneous Fire Risk, then they would either not have purchased or leased those vehicles or would have paid less for them. Fires and smoke in the Fire Risk Vehicles necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use, and other miscellaneous costs. And Plaintiffs and class members whose vehicles have undergone Ford's "fix" may now additionally need to contend with property damage due to leaked fluids and vapors.

18.     Plaintiffs bring this class action to redress Ford's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, state consumer protection acts, state implied warranty acts, and unjust enrichment at common law.

## II.     JURISDICTION

19.     This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Nationwide Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

20.     This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

- 10 -

### III.    VENUE

21.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

### IV.    PARTIES

**A.    Plaintiffs**

**1.    Anthony Pacheco (California)**

22.    Plaintiff and proposed class representative Anthony Pacheco ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Elk Grove, California. Plaintiff purchased a Ford Maverick on or about April 23, 2022, from a dealership in Corning, California. Plaintiff's Ford Maverick is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

23.    Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses it for his own transportation needs. He also uses the vehicle to take his two children to school and to run errands.

24.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability, safety, and the vehicle's benefits for use by families, including capacity and cargo room; these were the primary reasons Plaintiff purchased the Fire Risk Vehicle. However, despite touting the safety, reliability, and family-friendly aspect of the Fire Risk

Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

25.     Although Plaintiff's vehicle has been "fixed" in accordance with Ford's recall, Plaintiff is still concerned about driving the Fire Risk Vehicle. The following image is of Plaintiff's vehicle's under-engine shield after the "fix":



26.     Plaintiff does not accept that the additional holes drilled into his vehicle's under-engine shield or the blinds removed from his vehicle's active grille shutter are an adequate "fix" because it does not address the underlying manufacturing problems with the engine. If a manufacturing defect renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that defect, and it should not just provide an escape route for those

- 12 -

fluids and vapors to end up on the roadway, or on the floor of Plaintiff's garage. Plaintiff also alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

27.     Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased this vehicle, or he would have paid less for the vehicle.

**2.     Brice Murray (California)**

28.     Plaintiff and proposed class representative Brice Murray ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Laguna Niguel, California. Plaintiff purchased a 2022 Model Year Ford Maverick on or about December 23, 2021, from a dealership in Irvine, California. Plaintiff's Ford Maverick is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

29.     Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses the vehicle for his own transportation needs, including his daily drive to and from work. He also uses the vehicle to transport his 11-year-old son to school and to soccer practice. Plaintiff is a "Team Parent" for his son's soccer team, and so he regularly transports other children in the vehicle as well.

30.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability, safety, and the vehicle's benefits for use by families. Plaintiff states that his trust in the Ford brand

led him to conclude, at the time of his purchase, that the Ford Maverick was a reliable and safe vehicle. However, despite touting the safety, reliability, and family-friendly aspects of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

31.    Plaintiff does not accept that drilling additional holes into his vehicle's under-engine shield or removing blinds from his vehicle's active grill shutter is an adequate "fix" because these changes do not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Plaintiff Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the roadway or on the floor of Plaintiff's garage. Plaintiff also alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

32.    Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased this vehicle, or he would have paid less for the vehicle.

**3.    Jennifer Alvarado (California)**

33.    Plaintiff and proposed class representative Jennifer Alvarado ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Oak

- 14 -

View, California. Plaintiff purchased a 2022 Model Year Ford Maverick on or about December 20, 2021, from a dealership in Oxnard, California. Plaintiff's Ford Maverick is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

34.     Plaintiff purchased her Fire Risk Vehicle as her primary vehicle. She regularly uses it for her own transportation needs, including running errands and other day-to-day tasks.

35.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. Plaintiff states that, before buying the vehicle, she thought of Ford as a brand known for its solid craftmanship and for producing reliable, safe vehicles. However, despite touting the safety and reliability of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before her purchase.

36.     Plaintiff does not accept that drilling additional holes into her vehicle's under-engine shield or removing blinds from her vehicle's active grille shutter is an adequate "fix" because these changes do not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the road or on Plaintiff's driveway. Plaintiff also

- 15 -

alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

37.     Since learning of the Fire Risk, Plaintiff has not driven more than 40 miles at a time in the Fire Risk Vehicle. If she wants to leave Oak View, she will ride in a friend's vehicle, as she does not feel safe driving the Fire Risk Vehicle long distances.

38.     Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," she would not have purchased this vehicle, or she would have paid less for the vehicle.

**4.     David Petty (Illinois)**

39.     Plaintiff and proposed class representative David Petty ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Elgin, Illinois. Plaintiff ordered a 2022 Model Year Ford Maverick on or about July 31, 2021, and purchased the vehicle on April 19, 2022, from a dealership in Dekalb, Illinois. Plaintiff's Ford Maverick is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

40.     Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses it for his own transportation needs, including taking the vehicle on road-trips to visit family in Tennessee and Florida. Plaintiff's two-year-old daughter and wife also regularly ride in the vehicle with him.

- 16 -

41.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability, safety, and the vehicle's benefits for use by families. Plaintiff states that his trust in the Ford brand led him to conclude, at the time of his purchase, that the 2022 Model Year Ford Maverick was a safe vehicle. Plaintiff paid extra to ensure he had full access to all available safety features, including cross-traffic sensors and lane-keeping capabilities. Because Plaintiff regularly transports his family in the vehicle, the family-friendly design of the vehicle was also important to him. However, despite touting the safety, reliability, and family-friendly aspects of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

42.     Plaintiff does not accept that drilling additional holes into his vehicle's under-engine shield or removing blinds from his vehicle's active grille shutter is an adequate "fix" because these changes do not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Plaintiff Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the road or on Plaintiff's driveway. Plaintiff also alleges this "fix" is inappropriate because it results in decreased fuel efficiency.

- 17 -

43.     Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased this vehicle, or he would have paid less for the vehicle.

**5.     Sawyer Spackman (Nevada)**

44.     Plaintiff and proposed class representative Sawyer Spackman ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Henderson, Nevada. Plaintiff purchased a 2020 Model Year Ford Escape on or about January 15, 2021, from a dealership in Las Vegas, Nevada. Plaintiff's Ford Escape is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

45.     Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses it for his own transportation needs, including commuting to work and driving long distances to see family in Idaho. His partner also regularly rides in the Fire Risk Vehicle.

46.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. Plaintiff states that his trust in the Ford brand led him to conclude, at the time of his purchase, that the 2020 Model Year Ford Escape was a safe vehicle. However, despite touting the safety and reliability of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

- 18 -

47.    Plaintiff does not accept that drilling additional holes into his vehicle's under-engine shield or removing blinds from his vehicle's active grille shutter is an adequate "fix" because these changes do not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the road outside Plaintiff's home or his neighbors' homes. Plaintiff also alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

48.    Since learning of the Fire Risk, Plaintiff has been concerned that his Fire Risk Vehicle presents a safety hazard. When he last visited his family in Idaho, he opted to borrow his mother's car when driving with his younger sister. He did not want his sister to ride with him in the Fire Risk Vehicle because he was concerned for her safety.

49.    Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased this vehicle, or he would have paid less for the vehicle.

**6.    John Armani (New York)**

50.    Plaintiff and proposed class representative John Armani ("Plaintiff for the purposes of this paragraph) is a resident and citizen of Honeoye, New York.

011111-11/2044975 V2

Plaintiff purchased a 2022 Model Year Ford Maverick on or about April 28, 2022, from a dealership in Canandaigua, New York. Plaintiff's Ford Maverick is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

51.     Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses it for his own transportation needs and for running errands. Plaintiff's wife also regularly rides in the vehicle with him.

52.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. Plaintiff also states that he assumed Ford had conducted proper safety testing before marketing the vehicle. However, despite touting the safety and reliability of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

53.     Although Plaintiff's vehicle has been "fixed" in accordance with Ford's recall, Plaintiff is still concerned about driving the Fire Risk Vehicle. Plaintiff does not accept the additional holes drilled into his vehicle's under-engine shield or the blinds removed from his vehicle's active grille shutter as an adequate "fix" because these changes do not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up

- 20 -

on the road, on Plaintiff's driveway, or on the floor of Plaintiff's garage. Plaintiff

also alleges that this "fix" is inappropriate because it results in decreased fuel

efficiency.

54.    Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's

proposed "fix," he would not have purchased the vehicle, or he would have paid

less for the vehicle.

**7.    Ronald Finklestein (Ohio)**

55.    Plaintiff and proposed class representative Ronald Finklestein

("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Fairlawn,

Ohio. Plaintiff purchased a 2022 Model Year Ford Maverick on or about July 26,

2022, from a dealership in Montrose, Ohio. Plaintiff's Ford Maverick is a Fire Risk

Vehicle that suffers from the Spontaneous Fire Risk.

56.    Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day

vehicle. He regularly uses it for his own transportation needs and for running

errands. Plaintiff's wife also regularly rides in the vehicle with him.

57.    Through exposure and interaction with Ford, Plaintiff was aware of

Ford's uniform and pervasive marketing messages of reliability and safety.

Plaintiff noted that the availability of safety features, including blind spot detectors

and a rearview camera, influenced his purchasing decision. However, despite

touting the safety and reliability of the Fire Risk Vehicle, at no point did Ford or its

agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

58.    Although Plaintiff's vehicle has been "fixed" in accordance with Ford's recall, Plaintiff is still concerned about driving the Fire Risk Vehicle. Plaintiff does not accept the additional holes drilled into his vehicle's under-engine shield or the blinds removed from his vehicle's active grille shutter as an adequate "fix" because these changes do not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the roadway or on the floor of Plaintiff's garage. Plaintiff also alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

59.    Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased the vehicle, or he would have paid less for the vehicle.

**8.    Christopher Dunning (Oregon)**

60.    Plaintiff and proposed class representative Christopher Dunning ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Newberg, Oregon. Plaintiff purchased a 2022 Model Year Ford Maverick on or about June 15, 2022, from a Carvana, an online company that delivered the vehicle

- 22 -

directly to Plaintiff's home in Oregon. Plaintiff's Ford Maverick is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

61.     Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day vehicle. The vehicle also serves as the family car. He regularly uses it for his own transportation needs, and he and his wife also use it to transport their two children, ages 13 and 10, to and from sports practices and other after-school activities. Plaintiff and his wife are active members of their Church and regularly volunteer to babysit other members' children, whom they also sometimes transport in the vehicle.

62.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability, safety, and the vehicle's benefits for use by families. However, despite touting the safety, reliability, and family-friendly aspects of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

63.     Although Plaintiff's vehicle has been "fixed" in accordance with Ford's recall, Plaintiff is still concerned about driving the Fire Risk Vehicle. Plaintiff does not accept the additional holes drilled into his vehicle's under-engine shield or the blinds removed from his vehicle's active grille shutter as an adequate "fix" because these changes do not address the underlying manufacturing problems

- 23 -

with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the roadway or on the floor of Plaintiff's garage. Plaintiff also alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

64.     Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased the vehicle, or he would have paid less for the vehicle.

**9.     Christopher Lappas (Pennsylvania)**

65.     Plaintiff and proposed class representative Christopher Lappas ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Somerdale, New Jersey. Plaintiff purchased a 2022 Model Year Ford Maverick on or about January 21, 2022, from a dealership in Philadelphia, Pennsylvania. Plaintiff's Ford Maverick is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

66.     Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses it for his own transportation needs. He also uses the vehicle to transport his 13-year-old daughter and her friends to various activities.

67.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability, safety, and the

- 24 -

vehicle's benefits for use by families. Plaintiff states that his trust in the Ford brand led him to conclude, at the time of his purchase, that the 2022 Model Year Ford Maverick was a safe vehicle. However, despite touting the safety, reliability, and family-friendly aspects of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

68.     Although Plaintiff's vehicle has been "fixed" in accordance with Ford's recall, Plaintiff is still concerned about driving the Fire Risk Vehicle. Plaintiff does not accept the additional holes drilled into his vehicle's under-engine shield or the blinds removed from his vehicle's active grille shutter as an adequate "fix" because it does not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the road or on Plaintiff's driveway. Plaintiff also alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

69.     Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased the vehicle, or he would have paid less for the vehicle.

011111-11/2044975 V2

10. **Everett Garrett (Tennessee)**

70.     Plaintiff and proposed class representative Everett Garrett ("Plaintiff

for the purposes of this paragraph) is a resident and citizen of Dickson, Tennessee.

Plaintiff purchased a 2022 Model Year Ford Maverick on or about February 25,

2022, from a dealership in Dickson, Tennessee. Plaintiff's Ford Maverick is a Fire

Risk Vehicle that suffers from the Spontaneous Fire Risk.

71.     Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day

vehicle. He regularly uses it for his own transportation needs, including commuting

to work and hauling various materials in the bed of the truck.

72.     Through exposure and interaction with Ford, Plaintiff was aware of

Ford's uniform and pervasive marketing messages of reliability and safety.

Plaintiff states that vehicle safety was a top priority in his search for a new vehicle.

He paid extra to upgrade to the First Edition package to ensure his vehicle would

be equipped with all available safety features, including evasive steering assist,

lane centering, and rear parking sensors. However, despite touting the safety and

reliability of the Fire Risk Vehicle, at no point did Ford or its agents or other

representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

73.     Plaintiff does not accept that drilling additional holes into his

vehicle's under-engine shield or removing blinds from his vehicle's active grille

shutter is an adequate "fix" because these changes do not address the underlying

manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the roadway or on the floor of Plaintiff's garage. Plaintiff also alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

74.    Plaintiff is particularly concerned about the possibility of fluids leaking onto the floor of his garage because he has two dogs, and he worries that his dogs might ingest some of the leaked fluids and thereby poison themselves. Furthermore, Plaintiff is concerned about a potential leak because he works in high-end home construction, and any fluid that leaks from his vehicle onto the driveway of one of these homes could cause thousands of dollars of property damage.

75.    Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased the vehicle, or he would have paid less for the vehicle.

**11.    Brian Sutton (Texas)**

76.    Plaintiff and proposed class representative Brian Sutton ("Plaintiff for the purposes of this paragraph) is a resident and citizen of Houston, Texas. Plaintiff purchased a 2022 Model Year Ford Maverick on or about September 20,

2022, from a dealership in Houston, Texas. Plaintiff's Ford Maverick is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

77.     Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses it for his own transportation needs, including commuting to work. His wife regularly rides with him in the vehicle, as do his two sons when they stay with him during the summer.

78.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. However, despite touting the safety and reliability of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

79.     Plaintiff does not accept that drilling additional holes into his vehicle's under-engine shield or removing blinds from his vehicle's active grille shutter is an adequate "fix" because these changes do not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the road or on Plaintiff's driveway. Plaintiff also alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

80.     Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," she would not have purchased the vehicle, or she would have paid less for the vehicle.

## 12.   Jeffrey King (Texas)

81.     Plaintiff and proposed class representative Jeffrey King ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of San Antonio, Texas. Plaintiff purchased a 2022 Model Year Ford Maverick on or about December 24, 2021, from a dealership in San Antonio, Texas. Plaintiff's Ford Maverick is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

82.     Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day vehicle. He relies on the vehicle to commute to work and to run errands.

83.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. Plaintiff relied on Ford's assurances that it had thoroughly tested the vehicle, as well as on Ford's reputation for building dependable vehicles, in making his decision to purchase the vehicle. However, despite touting the safety and reliability of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

84.     Plaintiff does not accept that drilling additional holes into his vehicle's under-engine shield or removing blinds from his vehicle's active grille

shutter is an adequate "fix" because these changes do not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the roadway or on the floor of Plaintiff's garage. Plaintiff also alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

85.    Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased this vehicle, or he would have paid less for the vehicle.

**13.    Heyward Drummond (Virginia)**

86.    Plaintiff and proposed class representative Heyward Drummond ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Aldie, Virginia. Plaintiff purchased a 2022 Model Year Lincoln Corsair on or about January 26, 2022, from a dealership in Chantilly, Virginia. Plaintiff's Lincoln Corsair is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

87.    Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses it for his own transportation needs, including long-distance trips to Ohio to see friends and family. His husband regularly rides with him in the vehicle.

011111-11/2044975 V2

88.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. However, despite touting the safety and reliability of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

89.     Plaintiff does not accept that drilling additional holes into his vehicle's under-engine shield or removing blinds from his vehicle's active grille shutter is an adequate "fix" because these changes do not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the road or on Plaintiff's driveway. Plaintiff also alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

90.     Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased the vehicle, or he would have paid less for the vehicle.

**14.    Victoria Adams (Washington)**

91.     Plaintiff and proposed class representative Victoria Adams ("Plaintiff" for the purposes of this paragraph) was a resident and citizen of Seattle,

- 31 -

Washington, at the time she purchased her 2020 Model Year Ford Escape. Plaintiff purchased the vehicle on or about December 20, 2020, from a dealership in Kirkland, Washington. Plaintiff's Ford Escape is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk. Since purchasing the Fire Risk Vehicle, Plaintiff has moved to Arizona.

92.    Plaintiff purchased her Fire Risk Vehicle as her primary, day-to-day vehicle. She regularly uses it for her own transportation needs, including commuting to work and driving to see family and friends.

93.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. Just prior to buying the Fire Risk Vehicle, Plaintiff and her wife had been in a car accident, so safety features present in the car were particularly important to her when she made her purchasing decision. Plaintiff noted that the availability of features including blind spot detectors, lane change detectors, collision detectors, a rearview camera, and an automatic response by the vehicle to wet or icy terrain influenced her purchasing decision because they made her feel that the vehicle was safe and reliable. At no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before her purchase.

94.    Although Plaintiff's vehicle has been "fixed" in accordance with Ford's recall, Plaintiff is still concerned about driving the Fire Risk Vehicle.

- 32 -

Plaintiff does not consider the additional holes drilled into her vehicle's under-engine shield or the blinds removed from her vehicle's active grille shutter to be an adequate "fix" because these changes do not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just provide an escape route for those fluids and vapors to end up on the roadway or on the floor of Plaintiff's garage. Plaintiff also alleges that this "fix" is inappropriate because it results in decreased fuel efficiency.

95.    Furthermore, Plaintiff has experienced other issues with the vehicle, including once having her vehicle stall while she was driving because of an engine problem. Plaintiff states that she has not felt safe driving the vehicle since learning about Ford's recall.

96.    Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," she would not have purchased this vehicle, or she would have paid less for the vehicle.

**B.    Defendant**

97.    Defendant Ford Motor Company ("Ford") is a Delaware limited liability company organized and existing under the laws of the State of Delaware. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

98.     Ford is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Ford and Lincoln motor vehicles. The Ford brand is one of the "Big Three" American automobile brands. Lincoln is Ford's luxury automobile brand. Ford engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Ford and Lincoln brands.

99.     Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its agents designed and manufactured the Fire Risk Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Fire Risk Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

100.    Ford- and Lincoln-authorized automobile dealerships sell automobiles under the Ford and Lincoln brand names and disseminate vehicle information provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Ford's manufacturer warranty under the contracts between Ford and its nearly 10,000 authorized dealerships worldwide.

- 34 -

## V.   FACTUAL ALLEGATIONS

**A.   Ford marketed the Fire Risk Vehicles as safe, reliable, and fuel-efficient, and Ford knew that these attributes were material to consumers.**

101.   The Ford and Lincoln Fire Risk Vehicles are marketed to consumers as safe, reliable vehicles, and Ford knew these qualities were material to consumers in marketing them in this manner. These qualities were in fact material to Plaintiffs and Ford had the opportunity when describing safety features in sales material to be truthful.

102.   For example, in the sales brochure for the 2020 Ford Escape, Ford touted various safety features like pre-collision assist, blind spot alerts, lane-keeping system, and rear-view cameras in the Fire Risk Vehicles because Ford knew safety was material to the average customer.[9]

---

[9] *See* **Exhibit 4**, MY 2020 Ford Escape brochure, at 11; **Exhibit 5**, MY 2021 Ford Escape brochure, at 9, 14.

## MAKE YOUR WAY.
# CONFIDENTLY.

Changing lanes. Keeping your distance. Parallel and perpendicular parking. Our extensive well-rounded collection of standard and available Ford Co-Pilot360™ Technology features can help you with these everyday situations and so many more. Our advanced technologies are about supplementing your driving skills.¹ Helping you feel confidently in command on the road.

## FORD CO-PILOT360™ TECHNOLOGY

### FORD CO-PILOT360

*Standard on every 2022 Ford Escape® SUV*
- Pre-Collision Assist with Automatic Emergency Braking (AEB)
- BLIS® (Blind Spot Information System) with Cross-Traffic Alert
- Lane-Keeping System
- Auto High-Beam Headlamps
- Rear View Camera
- Autolamp (Automatic On/Off Headlamps)
- Post-Collision Braking

### FORD CO-PILOT360 ASSIST+

*Standard on Titanium; Available on SE and SEL*
- Intelligent Adaptive Cruise Control with Stop-and-Go and Lane Centering includes Speed Sign Recognition
- Evasive Steering Assist
- Voice-Activated Touchscreen Navigation System



**SCAN TO LEARN MORE**
or visit
Ford.com/Technology
*Data rates may apply.*

- 36 -



103.   In the sales brochure for the 2022 Ford Maverick, Ford again focused on safety features. Knowing safety is material to Plaintiffs and putative class members, Ford told consumers that the Maverick's built-in Ford Co-Pilot 360 Technology can help drivers "feel confidently in command behind the wheel."[10]

---

[10] **Exhibit 7**, MY 2022 Ford Maverick brochure, at 7.





104.   In the brochure given to dealership personnel to inform consumers about the vehicle, Ford noted among the available safety features the inclusion of a LATCH system (lower anchors and tether anchors for children), which is specifically designed to safely secure children's car seats in the car, because Ford knew the safety of customers' children was material to the average consumer.[11]

---

[11] **Exhibit 7**, MY 2022 Ford Maverick dealership brochure, at 11. $

105.   Ford also emphasizes the Maverick's overall reliability, noting the truck is "engineered for extremes" and has undergone "durability testing" because Ford knew that reliability is material to the average consumer.[12]

**ENGINEERED FOR EXTREMES**
The Maverick™ pickup architecture has endured 19 million miles of customer equivalent durability testing in real world, lab and proving ground environments. It's been tested in extreme weather, taken over off-road durability tests, endured harsh chassis tuning, and much more. After these tests, it's more than ready for yours.

106.   Ford makes similar claims about safety and reliability in its sales brochures for the 2021–2022 Lincoln Corsairs. As with the Ford Maverick, the Lincoln Corsair safety features list includes a LATCH system,[13] appealing to consumers with young children whose car seats need to be safely secured in the vehicle, because Ford knew the safety of customers' children was material to the average consumer.

107.   Both the 2021 and 2022 sales brochures for the Ford Maverick highlight a host of other safety features, including blind spot detection, a lane-keeping system, pre-collision assist, and a rearview camera, because Ford knew

---

[12] *Id.* at 10.

[13] **Exhibit 8**, MY 2021 Lincoln Corsair brochure, at 9; **Exhibit 9**, MY 2022 Lincoln Corsair brochure, at 13.

safety was material to the average customer.[14] The 2022 brochure further boasts that drivers will experience "all-season confidence."[15]

108.    As with the Escape and the Maverick, Ford also highlights the Corsair's engine's performance and reliability. The 2022 brochure notes that even the base model "smoothly responds" and offers a "thrilling drive,"[16] leading consumers to believe that the engine is of high quality and reliable.

---

[14] **Exhibit 8**, MY 2021 Lincoln Corsair brochure, at 4; **Exhibit 9**, MY 2022 Lincoln Corsair brochure, at 11.

[15] **Exhibit 9**, MY 2022 Lincoln Corsair brochure, at 8.

[16] *Id.* at 8.

- 40 -

TURBOCHARGED 2.0-LITER I-4
250 HORSEPOWER¹
280 LB.-FT. OF TORQUE¹

The Lincoln Corsair® SUV is powered by a standard
Turbocharged 2.0-liter engine that smoothly responds as
you press the accelerator, anticipating your thrilling drive.
Pair it with either front-wheel drive or available Intelligent
all-wheel drive (AWD) for all-season confidence.

TURBOCHARGED 2.3-LITER I-4
295 HORSEPOWER¹
310 LB.-FT. OF TORQUE¹

Those seeking more power will happily find it provided by
the available 2.3-liter engine paired wih Intelligent AWD.
With spirited agility and effortless acceleration, this
turbocharged powertrain offers an energetic and polished
driving experience.

Each of these available engines is paired with an 8-speed
SelectShift® automatic transmission designed to provide
the right gear at the right time, giving you a refined drive
that's smooth, sporty and sophisticated.

**B.      Ford marketed the Fire Risk Vehicles as fuel-efficient, and Ford knew this attribute was material to consumers.**

109.   The Ford and Lincoln Fire Risk Vehicles are marketed to consumers as fuel-efficient, and Ford knew this quality was material to consumers in marketing the vehicles in this manner. This quality was in fact material to Plaintiffs.

110.   For example, in the sales brochure for the 2020 Ford Escape, Ford noted that customers could expect to achieve an average of 40 miles per gallon in the vehicle.[17]

---

[17] **Exhibit 4**, MY 2020 Ford Escape brochure, at 2.



111. Ford similarly advertised the fuel economy of the 2021–2022 Model Year Ford Escapes (up to 41 combined miles-per-gallon),[18] and it emphasized the 2021–2022 Model Year Lincoln Corsairs' hybrid capabilities.[19]

112. In advertising the 2022 Model Year Ford Maverick, Ford noted that customers could expect to achieve an average of 37 miles per gallon.[20] Ford also

---

[18] **Exhibit 5**, 2021 MY Ford Escape brochure, at 16; **Exhibit 6**, 2022 MY Ford Escape brochure, at 16.

[19] **Exhibit 8**, 2021 MY Lincoln Corsair brochure, at 9; **Exhibit 9**, 2022 MY Lincoln Corsair brochure, at 7.

[20] **Exhibit 7**, 2022 MY Ford Maverick brochure, at 2.

- 42 -

referred to the vehicle as having "excellent affordability" thanks to its high fuel efficiency.[21]



113.   Furthermore, Ford specifically advertised that its 2020–2022 Model Year Ford Escapes and 2021–2022 Model Year Lincoln Corsairs were equipped with active grille shutters.[22] Ford explains on its website that active grille shutters reduce aerodynamic drag on its vehicles and improve fuel efficiency.[23]

---

[21] *Id.*

[22] **Exhibit 4**, MY 2020 Ford Escape brochure, at 3; **Exhibit 5**, MY 2021 Ford Escape brochure, at 14; **Exhibit 6**, MY 2022 Ford Escape brochure, at 15; **Exhibit 8**, MY 2021 Lincoln Corsair brochure, at 9; **Exhibit 9**, MY 2022 Lincoln Corsair brochure, at 13.

[23] **Exhibit 10**, *Active Grille Shutter*, Ford, https://www.ford.com.au/ technology/active-grill-shutter (last accessed Oct. 7, 2022).

114.   As Ford notes, "[a]erodynamic 'drag' is reduced when the grille is closed or partially closed, as air cannot flow through the grille into the vehicle."[24]

**C.    Plaintiffs and class members paid thousands of dollars for the Fire Risk Vehicles because they thought the vehicles were safe, reliable, and fuel-efficient.**

115.   Plaintiffs and putative class members, believing in the safety, reliability, and fuel efficiency of the Fire Risk Vehicles as touted by Ford, paid thousands of dollars for the vehicles. The Manufacturer's Suggested Retail Price ("MSRP") for the 2022 Ford Escape starts at $28,520 for the S base-level trim and goes up to $38,640 for the Titanium trim;[25] the MSRP for the 2022 Ford Maverick starts at $21,490 for the base-level trim and goes up to $27,355;[26] and the MSRP for the 2022 Lincoln Corsair starts at $37,775 for the base-level trim and goes up to $53,005.[27]

116.   Plaintiffs and putative class members would not have paid these prices for Fire Risk Vehicles if they had known that the vehicles were not, in fact, safe

---

[24] *Id.*

[25] **Exhibit 11**, *2022 Ford Escape*, EDMUNDS.COM, https://www.edmunds.com/ford/escape.

[26] **Exhibit 12**, *2022 Ford Maverick*, EDMUNDS.COM, https://www.edmunds.com/ford/maverick.

[27] **Exhibit 13**, *2022 Lincoln Corsair*, EDMUNDS.COM, https://www.edmunds.com/lincoln/corsair.

- 44 -

and reliable, and that Ford's purported "fix" would result in reduced fuel efficiency.

### D.  Ford's Vehicle Warranties

117.  Ford's New Vehicle Limited Warranty for Model Years 2020, 2021, and 2022 of the Ford Escape provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[28] Ford's Powertrain Warranty for the Escape provides coverage for 5 years/60,000 miles, whichever comes first.[29] On information and belief, this warranty coverage includes manufacturing issues like the Spontaneous Fire Risk in the Fire Risk Vehicles.

118.  Ford's New Vehicle Limited Warranty for the Model Year 2022 Ford Maverick provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[30] Ford's Powertrain Warranty for the Maverick provides coverage for 5 years/60,000 miles, whichever comes first.[31] On information and belief, this warranty coverage includes manufacturing issues like the Spontaneous Fire Risk in the Fire Risk Vehicles.

---

[28] **Exhibit 4**, MY 2020 Ford Escape brochure, at 16; **Exhibit 5**, MY 2021 Ford Escape brochure, at 16; **Exhibit 6**, MY 2022 Ford Escape brochure, at 16.

[29] **Exhibit 4**, MY 2020 Ford Escape brochure, at 16; **Exhibit 5**, MY 2021 Ford Escape brochure, at 16; **Exhibit 6**, MY 2022 Ford Escape brochure, at 16.

[30] **Exhibit 7**, MY 2022 Ford Maverick brochure, at 16.

[31] *Id.*

- 45 -

119.    Ford's New Vehicle Limited Warranty for Model Years 2021 and 2022 of the Lincoln Corsair provides "bumper-to-bumper" coverage for 4 years/50,000 miles, whichever comes first.[32] Ford's Powertrain Warranty for the Escape provides coverage for 6 years/70,000 miles, whichever comes first.[33] On information and belief, this warranty coverage includes manufacturing issues like the Spontaneous Fire Risk in the Fire Risk Vehicles.

120.    Because the Fire Risk Vehicles are all Model Year 2020, 2021, or 2022 vehicles sold or leased to putative class members in the fall of 2019 or later,[34] virtually all Fire Risk Vehicles—if not all of them, including Plaintiffs' vehicles— are still covered under Ford's new vehicle and powertrain warranties.

**E.      The Spontaneous Fire Risk**

121.    As Ford now admits in a July 7, 2022, safety recall notification to the National Highway Traffic Safety Administration ("NHTSA"), engine

---

[32] **Exhibit 8**, MY 2021 Lincoln Corsair brochure, at 11; **Exhibit 9**, MY 2022 Lincoln Corsair brochure, at 14.

[33] **Exhibit 8**, MY 2021 Lincoln Corsair brochure, at 11; **Exhibit 9**, MY 2022 Lincoln Corsair brochure, at 14.

[34] **Exhibit 14**, Joey Capparella, *The 2020 Ford Escape Looks to Fill a Car-Shaped Hole in the Lineup*, CAR & DRIVER, Apr. 2, 2019, https://www.caranddriver.com/news/a26996233/2020-ford-escape-photos-info; **Exhibit 15**, *2022 Ford Maverick: Release Date & Key Features*, BLUE SPRINGS FORD, https://www.bluespringsford.com/research/maverick.htm; **Exhibit 16**, Brett Foote, *2021 Lincoln Corsair Grand Touring PHEV Production Dates Revealed*, FORD AUTHORITY, Dec. 29, 2020, https://fordauthority.com/2020/12/2021-lincoln-corsair-grand-touring-phev-production-dates-revealed.

manufacturing issues resulting engine block or oil pan breaches, combined with

fluid dynamics induced by Ford's under engine shield and active grille shutter,

have caused certain Fire Risk Vehicles to catch on fire.[35]

122.   Ford further admits that the issues in the Fire Risk Vehicles can lead

to "under hood fire, localized melting of components, or smoke."[36]

123.   Ford's recall, number 22V-484, affects 100,689 total vehicles,

including all Model Year 2020–2022 Ford Escapes built between January 19,

2019, and June 13, 2022; all Model Year 2022 Ford Mavericks built between

February 3, 2021, and June 8, 2022; and all Model Year 2021–2022 Lincoln

Corsairs built between October 24, 2019, and June 13, 2022.[37]

124.   As of June 22, 2022, Ford reported 23 warranty and field reports

globally of under hood fire or smoke on 2.5L HEV/PHEV engines after a

suspected block or oil pan breach.[38] The date range of identified reports is April 5,

2021, through May 19, 2022.[39]

---

[35] **Exhibit 1**, National Highway Traffic Safety Administration, Part 573 Safety Recall Report No. 22v-484 at 3-4 (July 7, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V484-6430.PDF.

[36] *See id*. at 3.

[37] *See id*. at 1-2.

[38] *See id*. at 4.

[39] *See id.*

011111-11/2044975 V2

125.    Included in the 573 Report is Ford's "Description of the Cause: Isolated engine manufacturing issues have resulted in 2.5L HEV/PHEV engine failures involving engine block or oil pan breach. The fluid dynamics induced by the Under Engine Shield and Active Grille Shutter system could increase the likelihood of engine oil and/or fuel vapor expelled during an engine block or oil pan breach accumulating near sources of ignition, primarily expected to be the exhaust system."[40]

126.    Thus, Ford admits that the Fire Risk Vehicles suffer from engine manufacturing issues that can cause engine failures involving engine block or oil pan breach. But Ford's fix is wholly silent as to this admittedly affected component. Ford is leaving the engines exactly as they are and instead drilling holes into the under-engine shield and removing blinds from the active grille shutter to prevent oil and gas from pooling in the car. This "fix" does not live up to its name because the engines in the Fire Risk Vehicles may still leak flammable fluids—a problem Ford does not address.

127.    On information and belief, Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, advertising,

---

[40] *See id.* at 3.

promoting, marketing, and selling the Fire Risk Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

128.   On information and belief, Ford knew or should have known the Fire Risk Vehicles contained the Spontaneous Fire Risk and should have warned or disclosed this fact to Plaintiffs and putative class members before selling or leasing the vehicles.

129.   Ford plainly knows that the "fix" it is implementing with its recall will not resolve the engine manufacturing issue that is causing the leak of flammable fluids and vapors from the engines of the Fire Risk Vehicles.

130.   Ford also knew or should have known that its "fix" would actually cause additional problems, including potential property damage or personal injury from flammable fluids or vapors that escape from the Fire Risk Vehicles, and that the "fix" would reduce the vehicles' fuel efficiency.

131.   Plaintiff's counsel continues to investigate whether additional manufacturing periods and Model Years of the Ford Escape, Ford Maverick, and Lincoln Corsair are also plagued with the Spontaneous Fire Risk.

**F.    Ford knew or should have known of the Spontaneous Fire Risk before it disclosed the risk to Plaintiffs.**

132.   On information and belief, Ford knew or should have known about the Spontaneous Fire Risk before the Fire Risk Vehicles went to market. At the very least, Ford certainly knew of the Spontaneous Fire Risk well before it issued its

- 49 -

recall, as evidenced by: (1) the rigorous pre-launch testing of the Fire Risk

Vehicles; (2) the direct and public reports of fires or smoke in 23 Fire Risk

Vehicles; and (3) Ford's own investigation of fires in the Fire Risk Vehicles.

1.      **Ford's durability testing should have uncovered the Spontaneous Fire Risk.**

133.   Ford claims to conduct comprehensive and rigorous testing on all its

vehicles, saying, "Ford's comprehensive lineup of testing facilities around the

world puts vehicles through everything from the extreme, to the everyday, to

ensure that only world-class vehicles roll off the production line."[41]

134.   According to Ford, at their facilities across Thailand, India, Australia,

the Middle East, and China, "Ford vehicles and components are 'shaken, rattled

and rolled' in a variety of tests, some conducted in temperatures ranging from an

arctic minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees

Celsius."[42] These tests include stresses on the engines, moving parts, suspension,

and electrical components.[43]

---

[41] **Exhibit 17**, *Testing in the Extremes: How Ford's Multiple Testing Facilities Push Vehicles to the Limit*, October 7, 2019, FORD.COM, https://media.ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes--how-fords-multiple-testing-facilities-p.html.

[42] *See id.*

[43] *See id.*

- 50 -

135.   Ford even puts its vehicles through a Total Durability Cycle, described by Ford as "sped-up evaluation runs around the clock, day and night, to simulate 10 years, or 240,000km, of severe customer usage in just a few weeks."[44] "Gravel roads, cobblestones, pot-holes, curbs and water baths feature in this grueling test" and, "[j]ust for good measure, environmental factors like dust, water and mud are thrown in, while dynamometers simulate towing heavy loads in traffic and over mountain passes."[45]

136.   On information and belief, the Fire Risk Vehicles were put through similar durability testing or were designed and built in accordance with the findings of such durability testing. Indeed, as already described, Ford specifically advertised to Maverick consumers with the promise that the Maverick pickup architecture "has endured 19 million miles of customer equivalent durability testing in the real world, lab and proving ground environments."[46] Ford further explains that the pickup has "been tested in extreme weather, taken over off-road durability tests, endured harsh chassis turning, and much more."[47] On information

---

[44] *See id.*

[45] *See id.*

[46] **Exhibit 7**, MY 2022 Ford Maverick brochure, at 10.

[47] *See id.*

and belief, the Ford Escape and Lincoln Corsair were put through equally stringent testing.

137.   Based on such durability testing, Ford uncovered the Spontaneous Fire Risk before the Fire Risk Vehicles were sold to Plaintiffs and putative class members.

**2.   Ford knew about the Spontaneous Fire Risk from warranty claims for Fire Risk Vehicles and its own investigation.**

138.   According to its recall chronology, an issue pertaining to 2.5L HEV and PHEV under hood fires was brought to Ford's Critical Concern Review Group for review on May 4, 2022.[48] During the Review Group's analysis from May 4, 2022, through June 8, 2022, the Group included data from 19 field reports of under hood fire or smoke for 2.5L HEV/PHEV vehicles.[49]

139.   Ford's investigation continued up until the July 7, 2022 recall and uncovered four more reports of under hood smoke or fires in the Fire Risk Vehicles.

---

[48] **Exhibit 1**, National Highway Traffic Safety Administration, Part 573 Safety Recall Report No. 22v-484 at 4 (July 7, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V484-6430.PDF.

[49] *Id.*

140.   Ford did not disclose the dates of the 23 fires in the Fire Risk Vehicles, but on information and belief, Ford learned of at least some of these fires on or before the May 4, 2022 investigation launch.

141.   All vehicle manufacturers, including Ford, also routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, Ford has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Fire Risk Vehicles.[50]

142.   Ford also receives complaints directly from consumers and its dealers, and thus, on information and belief, has knowledge of all complaints lodged to it or its agents regarding the Fire Risk Vehicles and the Spontaneous Fire Risk. At a minimum, Ford received complaints from many scared and angry owners and lessees who learned about the Fire Defect.

143.   However, Ford has yet to address the manufacturing issues associated with the 2.5L HEV/PHEV engines involving engine block or oil pan breach. Instead, Ford has directed that the under-engine shield and active grille shutter of Fire Risk Vehicles be modified to redirect and/or purge the engine compartment of the engine oil or fuel vapor.[51] After the modifications are complete, Plaintiffs and

---

[50] *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

[51] *Id.* at 5.

class members will be left with vehicles that may still leak highly flammable oil and vapors if their engines succumb to the manufacturing issues identified. And Ford is not globally offering to buy back the vehicles or even provide loaner or rental vehicles until it can actually fix the manufacturing problem.

144. Because the Fire Risk Vehicles have manufacturing flaws that may cause the engines to leak flammable oil and vapors and Ford is not fixing this and is instead decreasing the fuel efficiency of the Fire Risk Vehicles and creating the further risk that fluids and vapors will leak into garages, roadways and the environment, all owners and lessees of the Fire Risk Vehicles have suffered ascertainable loss.

**G.   After instituting the "fix," Ford failed to conduct new mileage tests to ensure that its mileage estimates were not adversely affected.**

145. As described above, Ford knew that active grille shutters reduce aerodynamic drag on its vehicles and improve fuel efficiency.[52] Therefore, in removing four blinds from the Fire Risk Vehicles' active grille shutters as part of the "fix," Ford knew the vehicles' estimated gas mileage could be reduced. But despite this knowledge, Ford did not conduct new mileage tests to ensure that the

---

[52] **Exhibit 10**, *Active Grille Shutter*, Ford, https://www.ford.com.au/technology/active-grill-shutter (last accessed Oct. 7, 2022).

mileage estimates it reported to the Environmental Protection Agency ("EPA") were accurate, as it was required to do.[53]

146.   The potential impact on mileage of removing active grille shutter blinds has not been lost on consumers. For instance, one Fire Risk Vehicle owner posted in a Maverick forum, "I'm NOT OK with removing blinds from the active grill shutters. They are there for a reason. Specifically, the AGS reduces emissions and improves aerodynamics. Is there really no other solution to this problem?!?!"[54] Another user asks whether this fix "is the best they can do or is it the quickest and cheapest????"[55] And a user in a separate thread asked, "Has anyone felt like their highway miles has taken a hit after this? I don't have enough data to tell, so I'm

---

[53] The EPA "requires auto manufacturers to change or update their MPG (miles per gallon) values on fuel economy labels (window stickers) if information comes to light that show that the values are too high." **Exhibit 18**, *Data on Cars Used for Testing Fuel Economy*, EPA, https://www.epa.gov/compliance-and-fuel-economy-data/data-cars-used-testing-fuel-economy (last accessed Oct. 7, 2022).

[54] **Exhibit 19**, *New Maverick Recall: 2.5 Hybrid Engine Fire Hazard [Updated w/ Safety Recall Notice to Dealers]*, Maverick Truck Club, at online forum comment #51 (July 8, 2022), https://www.mavericktruckclub.com/forum/threads/new-maverick-recall-2-5-hybrid-engine-fire-hazard-updated-w-safety-recall-notice-to-dealers.17459/page-4

[55] **Exhibit 20**, *New Maverick Recall: 2.5 Hybrid Engine Fire Hazard [Updated w/ Safety Recall Notice to Dealers]*, Maverick Truck Club, at online forum comment #80 (July 8, 2022), https://www.mavericktruckclub.com/forum/threads/new-maverick-recall-2-5-hybrid-engine-fire-hazard-updated-w-safety-recall-notice-to-dealers.17459/page-6

not sure if it's the heat, or this recall. But I feel like I'm down 3-4 MPG on the highway."[56]

147.   By failing to conduct new mileage tests to ensure that the touted mileage of the Fire Risk Vehicles remains accurate even after the "fix," Ford is actively concealing information from class members, including Plaintiffs, about the actual fuel efficiency of their Fire Risk Vehicles.

## H.   Class members could have been made aware of the Spontaneous Fire Risk at the point of sale.

148.   Plaintiffs and all putative class members were necessarily exposed to Ford's omissions before purchasing the Fire Risk Vehicles because they each interacted with an authorized Ford dealer at the point of sale. These dealers could have disclosed the omitted information to each class member, but they failed to do so. As a district court affirmed in another consumer class action case against Ford, all class members in that case would have "been aware of a disclosure" from Ford

---

[56] **Exhibit 21**, *New Maverick Recall: 2.5 Hybrid Engine Fire Hazard [Updated w/ Safety Recall Notice to Dealers]*, Maverick Truck Club, at online forum comment #63 (Sept. 2, 2022), https://www.mavericktruckclub.com/forum/threads/2022-maverick-hybrid-safety-recall-engine-oil-fuel-vapor-may-leak-in-event-of-engine-failure-recall-22s47-nhtsa-recall-22v484.19340/page-5.

about the defect at the point of sale because class members "interact[ed] with an authorized Ford dealer prior to purchase."[57] The same is true here.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

149.    Because Ford (i) omitted the existence of the Spontaneous Fire Risk and (ii) omitted the fact that the recall repair does not fix the manufacturing flaw and instead creates additional risks and reduces fuel efficiency, class members had no way of knowing about the potential danger of the Fire Risk Vehicles and the lack of a *bona fide* repair during the recall.

150.    Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Ford was not revealing the existence of the Spontaneous Fire Risk complained of herein and not repairing it during the recall.

151.    Plaintiffs and putative class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had omitted information about the unreasonable fire risk of the

---

[57] *Daniel v. Ford Motor Co.*, 2016 WL 8077932, at *8 (E.D. Cal. Sept. 23, 2016).

Fire Risk Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

152.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Fire Risk Vehicles.

**B.     Estoppel**

153.   Ford was under a continuous duty to disclose to Plaintiffs and putative class members the true character, quality, and nature of the fire risk of the Fire Risk Vehicles.

154.   Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fire risk of the Fire Risk Vehicles and it knowingly, affirmatively and actively concealed or recklessly disregarded the true nature, quality and character of the repair it was performing under the recall of the Fire Risk Vehicles.

155.   Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

156.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class and Subclasses:

- 58 -

**Nationwide Class**: All persons or entities who purchased or leased model year 2020–2022 Ford Escape, 2022 Ford Maverick, or 2021–2022 Lincoln Corsair vehicles (the "Fire Risk Vehicles").

**California Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of California.

**Illinois Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Illinois.

**Nevada Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Nevada.

**New York Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of New York.

**Ohio Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Ohio.

**Oregon Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Oregon.

**Pennsylvania Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Pennsylvania.

**Tennessee Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Tennessee.

**Texas Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Texas.

- 59 -

**Virginia Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Virginia.

**Washington Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Washington.

157.   Plaintiffs assert claims under the laws of each state set forth below.

158.   Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Fire Risk Vehicles, as well as any personal injury or property damages claims resulting from fluid that leaks from a Fire Risk Vehicle that has undergone Ford's "fix." Also excluded from the Class and Subclasses are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

159.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

160.   This action has been brought and may be properly maintained on behalf of the Class and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

161.   **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Class and Subclasses are so numerous and geographically dispersed that individual joinder of all class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be at least 100,689 or more Fire Risk Vehicles in the Nationwide Class. The precise number of Class and Subclass members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and published notice.

162.   **Commonality and Predominance**: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass members, including, without limitation:

   a.   Whether Ford engaged in the conduct alleged herein;

   b.   Whether the Spontaneous Fire Risk creates an unreasonable risk of fires in the Fire Risk Vehicles;

   c.   When Ford first knew about the Spontaneous Fire Risk;

    d.    Whether Ford designed, manufactured, marketed, and distributed the Fire Risk Vehicles with manufacturing flaws or defective component(s) that cause under hood fire;

    e.    Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

    f.    Whether Ford has been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

    g.    Whether Plaintiffs and the other Class and Subclass members overpaid for their vehicles at the point of sale; and

    h.    Whether Plaintiffs and the other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

163.  **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass members' claims because, among other things, all Class and Subclass members were comparably injured through Ford's wrongful conduct as described above.

164.  **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class and Subclasses will be fairly and adequately protected by Plaintiffs and their counsel.

165.  **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for Ford's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

011111-11/2044975 V2

## VIII. CLAIMS

**A.    Nationwide Claims**

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq*.)

**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

166.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

167.    Plaintiffs bring this claim on behalf of the Nationwide Class.

168.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

169.    The Fire Risk Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

170.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

171.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

172.    Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of

- 64 -

their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Fire Risk Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

173. Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiffs and Nationwide Class members under 15 U.S.C. § 2310(d)(1). Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue in the engine compartment that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

174. As discussed herein, on information and belief, Ford knew or should have known about the Spontaneous Fire Risk from its own durability testing of the Fire Risk Vehicles before launching the Fire Risk Vehicles. Ford omitted information about the engine defect and its consequences from Plaintiffs

- 65 -

and class members, misrepresented the qualities of the Fire Risk Vehicles, and has failed to provide a fix for the engine defect.

175.   Ford further breached its implied warranties, as described herein, and is therefore liable to Plaintiffs and Nationwide Class members under 15 U.S.C. § 2310(d)(1) because it is performing an recall and "repair" that does not actually repair the Spontaneous Fire Risk and instead degrades the fuel efficiency of the Fire Risk Vehicles and creates further risks and hazards from leaking oil and vapor, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The deceptive nature of the repair issued by Ford to address the Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

176.   As discussed herein, Ford knew at the time it issued the recall and repair that the repair would not address the manufacturing defect in the Fire Risk Vehicles. Ford omitted information about the recall repair and its consequences from Plaintiffs and class members, misrepresented the qualities of the recall and repair of the Fire Risk Vehicles, and has failed to provide a fix for the manufacturing defect.

- 66 -

177.   Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Fire Risk Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

178.   Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs, because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

179.   Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Fire Risk Vehicles were defective and that the Fire Risk Vehicles could catch on fire when used as intended long before Plaintiffs and class members knew or should have known. Ford further knew that the recall repair it deployed did not actually mitigate or fix the manufacturing defect that results in the Spontaneous Fire Risk. Ford failed to disclose this risk to Plaintiffs and class members. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

180.   Plaintiffs have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are an intended third-party beneficiary of contracts between Ford and its dealers, and specifically, of

- 67 -

Ford's implied warranties. The dealers were not intended to be the ultimate

consumers of the Fire Risk Vehicles and have no rights under the warranty

agreements provided with the Fire Risk Vehicles; the warranty agreements were

designed for and intended to benefit consumers. Finally, privity is also not

required because the Fire Risk Vehicles are dangerous instrumentalities due to the

Spontaneous Fire Risk, as under hood smoke and fires present an unreasonable risk

of death, serious bodily harm, and property damage to owners and lessees of the

Fire Risk Vehicles.

181.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this

class action and are not required to give Ford notice and an opportunity to cure

until such time as the Court determines the representative capacity of Plaintiffs

under Rule 23 of the Federal Rules of Civil Procedure.

182.   Plaintiffs would suffer economic hardship if they returned their Fire

Risk Vehicles but did not receive the return of all payments made by them. Because

Ford will not acknowledge any revocation of acceptance and immediately return any

payments made, Plaintiffs have not re-accepted their Fire Risk Vehicles by

retaining them.

183.   The amount in controversy of Plaintiffs' individual claims meets or

exceeds the sum of $25. The amount in controversy of this action exceeds the sum

of $50,000, exclusive of interest and costs, computed based on all claims to be

determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Fire Risk Vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and Nationwide Class members in connection with the commencement and prosecution of this action.

184.   Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Spontaneous Fire Risk in their Fire Risk Vehicles.

## COUNT II

### FRAUDULENT CONCEALMENT
### (COMMON LAW)

**(Alleged by all Plaintiffs other than Plaintiff Christopher
Dunning on behalf of the Nationwide Class)**

185.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

186.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the State-specific Subclasses.

- 69 -

187.   A nationwide class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles; (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles; (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; or (d) failed to disclose material information concerning the recall repair for the Spontaneous Fire Risk; and (iii) as a result of Ford's conduct, Plaintiffs suffered economic damages.

188.   Ford concealed and suppressed material facts concerning the serious safety issues with Plaintiffs' vehicles. Ford concealed and suppressed material facts concerning the recall repair of Plaintiffs' vehicles.

189.   Ford sold the Fire Risk Vehicles to Plaintiffs without disclosing the Spontaneous Fire Risk and concealed and suppressed the risk from regulators and consumers.

190.   Ford concealed and suppressed the Spontaneous Fire Risk with the intent to deceive Plaintiffs.

191.   Ford did so in order to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and reliable and would live up to the performance characteristics associated with the Ford brand, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality, safety, and performance of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

192.   Ford had a duty to disclose the Spontaneous Fire Risk because it was known and only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiffs. Ford also had a duty to disclose because it made many affirmative representations about the safety, high performance, and quality of the Fire Risk Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

193.   Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiffs and the Nationwide Class.

194.   On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Nationwide Class and conceal material information regarding the Spontaneous Fire Risk. This is especially true in the context of Ford's purported "fix," which does not actually fix the leaky engines but appears instead to simply allow highly flammable oil and vapors to leak out of the car while reducing the vehicle's fuel efficiency.

195.   Plaintiffs were unaware of these omitted material facts and would have acted different if they had known of the concealed and/or suppressed facts. If Plaintiffs knew of the Spontaneous Fire Risk and of Ford's proposed "fix," they would not have purchased their Fire Risk Vehicles or would have paid less for them. Plaintiffs' actions at the time they purchased their Fire Risk Vehicles were justified because Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

196.   Because of the concealment and/or suppression of the facts, Plaintiffs and other class members sustained damage. In purchasing their Fire Risk Vehicles, Plaintiffs did not get the benefit of their bargain since the vehicles were worth less than they would have been without the Spontaneous Fire Risk, and because they

own vehicles that have diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the Spontaneous Fire Risk. Those Nationwide Class members who sold their dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does).

197.   Accordingly, Ford is liable to Plaintiffs and the Nationwide Class for damages in an amount to be proven at trial.

198.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and class members' rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## UNJUST ENRICHMENT
## (COMMON LAW)

### (Alleged by all Plaintiffs other than Plaintiff Christopher Dunning on behalf of the Nationwide Class)

199.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 73 -

200.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the California Subclass. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all states.

201.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

202.   Ford has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

203.   Ford has benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiffs and class members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

204.   Thus, Plaintiffs and the Nationwide Class conferred a benefit on Ford.

205.   It is inequitable for Ford to retain these benefits.

206.   Plaintiffs and Nationwide Class members were not aware of the true facts about the Fire Risk Vehicles and did not benefit from Ford's conduct described herein.

207.   Ford knowingly accepted the benefits of its unjust conduct.

208.   As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

- 74 -

**B.** **State-Specific Claims**

**1.** **California**

## COUNT IV

### VIOLATION OF THE CALIFORNIA
### CONSUMER LEGAL REMEDIES ACT
### (Cal. Civ. Code § 1750, *et seq.*)

### (Alleged by Plaintiffs Murray, Alvarado, and Pacheco
### on behalf of the California Subclass)

209. Plaintiffs Murray, Alvarado, and Pacheco ("Plaintiffs" for the purposes of this claim) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

210. Plaintiffs bring this claim on behalf of themselves and the California Subclass.

211. Ford is a "person" as defined in California Civil Code § 1761(c).

212. Plaintiffs and California Subclass members are "consumers" as defined in California Civil Code § 1761(d).

213. Ford engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act ("CLRA") through the practices described herein, and by omitting the Spontaneous Fire Risk and misrepresenting and misleading Plaintiffs and the California Subclass about the Fire Risk Vehicles, along with omitting the risks, costs, and monetary damage resulting from the Spontaneous Fire Risk and the inadequate recall repair. These acts and practices

- 75 -

violate, at a minimum, the following sections of the CLRA: (a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which they do not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised.

214.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

215.   Ford knew or should have known that its conduct violated the CLRA.

216.   Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiffs and California Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires or smoke in 23 Fire Risk Vehicles; and (iii) Ford's own investigation of fires in the Fire Risk Vehicles.

217.   Ford knew that the recall repair it implemented did nothing to address the manufacturing flaw that causes the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiffs and California Subclass members.

- 76 -

218.   In the course of its business, Ford violated the CLRA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Risk Vehicles because it misrepresented and omitted material facts concerning the Fire Risk Vehicles, specifically the existence of the Spontaneous Fire Risk, as alleged herein. Ford omitted the fact of the Spontaneous Fire Risk from Plaintiffs and the California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Risk Vehicles given the existence of the Spontaneous Fire Risk in them. Ford also misrepresented the efficacy and effectiveness of the recall repair it issued for the Fire Risk Vehicles.

219.   Ford owed Plaintiffs and the California Subclass a duty to disclose the true safety and reliability of the Fire Risk Vehicles and the adequacy of the recall repair because Ford:

   a.   Possessed exclusive knowledge about the Spontaneous Fire Risk and the nature of its recall repair;

   b.   Omitted the foregoing from Plaintiffs and the California Subclass;

   c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Risk Vehicles, while withholding material facts from Plaintiffs and the California Subclass that contradicted these representations; and/or

   d.   Had duties under the TREAD Act and related regulations to disclose and remedy the Spontaneous Fire Risk.

011111-11/2044975 V2

220. In failing to disclose the Spontaneous Fire Risk and associated safety risks and repair costs that result from it, Ford has misrepresented the Fire Risk Vehicles, omitted disclosure the Spontaneous Fire Risk, and breached its duty to disclose.

221. The facts omitted and misrepresented by Ford to Plaintiffs and California Subclass members, as described herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Fire Risk Vehicles or to pay a lesser price. Had Plaintiffs and California Subclass members known about the defective nature of the Fire Risk Vehicles, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

222. Ford's violations of the CLRA present continuing risk and harm to Plaintiffs, the California Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate fix for the engines that leak oil and vapors. Furthermore, Ford's "fix" raises additional safety concerns and reduces the vehicles' fuel efficiency.

223. On or about August 15, 2022, Plaintiffs' undersigned counsel provided Ford written notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Fire Risk Vehicles.

224. Plaintiffs and California Subclass members' injuries were proximately caused by Ford's deceptive business practices.

225. Plaintiffs and California Subclass members seek all relief available under the CLRA, including equitable relief, damages, and attorneys' fees.

## COUNT V

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200)

**(Alleged by Plaintiffs Murray, Alvarado, and Pacheco
on behalf of the California Subclass)**

226. Plaintiffs Murray, Alvarado, and Pacheco ("Plaintiffs" for the purposes of this claim) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

227. Plaintiffs bring this claim on behalf of themselves and the California Subclass.

228. The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

229. In the course of its business, Ford engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Risk Vehicles because it misrepresented and omitted material facts concerning the Fire Risk Vehicles,

- 79 -

specifically the existence of the Spontaneous Fire Risk, as alleged herein. Ford

omitted the fact of the Spontaneous Fire Risk from Plaintiffs and California

Subclass members. Ford also mispresented the safety, quality, functionality, and

reliability of the Fire Risk Vehicles given the existence of the Spontaneous Fire

Risk in them. Ford also misrepresented the efficacy and effectiveness of the recall

repair of the Fire Risk Vehicles.

230.   Ford engaged in unfair competition and unfair, unlawful, or fraudulent

business practices through the conduct, statements, and omissions described

herein, and by omitting the Spontaneous Fire Risk in the Fire Risk Vehicles from

Plaintiffs and California Subclass members, along with omitting the risks, costs,

and monetary damage resulting from the defect. Ford should have disclosed this

information because it was in a superior position to know the true facts related to

the Spontaneous Fire Risk, and Plaintiffs and California Subclass members could

not reasonably be expected to learn or discover the true facts related to the

Spontaneous Fire Risk.

231.   The Spontaneous Fire Risk causes catastrophic fire in the Fire Risk

Vehicles, and this constitutes a safety issue that triggered Ford's duty to disclose

the safety issue to consumers.

232.   Ford's acts and practices misled and deceived Plaintiffs and are likely

to deceive the public. In failing to disclose the Spontaneous Fire Risk and omitting

other material facts from Plaintiffs and California Subclass members, Ford breached its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and California Subclass members. Ford's omissions and misrepresentations concerned information that was material to Plaintiffs and California Subclass members, as it would have been to all reasonable consumers.

233.   The injuries suffered by Plaintiffs and California Subclass members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and California Subclass members could or should have reasonably avoided.

234.   Ford's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. Ford knew or should have known its conduct violated the UCL.

235.   Plaintiffs and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's unfair, unlawful, and deceptive practices.

236.   Plaintiffs seek to enjoin further unlawful, unfair, and fraudulent acts or practices by Ford, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

011111-11/2044975 V2

## COUNT VI

### VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, et seq.)

### (Alleged by Plaintiffs Murray, Alvarado, and Pacheco
### on behalf of the California Subclass)

237.   Plaintiffs Murray, Alvarado, and Pacheco ("Plaintiffs" for the purposes of this claim) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

238.   Plaintiffs bring this claim on behalf of themselves and the California Subclass.

239.   California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

240.   Ford caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements

- 82 -

that were untrue or misleading, and which were known, or through the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiffs and California Subclass members.

241. Ford violated Section 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Fire Risk Vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

242. Plaintiffs and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's deceptive advertising. In purchasing or leasing their Fire Risk Vehicles, Plaintiffs and California Subclass members relied on Ford's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. Ford's representations and omissions were untrue because the Fire Risk Vehicles were sold or leased with the Spontaneous Fire Risk. Had Plaintiffs and California Subclass members known this, they would not have purchased or leased their Fire Risk Vehicles or paid as much for them. Accordingly, Plaintiffs and California Subclass members overpaid for their Fire Risk Vehicles and did not receive the benefit of their bargain.

243. All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a

- 83 -

pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

244. Plaintiffs, individually and on behalf of the California Subclass members, request this Court enter such orders or judgments as necessary to enjoin Ford from continuing its unlawful and deceptive advertising, to restore to Plaintiffs and California Subclass members any money Ford acquired by its deceptive advertising, including restitution and restitutionary disgorgement, and for such other relief permitted.

## COUNT VII

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792)

### (Alleged by Plaintiffs Murray, Alvarado, and Pacheco on behalf of the California Subclass)

245. Plaintiffs Murray, Alvarado, and Pacheco ("Plaintiffs" for the purposes of this claim) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

246. Plaintiffs bring this claim on behalf of themselves and the California Subclass.

247. Plaintiffs and California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

- 84 -

248.   The Fire Risk Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

249.   Ford is the "manufacturer" of the Fire Risk Vehicles within the meaning of Cal. Civ. Code § 1791(j).

250.   Ford impliedly warranted to Plaintiffs and the California Subclass that the Fire Risk Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Fire Risk Vehicles do not have the quality that a buyer would reasonably expect and were therefore not merchantable.

251.   Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)   Pass without objection in the trade under the contract description.

(2)   Are fit for the ordinary purposes for which such goods are used.

(3)   Are adequately contained, packaged, and labeled.

(4)   Conform to the promises or affirmations of fact made on the container or label.

252.   The Fire Risk Vehicles were not merchantable when sold or leased because they pose an unreasonable risk of fires due to the Spontaneous Fire Risk as described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue in the engine compartment that makes the

- 85 -

vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

253.   Ford breached the implied warranty of merchantability by selling Fire Risk Vehicles containing a defect leading to under hood fires during ordinary operating conditions. This defect has deprived Plaintiffs and California Subclass members of the benefit of their bargain.

254.   Plaintiffs and the California Subclass have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between them. Nonetheless, privity is not required here because Plaintiffs and the California Subclass are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Fire Risk Vehicles and have no rights under the warranty agreements provided with the Fire Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers.

255.   Notice of breach is not required because Plaintiffs and California Subclass members did not purchase their automobiles directly from Ford. Nonetheless, Plaintiffs' counsel sent notification to Ford on or about August 15, 2022.

256.   Plaintiffs and California Subclass members were and are third-party beneficiaries to Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Risk Vehicles to Plaintiffs and California Subclass members.

257.   As a direct and proximate result Ford's breach of the implied warranty of merchantability, Plaintiffs and California Subclass members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiffs and California Subclass members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Fire Risk Vehicles.

258.   Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Fire Risk Vehicles, or the overpayment or diminution in value of their Fire Risk Vehicles.

259.   Under Cal. Civ. Code § 1794, Plaintiffs and California Subclass members are entitled to costs and attorneys' fees.

2.    **Illinois**

## COUNT VIII

### VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (810 ILCS 505/1, *et seq.*, and 720 ILCS 295/1A)

**(Alleged by Plaintiff Petty on behalf of the Illinois Subclass)**

260.   Plaintiff Petty ("Plaintiff" for purposes of this claim) and the Illinois Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

261.   Plaintiff brings this claim on behalf of himself and the Illinois Subclass.

262.   Ford is a "person" as that term is defined in 815 ILCS 505/1(c).

263.   Plaintiff and the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

264.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact ... in the conduct of trade or commerce ... whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

- 88 -

265.    In the course of its business, Ford violated the Illinois CFA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Risk Vehicles because it misrepresented and omitted material facts concerning the Fire Risk Vehicles, specifically the existence of the Spontaneous Fire Risk, as alleged herein, as well as the true nature of the recall repair it was performing on the Fire Risk Vehicles. Ford omitted the fact of the Spontaneous Fire Risk from Plaintiff and the Illinois Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Risk Vehicles given the existence of the Spontaneous Fire Risk in them.

266.    Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Risk Vehicles to Plaintiff and the Illinois Subclass.

267.    By failing to disclose and omitting the Spontaneous Fire Risk in the Fire Risk Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Illinois CFA.

268.    The Spontaneous Fire Risk would be material to a reasonable consumer, such as the Illinois Subclass, and it is material to Plaintiff.

269.    Ford's deceptive act or practices described herein concerning the Spontaneous Fire Risk and the Fire Risk Vehicles were likely to deceive or mislead

a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Illinois Subclass, and did in fact deceive and mislead Plaintiff.

270.  Ford failed to disclose material information about the Spontaneous Fire Risk and the Fire Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the Illinois Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Risk and the Fire Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Illinois Subclass, and did in fact deceive and mislead Plaintiff.

271.  Plaintiff and the Illinois Subclass members could not have discovered the existence of the Spontaneous Fire Risk, or Ford's deception and responsibility for the Spontaneous Fire Risk, until shortly before this class action was commenced.

272.  Ford knew or should have known that its conduct violated the Illinois CPA.

273.  Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiff and the Illinois Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires or smoke in 23 Fire Risk Vehicles; and (iii) Ford's own investigation of fires in the Fire Risk Vehicles.

274.   As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Risk Vehicles that were either false or misleading.

275.   Ford owed Plaintiff and the Illinois Subclass a duty to disclose the true safety and reliability of the Fire Risk Vehicles because Ford:

a.   Possessed exclusive knowledge about the Spontaneous Fire Risk and the true nature of the recall repair;

b.   Omitted the foregoing from Plaintiff and the Illinois Subclass;

c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Risk Vehicles, while withholding material facts from Plaintiff and the Illinois Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the Fire Risk well prior to the issue of its recall notice in 2022.

276.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Illinois Subclass. Because Ford omitted the Spontaneous Fire Risk, Plaintiff and the Illinois Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Risk. Had Plaintiff and the Illinois Subclass been aware of the Spontaneous Fire Risk in their vehicles, they would

have either not have bought their Fire Risk Vehicles or would have paid less for them.

277.  Ford's violations of the Illinois CPA present continuing risk and harm to Plaintiff, the Illinois Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate fix for the leaking engines. Furthermore, Ford's "fix" raises additional safety concerns and reduces the vehicles' fuel efficiency.

278.  Under 815 ILCS 505/10a(a), Plaintiff and the Illinois Subclass seek monetary relief against Ford in the amount of actual damages. Plaintiff and the Illinois Subclass also seek an order enjoining Ford's unfair and deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

## COUNT IX

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER ILLINOIS LAW (810 ILCS 5/2-314)

#### (Alleged by Plaintiff Petty on behalf of the Illinois Subclass)

279.  Plaintiff Petty ("Plaintiff" for purposes of this claim) and the Illinois Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

280.   Plaintiff brings this claim on behalf of himself and the Illinois

Subclass.

281.   Ford is a "merchant" within the meaning of 810 ILCS 5/2-103(2) and

810 ILCS 5/2-104, and a "seller" of motor vehicles within the meaning of 810

ILCS 5/2-103(1)(d).

282.   Under Illinois law, an implied warranty of merchantability attaches to

the Fire Risk Vehicles. 810 ILCS 5/2-314.

283.   The Fire Risk Vehicles were not merchantable when sold or leased

because they are prone to a spontaneous and unreasonable risk of fire due to the

Spontaneous Fire Risk described herein. Without limitation, the Fire Risk Vehicles

share a common defect in that they all suffer from an issue in the engine

compartment that makes the vehicles susceptible to a risk of spontaneous fire,

causing an unreasonable risk of death, serious bodily harm, and property damage

to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of

damage and harm to their homes or other nearby property, passengers, and

bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles

unmerchantable and unfit for their ordinary use of driving when they were sold or

leased, and at all times thereafter.

284.   The engine defect existed at the time the Fire Risk Vehicles

containing the Spontaneous Fire Risk left the possession or control of Ford.

- 93 -

285.   Based upon the dangerous product defect, Ford failed to meet the expectations of a reasonable consumer. The Fire Risk Vehicles failed their ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and therefore do not function as a reasonable consumer would expect.

286.   Plaintiff and the Illinois Subclass have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between them.

287.   It was reasonable to expect that Plaintiff and the Illinois Subclass would be affected by the Fire Risk Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability.

288.   Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel, consumer complaints to NHTSA regarding the Fire Risk that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

289.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Illinois Subclass have been damaged in an amount to be determined at trial.

3.      **Nevada**

## COUNT X

**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
(Nev. Rev. Stat. § 598.0903, *et seq.*)**

**(Alleged by Plaintiff Spackman on behalf of the Nevada Subclass)**

290.    Plaintiff Spackman ("Plaintiff" for the purposes of this claim) and the Nevada Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

291.    Plaintiff brings this claim on behalf of himself and the Nevada Subclass.

292.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, *et seq.* prohibits deceptive trade practices Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as

- 95 -

advertised"; or "15. Knowingly makes any other false representation in a transaction."

293.   In the course of its business, Ford engaged in deceptive trade practices that violated the Nevada DTPA, including: knowingly making false representations as to the safety of the Fire Risk Vehicle; representing that Fire Risk Vehicles are of a high standard, quality, and grade when in fact the Fire Risk Vehicles are at risk of catching on fire due to quality issues; advertising Fire Risk Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Fire Risk Vehicles has been supplied in accordance with a previous representation when it has not; knowingly making other false representations in a transaction; and concealing the known Spontaneous Fire Risk in the Fire Risk Vehicles.

294.   Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Risk Vehicles to Plaintiff and the Nevada Subclass.

295.   By failing to disclose and by actively concealing the defect in the Fire Risk Vehicles, which it marketed as safe, reliable, and of high quality, Ford engaged in unfair and deceptive business practices in violation of the Nevada DTPA.

296.   The Spontaneous Fire Risk would be material to a reasonable consumer, such as the Nevada Subclass, and it is material to Plaintiff.

297.   Ford's deceptive act or practices described herein concerning the Spontaneous Fire Risk and the Fire Risk Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Nevada Subclass, and did in fact deceive and mislead Plaintiff.

298.   Ford failed to disclose material information about the Spontaneous Fire Risk and the Fire Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the Nevada Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Risk and the Fire Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Nevada Subclass, and did in fact deceive and mislead Plaintiff.

299.   Plaintiff and the Nevada Subclass could not have discovered the existence of the Spontaneous Fire Risk, or Ford's deception and responsibility for the Spontaneous Fire Risk, until shortly before this class action was commenced.

300.   Ford knew or should have known that its conduct violated the Nevada DTPA.

301.   Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiff and the Nevada

- 97 -

Subclass members based on (i) its own pre-sale durability testing; (ii) the direct

and public reports of fires or smoke in 23 Fire Risk Vehicles; and (iii) Ford's own

investigation of fires in the Fire Risk Vehicles.

302.   As alleged above, Ford made material statements about the safety and

reliability of the Fire Risk Vehicles that were either false or misleading.

303.   Ford owed Plaintiff and the Nevada Subclass a duty to disclose the

true safety and reliability of the Fire Risk Vehicles because Ford:

    a.    Possessed exclusive knowledge about the Spontaneous Fire Risk and the true nature of the recall repair;

    b.    Intentionally concealed the foregoing from Plaintiff and the Nevada Subclass;

    c.    Made incomplete representations about the safety and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Nevada Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Fire Risk well prior to the issue of its recall notice in 2022.

304.   Ford's deceptive acts and practices alleged herein directly and

proximately caused actual damages and an ascertainable monetary loss to Plaintiff

and the Nevada Subclass. Because Ford omitted the Spontaneous Fire Risk, Fire

Risk Vehicle owners were deprived of the benefit of their bargain since the

vehicles they purchased were worth less than they would have been if they were

free from the known Spontaneous Fire Risk. Had Fire Risk Vehicle owners been

aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

305.   Ford's violations of the Nevada DTPA present continuing risk and harm to Plaintiff, the Nevada Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate fix for the defective engines. Furthermore, Ford's "fix" raises additional safety concerns and reduces the vehicles' fuel efficiency.

306.   Under Nev. Rev. Stat. § 41.600, Plaintiff and the Nevada Subclass seek monetary relief against Ford in the amount of actual damages. Plaintiff and the Nevada Subclass also seek punitive damages, an order enjoining Ford's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA.

## COUNT XI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER NEVADA LAW
### (Nev. Rev. Stat. § 104.2314)

**(Alleged by Plaintiff Spackman on behalf of the Nevada Subclass)**

307.   Plaintiff Spackman ("Plaintiff" for the purposes of this claim) brings this claim on behalf of himself and the Nevada Subclass.

308.   Plaintiff and the Nevada Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

309.   Ford is a "merchant" of the Fire Risk Vehicles within the meaning of Nev. Rev. Stat. § 104.2104, and the Fire Risk Vehicles are "goods" under Nev. Rev. Stat. § 1-4.2105(1).

310.   Under Nevada law, an implied warranty of merchantability attaches to the Fire Risk Vehicles. Nev. Rev. Stat. § 1-4.2314.

311.   The Fire Risk Vehicles were not merchantable when sold or leased because they posed an unreasonable risk of fires due to the Spontaneous Fire Risk as described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue in the engine compartment that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

312.   The engine defect existed at the time the Fire Risk Vehicles containing the Spontaneous Fire Risk left the possession or control of Ford.

313.   Based upon the dangerous product defect, Ford failed to meet the expectations of a reasonable consumer. The Fire Risk Vehicles failed their

- 100 -

ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and therefore do not function as a reasonable consumer would expect.

314.   Plaintiff and the Nevada Subclass were and are third-party beneficiaries to Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Risk Vehicles to them.

315.   It was reasonable to expect that Plaintiff and the Nevada Subclass would be affected by the Fire Risk Vehicles, and he is therefore entitled to the protections of the implied warranty of merchantability under Nev. Rev. Stat. § 1-4.2318.

316.   Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel, consumer complaints to NHTSA regarding the Fire Risk that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

317.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff has been damaged in an amount to be determined at trial.

- 101 -

4.    **New York**

**COUNT XII**

**VIOLATION OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES**
**(N.Y. Gen. Bus. Law § 349, *et seq.*)**

**(Alleged by Plaintiff Armani on behalf of the New York Subclass)**

318.   Plaintiff Armani ("Plaintiff" for the purposes of this claim) and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

319.   Plaintiff brings this action on behalf of himself and the New York Subclass.

320.   Plaintiff and the New York Subclass members are "persons" within the meaning of New York General Business Law ("NYGBL"), N.Y. Gen. Bus. Law § 349(h).

321.   Ford is a "person," "firm," "corporation," or "association" within the meaning of NYGBL Section 349.

322.   NYGBL Section 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce, or in the furnishing of any service in this state…." Material omissions are also actionable under NYGBL § 349.

323.   By omitting the Spontaneous Fire Risk and misleading Plaintiff and the New York Subclass about the Fire Risk Vehicles and the recall repair, Ford's

- 102 -

conduct described herein constitutes "deceptive acts or practices" within the meaning of the NYGBL.

324.    In the course of its business, Ford violated NYGBL Section 349 and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Risk Vehicles because it misrepresented and omitted material facts concerning the Fire Risk Vehicles, specifically the existence of the Spontaneous Fire Risk and the nature of the recall repair, as alleged herein. Ford omitted the fact of the Spontaneous Fire Risk from Plaintiff and the New York Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Risk Vehicles given the existence of the Spontaneous Fire Risk.

325.    Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Risk Vehicles to Plaintiff and the New York Subclass.

326.    By failing to disclose and omitting the Spontaneous Fire Risk in the Fire Risk Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of NYGBL.

327.    The Spontaneous Fire Risk would be material to a reasonable consumer, such as the New York Subclass, and it is material to Plaintiff.

- 103 -

328.   Ford's deceptive act or practices described herein concerning the Spontaneous Fire Risk and the Fire Risk Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the New York Subclass, and did in fact deceive and mislead Plaintiff.

329.   Ford failed to disclose material information about the Spontaneous Fire Risk and the Fire Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the New York Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Risk and the Fire Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the New York Subclass, and did in fact deceive and mislead Plaintiff.

330.   Plaintiff could not have discovered the existence of the Spontaneous Fire Risk, or Ford's deception and responsibility for the Spontaneous Fire Risk, until shortly before this class action was commenced.

331.   Ford knew or should have known that its conduct violated NYGBL.

332.   Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiff and the New York Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in 23 Fire Risk Vehicles; and (iii) Ford's own investigation of fires in the Fire Risk Vehicles.

- 104 -

333. As alleged above, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Risk Vehicles that were either false or misleading.

334. Ford owed Plaintiff and the New York Subclass a duty to disclose the true safety and reliability of the Fire Risk Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Risk;

b. Omitted the foregoing from Plaintiff and the New York Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Risk Vehicles, while withholding material facts from Plaintiff and the New York Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Fire Risk well prior to the issue of its recall notice in 2022.

335. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the New York Subclass. Because Ford omitted the Spontaneous Fire Risk, Plaintiff and the New York Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Risk. Had Plaintiff and the New York Subclass been aware of the Spontaneous Fire Risk in their vehicles, they would

- 105 -

have either not have bought their Fire Risk Vehicles or would have paid less for them.

336. Ford's violations of NYGBL present continuing risk and harm to Plaintiff, the New York Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate fix for the defective engines. Furthermore, Ford's "fix" raises additional safety concerns and reduces the vehicles' fuel efficiency.

337. Because Ford's deceptive acts and practices caused injury to Plaintiff and the New York Subclass, they seek monetary relief against Ford in the greater amount of actual damages or statutory damages, and reasonable attorneys' fees and costs. Plaintiff and the New York Subclass also seek an order enjoining Ford's unlawful practices and any other just and proper relief available under NYGBL Section 349.

## COUNT XIII

### VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT
### (N.Y. Gen. Bus. Law § 350)

**(Alleged by Plaintiff Armani on behalf of the New York Subclass)**

338. Plaintiff and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

339. Plaintiff brings this action on behalf of himself and the New York Subclass.

- 106 -

340.  Ford was and is engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

341.  New York's General Business Law ("NYGBL") Section 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity…." N.Y. Gen. Bus. Law § 350-a.

342.  Ford caused to be made or disseminated through New York, through representations, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff and the New York Subclass members.

343.  Ford violated NYGBL Section 350 because it omitted facts regarding the Spontaneous Fire Risk and misrepresented the safety, quality, functionality, and reliability of the Fire Risk Vehicles to Plaintiff and New York Subclass members, as alleged herein, which were material omissions and misrepresentations and likely to deceive a reasonable consumer, such as Plaintiff and New York Subclass members.

- 107 -

344.   Plaintiff and the New York Subclass suffered injury, including the loss of money or property, because of Ford's false advertising. In purchasing or leasing their Fire Risk Vehicles, Plaintiff and the New York Subclass members relied on Ford's misrepresentations and omissions regarding the safety, quality, functionality, and reliability of the Fire Risk Vehicles. Had Plaintiff and the New York Subclass members known about the Spontaneous Fire Risk, they would not have purchased or leased their Fire Risk Vehicles or paid as much for them.

345.   Under NYGBL Section 350, Plaintiff and the New York Subclass seek monetary relief against Ford in the greater amount of actual damages or statutory damages. Plaintiff and the New York Subclass also seek an order enjoining Ford's unlawful practices, attorneys' fees, costs, and any other just and proper relief available under NYGBL Section 350.

### COUNT XIV

### BREACH OF NEW YORK'S IMPLIED WARRANTY OF MERCHANTABILITY (N.Y. U.C.C. Law §§ 2-314; 2A-212)

**(Alleged by Plaintiff Armani on behalf of the New York Subclass)**

346.   Plaintiff and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

347.   Plaintiff brings this action on behalf of himself and the New York Subclass.

- 108 -

348.   Ford is a "merchant[]" and "seller[]" of motor vehicles, and the Fire Risk Vehicles are "goods" under New York law. *See* N.Y. U.C.C. § 2-104(1).

349.   Under N.Y. U.C.C. §§ 2-314; 2A-212, an implied warranty of merchantability attaches to the Fire Risk Vehicles when they were sold or leased by Ford to Plaintiff and the New York Subclass members.

350.   The Fire Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Risk described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue in the engine compartment that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

351.   The engine defect existed at the time the Fire Risk Vehicles containing the Spontaneous Fire Risk left the possession or control of Ford.

352.   Based upon the dangerous product defect, Ford failed to meet the expectations of a reasonable consumer. The Fire Risk Vehicles failed their

- 109 -

ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and therefore do not function as a reasonable consumer would expect.

353.   Plaintiff and the New York Subclass have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between them. Nonetheless, privity is not required here because Plaintiff and the New York Subclass are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Fire Risk Vehicles and have no rights under the warranty agreements provided with the Fire Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers.

354.   It was reasonable to expect that Plaintiff and the New York Subclass would be affected by the Fire Risk Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability.

355.   Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel, consumer complaints to NHTSA regarding the Fire Risk that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

356.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the New York Subclass have been damaged in an amount to be determined at trial.

**5.     Ohio**

**COUNT XV**

**VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT**
**(Ohio Rev. Code § 1345.01, *et seq.*)**

**(Alleged by Plaintiff Finklestein on behalf of the Ohio Subclass)**

357.   Plaintiff Finklestein ("Plaintiff" for the purposes of this claim) and the Ohio Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

358.   Plaintiff brings this action on behalf of himself and the Ohio Subclass.

359.   Ford is a "supplier" as that term is defined in Ohio Rev. Code § 1345.01(I).

360.   Plaintiff and the Ohio Subclass members are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchases and leases of the Fire Risk Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

361.   The Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code § 1345.02 *et seq.*, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the

- 111 -

broad prohibition, the Ohio CSPA prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not. *Id.* Ford's conduct as alleged herein constitutes unfair and/or deceptive consumer sales practices in violation of Ohio Rev. Code § 1345.02.

362.  By devaluing safety and omitting the Spontaneous Fire Risk, Ford engaged in deceptive business practices prohibited by the Ohio CSPA, including: representing that Fire Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that vehicles are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving Fire Risk Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

363.  In the course of its business, Ford violated the Ohio CSPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Risk Vehicles because it misrepresented and omitted material facts concerning the Fire Risk Vehicles, specifically the existence of the Spontaneous Fire Risk and the nature of the recall repair, as alleged herein. Ford omitted the fact of the

- 112 -

Spontaneous Fire Risk from Plaintiff and the Ohio Subclass members. Ford also

mispresented the safety, quality, functionality, and reliability of the Fire Risk

Vehicles given the existence of the Spontaneous Fire Risk in them.

364.   Ford's actions described herein occurred in the conduct of trade or

commerce, specifically the sale or lease of the Fire Risk Vehicles to Plaintiff and

the Ohio Subclass.

365.   By failing to disclose and omitting the Spontaneous Fire Risk in the

Fire Risk Vehicles, which it marketed as safe, reliable, of high quality, and safe for

ordinary use, Ford engaged in unfair and deceptive business practices in violation

of the Ohio CSPA.

366.   The Spontaneous Fire Risk would be material to a reasonable

consumer, such as the Ohio Subclass, and it is material to Plaintiff.

367.   Ford's deceptive act or practices described herein concerning the

Spontaneous Fire Risk and the Fire Risk Vehicles were likely to deceive or mislead

a reasonable consumer acting reasonably under the circumstances, such as Plaintiff

and the Ohio Subclass, and did in fact deceive and mislead Plaintiff.

368.   Ford failed to disclose material information about the Spontaneous

Fire Risk and the Fire Risk Vehicles, which Ford possessed and of which

consumers, like Plaintiff and the Ohio Subclass, were unaware. Ford's failure to

disclose this material information about the Spontaneous Fire Risk and the Fire

Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Ohio Subclass, and did in fact deceive and mislead Plaintiff.

369.   Plaintiff and the Ohio Subclass could not have discovered the existence of the Spontaneous Fire Risk, or Ford's deception and responsibility for the Spontaneous Fire Risk, until shortly before this class action was commenced.

370.   Ford knew or should have known that its conduct violated the Ohio CSPA.

371.   Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiff and the Ohio Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires or smoke in 23 Fire Risk Vehicles; and (iii) Ford's own investigation of fires in the Fire Risk Vehicles.

372.   As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Risk Vehicles that were either false or misleading.

373.   Ford owed Plaintiff and the Ohio Subclass a duty to disclose the true safety and reliability of the Fire Risk Vehicles because Ford:

      a.     Possessed exclusive knowledge about the Spontaneous Fire Risk and the recall repair;

      b.     Omitted the foregoing from Plaintiff and the Ohio Subclass;

- 114 -

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Risk Vehicles, while withholding material facts from Plaintiff and the Ohio Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the defect well prior to the issue of its recall notice in 2022.

374. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Ohio Subclass. Because Ford omitted the Spontaneous Fire Risk, Plaintiff and the Ohio Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Risk. Had Plaintiff and the Ohio Subclass been aware of the Spontaneous Fire Risk in their vehicles, they would have either not have bought their Fire Risk Vehicles or would have paid less for them.

375. Ford's violations of the Ohio CSPA present continuing risk and harm to Plaintiff, the Ohio Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate fix for the defective engines. Furthermore, Ford's "fix" raises additional safety concerns and reduces the vehicles' fuel efficiency.

376. Ford was on notice pursuant to Ohio Rev. Code § 1345.09(B) that its actions constituted unfair, deceptive, and unconscionable practices by, for

example, *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio App. LEXIS 3911, at

*33 (S.D. Ohio Aug. 18, 2005), and *Lilly v. Hewlett-Packard Co.*, 2006 U.S. Dist.

LEXIS 22114, at *17–18 (S.D. Ohio Apr. 21, 2006). Further, Ford's conduct as

alleged above constitutes an act or practice previously declared to be deceptive or

unconscionable by rule adopted under division (B)(2) of section 1345.05 and

previously determined by Ohio courts to violate Ohio's Consumer Sales Practices

Act and was committed after the decisions containing these determinations were

made available for public inspection under division (A)(3) of Ohio Rev. Code

§ 1345.05. The applicable rule and Ohio court opinions include but are not limited

to: OAC 109:4-3-16; *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio 4296 (Ohio

Ct. App. 2005); *Khouri v. Lewis*, Cuyahoga Common Pleas No. 342098 (2001);

*State ex rel. Montgomery v. Canterbury*, Franklin App. No. 98CVH054085 (2000);

and *Fribourg v. Vandemark* (July 26, 1999), Clermont App. No. CA99-02-017,

unreported (PIF # 10001874).

377.   As a result of the foregoing wrongful conduct of Ford, Plaintiff and

the Ohio Subclass have been damaged in an amount to be proven at trial, and seek

all just and proper remedies, including, but not limited to, actual and statutory

damages, an order enjoining Ford's deceptive and unfair conduct, treble damages,

court costs and reasonable attorneys' fees, pursuant to Ohio Rev. Code § 1345.09,

*et seq.*

## COUNT XVI

## IMPLIED WARRANTY IN TORT UNDER OHIO LAW

### (Alleged by Plaintiff Finklestein on behalf of the Ohio Subclass)

378.   Plaintiff Finklestein ("Plaintiff" for the purposes of this claim) and the Ohio Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

379.   Plaintiff brings this action on behalf of himself and the Ohio Subclass.

380.   The Fire Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Risk described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue in the engine compartment that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

381.   The engine defect existed at the time the Fire Risk Vehicles containing the Spontaneous Fire Risk left the possession or control of Ford.

- 117 -

382.   Based upon the dangerous product defect, Ford failed to meet the expectations of a reasonable consumer. The Fire Risk Vehicles failed their ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and therefore do not function as a reasonable consumer would expect.

383.   Plaintiff and the Ohio Subclass have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between them.

384.   It was reasonable to expect that Plaintiff and the Ohio Subclass would be affected by the Fire Risk Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability.

385.   Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel, consumer complaints to NHTSA regarding the Fire Risk that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

386.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Ohio Subclass have been damaged in an amount to be proven at trial.

6.      **Oregon**

## COUNT XVII

**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**
**(Or. Rev. Stat. §§ 646.605, *et seq.*)**

**(Alleged by Plaintiff Dunning on behalf of the Oregon Subclass)**

387.   Plaintiff Dunning ("Plaintiff" for the purposes of this claim) and the

Oregon Subclass reallege and incorporate by reference all paragraphs as though

fully set forth herein.

388.   Plaintiff brings this action on behalf of himself and the Oregon

Subclass.

389.   Ford is a person within the meaning of Or. Rev. Stat. § 646.605(4).

390.   The Fire Defect Vehicles at issue are "goods" obtained primarily for

personal family or household purposes within the meaning of Or. Rev. Stat.

§ 646.605(6).

391.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a

person from, in the course of the person's business, doing any of the following:

"(e) Represent[ing] that … goods … have … characteristics … uses, benefits, …

or qualities that they do not have; … (g) Represent[ing] that … goods … are of a

particular standard [or] quality … if they are of another; … (i) Advertis[ing] …

goods or services with intent not to provide them as advertised; … and

- 119 -

(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(1).

392.   In the course of its business, Ford violated the Oregon UTPA and engaged in deceptive acts or practices concerning the Fire Risk Vehicles because it misrepresented and omitted material facts concerning the Fire Risk Vehicles, specifically the nature of the recall repair, as alleged herein.

393.   By failing to disclose material facts concerning the nature of the recall repair to the Fire Risk Vehicles, Ford engaged in unfair and deceptive business practices in violation of the Oregon UTPA.

394.   The true nature of the recall repair would be material to a reasonable consumer, such as the Oregon Subclass, and is material to Plaintiff Dunning.

395.   Ford's deceptive act or practices described herein concerning the recall repair were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Dunning and the Oregon Subclass, and did in fact deceive and mislead Plaintiff Dunning.

396.   Ford failed to disclose material information about the recall repair, which Ford possessed and of which consumers, like Plaintiff Dunning and the Oregon Subclass, were unaware. Ford's failure to disclose this material information about the recall repair was likely to deceive or mislead a reasonable

- 120 -

consumer acting reasonably under the circumstances, such as Plaintiff Dunning and the Oregon Subclass, and did in fact deceive and mislead Plaintiff Dunning.

397. Plaintiff could not have discovered Ford's deception until shortly before this class action was commenced.

398. Ford knew or should have known that its conduct violated the Oregon UTPA.

399. Ford knew or should have known about the problems with its recall repair.

400. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles after being subjected to the repair that were either false or misleading.

401. Ford owed Plaintiff Dunning and the Oregon Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

    a.    Possessed exclusive knowledge about the recall repair;

    b.    Omitted the foregoing from Plaintiff Dunning and the Oregon Subclass;

    c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles after they underwent the recall repair, while withholding material facts from Plaintiff Dunning and the Oregon Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the problems with the recall repair.

- 121 -

402.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Dunning and the Oregon Subclass. Because Ford omitted information about the recall repair, Plaintiff Dunning and the Oregon Subclass were deprived of the benefit of their bargain since their vehicles were worth less than they would have been if they did not suffer from reduced average mileage and the potential to leak flammable fluids and vapors after Ford instituted the recall repair.

403.   Ford's violations of the Oregon UTPA present a continuing risk to Plaintiff Dunning, the Oregon Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the defective engines. Furthermore, Ford's "fix" raises additional safety concerns and reduces the vehicles' fuel efficiency.

404.   Plaintiff Dunning and the Oregon Subclass are entitled to recover the greater of actual damages or $200 under to Or. Rev. Stat. § 646.638(1).

7. **Pennsylvania**

## COUNT XVIII

## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, *et seq*.)

**(Alleged by Plaintiff Lappas on behalf of the Pennsylvania Subclass)**

405.   Plaintiff Lappas ("Plaintiff" for the purposes of this claim) and the Pennsylvania Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

406.   Plaintiff brings this action on behalf of herself and the Pennsylvania Subclass.

407.   Plaintiff and the Pennsylvania Subclass members purchased or leased their Fire Risk Vehicles primarily for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2.

408.   All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

409.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, … Benefits or qualities that they do not have"; (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another"; (iii) "Advertising goods or services with intent not to sell them as advertised"; and

- 123 -

(iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

410.   In the course of its business, Ford engaged in unlawful trade practices, including representing that Fire Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Fire Risk Vehicles are of a particular standard and quality when they are not; advertising Fire Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

411.   Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Risk Vehicles to Plaintiff and the Pennsylvania Subclass.

412.   By failing to disclose and omitting the Spontaneous Fire Risk in the Fire Risk Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, and by failing to disclose the true nature of the recall repair, Ford engaged in unfair and deceptive business practices in violation of the Pennsylvania CPL.

413.   The Spontaneous Fire Risk would be material to a reasonable consumer, such as the Pennsylvania Subclass, and it is material to Plaintiff.

414.   Ford's deceptive act or practices described herein concerning the Spontaneous Fire Risk and the Fire Risk Vehicles were likely to deceive or mislead

- 124 -

a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Pennsylvania Subclass, and did in fact deceive and mislead Plaintiff.

415.   Ford failed to disclose material information about the Spontaneous Fire Risk and the Fire Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the Pennsylvania Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Risk and the Fire Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Pennsylvania Subclass, and did in fact deceive and mislead Plaintiff.

416.   Plaintiff could not have discovered the existence of the Spontaneous Fire Risk, or Ford's deception and responsibility for the Spontaneous Fire Risk, until shortly before this class action was commenced.

417.   Ford knew or should have known that its conduct violated the Pennsylvania CPL.

418.   Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiff and the Pennsylvania Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in 23 Fire Risk Vehicles; and (iii) Ford's own investigation of fires in the Fire Risk Vehicles.

419.   As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Risk Vehicles that were either false or misleading.

420.   Ford owed Plaintiff and the Pennsylvania Subclass a duty to disclose the true safety and reliability of the Fire Risk Vehicles because Ford:

a.   Possessed exclusive knowledge about the Spontaneous Fire Risk and the recall repair;

b.   Omitted the foregoing from Plaintiff and the Pennsylvania Subclass;

c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Risk Vehicles, while withholding material facts from Plaintiff and the Pennsylvania Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defect well prior to the issue of its recall notice in 2022.

421.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Pennsylvania Subclass. Because Ford omitted the Spontaneous Fire Risk, Plaintiff and the Pennsylvania Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Risk. Had Plaintiff and the Pennsylvania Subclass members known the truth about the Spontaneous Fire Risk

they would not have purchased or leased the vehicles or would have paid

significantly less for them.

422.   Ford's violations of the Pennsylvania CPL present continuing risk and

harm to Plaintiff, the Illinois Subclass, and the public. In particular and as alleged

herein, Ford has yet to provide an adequate fix for the defective engines.

Furthermore, Ford's "fix" raises additional safety concerns and reduces the

vehicles' fuel efficiency.

423.   Under 73 P.S. § 201-9.2(a), Ford is liable to Plaintiff and the

Pennsylvania Subclass for treble their actual damages or $100, whichever is

greater, and attorneys' fees and costs.

## COUNT XIX

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER PENNSYLVANIA LAW (13 Pa. Cons. Stat. Ann. § 2314)

**(Alleged by Plaintiff Lappas on behalf of the Pennsylvania Subclass)**

424.   Plaintiff Lappas ("Plaintiff" for the purposes of this claim) and the

Pennsylvania Subclass reallege and incorporate by reference all paragraphs as

though fully set forth herein.

425.   Plaintiff brings this action on behalf of himself and the Pennsylvania

Subclass.

426.   Ford is a "merchant" with respect to motor vehicles.

- 127 -

427.   Under Pennsylvania law, an implied warranty of merchantability attaches to the Fire Risk Vehicles.

428.   The Fire Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Risk described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue in the engine compartment that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

429.   The engine defect existed at the time the Fire Risk Vehicles containing the Spontaneous Fire Risk left the possession or control of Ford.

430.   Based upon the dangerous product defect, Ford failed to meet the expectations of a reasonable consumer. The Fire Risk Vehicles failed their ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and therefore do not function as a reasonable consumer would expect.

431.    Plaintiff and the Pennsylvania Subclass members were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Risk Vehicles to Plaintiff and the Pennsylvania Subclass members.

432.    It was reasonable to expect that Plaintiff and the Subclass members would be affected by the Fire Risk Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability.

433.    Ford was provided notice of these issues within a reasonable time of Plaintiff and the Pennsylvania Subclass members' knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to Ford, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and by the allegations contained in this Complaints.

434.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Pennsylvania Subclass members have been damaged in an amount to be determined at trial.

8.      **Tennessee**

## COUNT XX

**VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT**
**(Tenn. Code Ann. § 47-18-101,** *et seq.***)**

**(Alleged by Plaintiff Garrett on behalf of the Tennessee Subclass)**

435.    Plaintiff Garrett ("Plaintiff" for the purposes of this claim) and the

Tennessee Subclass reallege and incorporate by reference all paragraphs as though

fully set forth herein.

436.    Plaintiff brings this claim on behalf of himself and the Tennessee

Subclass.

437.    Plaintiff is a "natural person" and "consumer" within the meaning of

Tenn. Code Ann. § 47-18-103(2).

438.    Ford is a "person" within the meaning of Tenn. Code Ann. § 47-18-

103(2).

439.    Ford's conduct complained of herein affected "trade," "commerce" or

"consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

440.    The Tennessee Consumer Protection Act ("Tennessee CPA")

prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade

or commerce," including but not limited to: "Representing that goods or services

have … characteristics, [or] … benefits … that they do not have…"; "Representing

that goods or services are of a particular standard, quality or grade… if they are of

- 130 -

another"; and "Advertising goods or services with intent not to sell them as advertised." Tenn. Code Ann. § 47-18-104. Ford violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Fire Risk Vehicles have characteristics or benefits that they did not have; representing that Fire Risk Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Fire Risk Vehicles with intent not to sell them as advertised.

441.   In the course of its business, Ford concealed the Spontaneous Fire Risk in the Fire Risk Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and recall of the Fire Risk Vehicles.

442.   Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Risk Vehicles to Plaintiff and the Tennessee Subclass.

443.   By failing to disclose and by actively concealing the defect in the Fire Risk Vehicles, which it marketed as safe, reliable, and of high quality, Ford

- 131 -

engaged in unfair and deceptive business practices in violation of the Tennessee CPA.

444. The Spontaneous Fire Risk would be material to a reasonable consumer, such as the Tennessee Subclass, and it is material to Plaintiff.

445. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Risk and the Fire Risk Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Tennessee Subclass, and did in fact deceive and mislead Plaintiff.

446. Ford failed to disclose material information about the Spontaneous Fire Risk and the Fire Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the Tennessee Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Risk and the Fire Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Tennessee Subclass, and did in fact deceive and mislead Plaintiff.

447. Plaintiff could not have discovered the existence of the Spontaneous Fire Risk, or Ford's deception and responsibility for the Spontaneous Fire Risk, until shortly before this class action was commenced.

448. Ford knew or should have known that its conduct violated the Tennessee CPA.

- 132 -

449.   Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiff and the Tennessee Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires or smoke in 23 Fire Risk Vehicles; and (iii) Ford's own investigation of fires in the Fire Risk Vehicles.

450.   As alleged above, Ford made material statements about the safety and reliability of the Fire Risk Vehicles that were either false or misleading.

451.   Ford owed Plaintiff and the Tennessee Subclass a duty to disclose the true safety and reliability of the Fire Risk Vehicles because Ford:

   a.   Possessed exclusive knowledge about the defects in the Fire Risk Vehicles and the true nature of the recall repair;

   b.   Intentionally concealed the foregoing from Plaintiff and the Tennessee Subclass;

   c.   Made incomplete representations about the safety and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Tennessee Subclass that contradicted these representations; and/or

   d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

452.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Tennessee Subclass. Because Ford omitted the Spontaneous Fire Risk, Fire Risk Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were

- 133 -

free from the known serious safety defect. Had Fire Risk Vehicle owners been

aware of the defects in their vehicles, they would have either not have bought their

vehicles or would have paid less for them.

453.   Ford's violations of the Tennessee CPA present continuing risk and

harm to Plaintiff, the Tennessee Subclass, and the public. In particular and as

alleged herein, Ford has yet to provide an adequate fix for the defective engines.

Furthermore, Ford's "fix" raises additional safety concerns and reduces the

vehicles' fuel efficiency.

454.   Pursuant to Tenn. Code § 47-18-109(a), Plaintiff and the Tennessee

Subclass seek monetary relief against Ford measured as actual damages in an

amount to be determined at trial, treble damages as a result of Ford's willful or

knowing violations, and any other just and proper relief available under the

Tennessee CPA.

## COUNT XXI

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER TENNESSEE LAW
### (Tenn. Code Ann. §§ 47-2A-212, 47-2-314)

### (Alleged by Plaintiff Garrett on behalf of the Tennessee Subclass)

455.   Plaintiff Garrett ("Plaintiff" for the purposes of this claim) and the

Tennessee Subclass reallege and incorporate by reference all paragraphs as though

fully set forth herein.

- 134 -

456.   Plaintiff brings this claim on behalf of himself and the Tennessee

Subclass.

457.   Ford is a "merchant" with respect to motor vehicles.

458.   Under Tennessee law, an implied warranty of merchantability attaches

to the Fire Risk Vehicles. Tenn. Code Ann. §§ 47-2A-212, 47-2-314.

459.   The Fire Risk Vehicles were not merchantable when sold or leased

because they are prone to a spontaneous and unreasonable risk of fire due to the

Spontaneous Fire Risk described herein. Without limitation, the Fire Risk Vehicles

share a common defect in that they all suffer from an issue in the engine

compartment that makes the vehicles susceptible to a risk of spontaneous fire,

causing an unreasonable risk of death, serious bodily harm, and property damage

to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of

damage and harm to their homes or other nearby property, passengers, and

bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles

unmerchantable and unfit for their ordinary use of driving when they were sold or

leased, and at all times thereafter.

460.   The engine defect existed at the time the Fire Risk Vehicles

containing the Spontaneous Fire Risk left the possession or control of Ford.

461.   Based upon the dangerous product defect, Ford failed to meet the

expectations of a reasonable consumer. The Fire Risk Vehicles failed their

- 135 -

ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and therefore do not function as a reasonable consumer would expect.

462.   Plaintiff and the Tennessee Subclass have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between them.

463.   It was reasonable to expect that Plaintiff and the Tennessee Subclass members would be affected by the Fire Risk Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability.

464.   Ford was provided notice of these issues within a reasonable time of Plaintiff and the Tennessee Subclass members' knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to Ford, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and by the allegations contained in this Complaints.

465.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Tennessee Subclass members have been damaged in an amount to be determined at trial.

9.     **Texas**

**COUNT XXII**

**VIOLATION OF TEXAS'S DECEPTIVE TRADE PRACTICES ACT**
**(Tex. Bus. & Com. Code §§ 17.41, *et seq*.)**

**(Alleged by Plaintiffs King and Sutton on behalf of the Texas Subclass)**

466.   Plaintiffs King and Sutton ("Plaintiffs" for purposes of this claim) and the Texas Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

467.   Plaintiffs bring this action on behalf of themselves and the Texas Subclass.

468.   Plaintiffs and the Texas Subclass members are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" under Tex. Bus. & Com. Code § 17.45(4).

469.   Ford is a "person" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

470.   Ford's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of Tex. Bus. & Com. Code § 17.46(A).

- 137 -

471.   The Texas Deceptive Trade Practices Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

472.   In the course of its business, Ford violated the Texas DTPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Risk Vehicles because it misrepresented and omitted material facts concerning the Fire Risk Vehicles, specifically the existence of the Spontaneous Fire Risk and the nature of the recall repair, as alleged herein. Ford omitted the fact of the Spontaneous Fire Risk from Plaintiffs and the Texas Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Risk Vehicles given the existence of the Spontaneous Fire Risk in them.

473.   Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Risk Vehicles to Plaintiffs and the Texas Subclass.

474.   By failing to disclose and omitting the Spontaneous Fire Risk in the Fire Risk Vehicles, which it marketed as safe, reliable, of high quality, and safe for

- 138 -

ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Texas DTPA.

475. The Spontaneous Fire Risk would be material to a reasonable consumer, such as the Texas Subclass, and is material to Plaintiffs.

476. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Risk and the Fire Risk Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Texas Subclass, and did in fact deceive and mislead Plaintiffs.

477. Ford failed to disclose material information about the Spontaneous Fire Risk, the recall repair, and the Fire Risk Vehicles, which Ford possessed and of which consumers, like Plaintiffs and the Texas Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Risk and the Fire Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Texas Subclass, and did in fact deceive and mislead Plaintiffs.

478. Plaintiffs could not have discovered the existence of the Spontaneous Fire Risk, or Ford's deception and responsibility for the Spontaneous Fire Risk, until shortly before this class action was commenced.

479. Ford knew or should have known that its conduct violated the Texas DTPA.

- 139 -

480.   Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiffs and the Texas Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Risk Vehicles; and (iii) Ford's own investigation of fires in the Fire Risk Vehicles.

481.   As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Risk Vehicles that were either false or misleading.

482.   Ford owed Plaintiffs and the Texas Subclass a duty to disclose the true safety and reliability of the Fire Risk Vehicles because Ford:

     a.     Possessed exclusive knowledge about the Spontaneous Fire Risk and the recall repair;

     b.     Omitted the foregoing from Plaintiffs and the Texas Subclass;

     c.     Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Risk Vehicles, while withholding material facts from Plaintiffs and the Texas Subclass that contradicted these representations; and/or

     d.     Had duties under the TREAD Act and related regulations to disclose and remedy the Fire Risk well prior to the issue of its recall notice in 2022.

483.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Texas Subclass. Because Ford omitted the Spontaneous Fire Risk,

- 140 -

Plaintiffs and the Texas Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Risk. Had Plaintiffs and the Texas Subclass been aware of the Spontaneous Fire Risk in their vehicles, they would have either not have bought their Fire Risk Vehicles or would have paid less for them.

484.   Ford's violations of the Texas DTPA present continuing risk and harm to Plaintiff, the Texas Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate fix for the defective engines. Furthermore, Ford's "fix" raises additional safety concerns and reduces the vehicles' fuel efficiency.

485.   Under Tex. Bus. & Com. Code § 17.50, Plaintiffs and the Texas Subclass seek monetary relief against Ford measured as actual damages in an amount to be determined at trial, multiple damages for knowing and intentional violations, under § 17.50(b)(1), attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

486.   On or about August 15, 2022, Plaintiffs' undersigned counsel sent a letter complying with Tex. Bus. & Com. Code § 17.505(a). Because Ford failed to remedy its unlawful conduct within the requisite period, Plaintiffs and the Texas Subclass seek all damages and relief to which they are entitled.

- 141 -

## COUNT XXIII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Tex. Bus. & Com. Code § 2.314)

**(Alleged by Plaintiffs King and Sutton on behalf of the Texas Subclass)**

487.    Plaintiffs King and Sutton ("Plaintiffs" for purposes of this claim) and the Texas Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

488.    Plaintiffs bring this action on behalf of themselves and the Texas Subclass.

489.    Ford is and was at all relevant times a merchant with respect to motor vehicles.

490.    A warranty that the Fire Risk Vehicles were in merchantable condition is implied by law in the instant transactions. The Fire Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Risk described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue in the engine compartment that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire

- 142 -

Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

491.   The engine defect existed at the time the Fire Risk Vehicles containing the Spontaneous Fire Risk left the possession or control of Ford.

492.   Based upon the dangerous product defect, Ford failed to meet the expectations of a reasonable consumer. The Fire Risk Vehicles failed their ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and therefore do not function as a reasonable consumer would expect.

493.   Plaintiffs and the Texas Subclass have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between them.

494.   It was reasonable to expect that Plaintiff and the Texas Subclass members would be affected by the Fire Risk Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability.

495.   Ford was provided notice of these issues within a reasonable time of Plaintiffs and the Texas Subclass members' knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel to Ford, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and by the allegations contained in this Complaint.

496.   As a direct and proximate result of Ford's breach of the implied

warranty of merchantability, Plaintiffs and the Texas Subclass have been damaged

in an amount to be determined at trial.

**10.   Virginia**

**COUNT XXIV**

**VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT**
**(Va. Code Ann. §§ 59.1-196, *et seq.*)**

**(Alleged by Plaintiff Drummond on behalf of the Virginia Subclass)**

497.   Plaintiff Drummond ("Plaintiff" for the purposes of this claim) and

the Virginia Subclass reallege and incorporate by reference all paragraphs as

though fully set forth herein.

498.   Plaintiff brings this action on behalf of himself and the Virginia

Subclass.

499.   Ford is a "supplier" under Va. Code Ann. § 59.1-198.

500.   The sale of the Fire Risk Vehicles to Plaintiff and the Virginia

Subclass members was a "consumer transaction" within the meaning of Va. Code

Ann. § 59.1-198.

501.   The Virginia Consumer Protection Act ("Virginia CPA") lists

prohibited "practices" which include: "5. Misrepresenting that goods or services

have certain characteristics"; "6. Misrepresenting that goods or services are of a

particular standard, quality, grade style, or model"; "8. Advertising goods or

- 144 -

services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised"; "9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200.

502.   In the course of its business, Ford violated the Virginia CPA by misrepresenting that Fire Risk Vehicles had certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that Fire Risk Vehicles were of a particular standard, quality, grade, style, or model when they were another; advertising Fire Risk Vehicles with intent not to sell them as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Ford concealed the Spontaneous Fire Risk in the Fire Risk Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Risk Vehicles.

503.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Risk Vehicles to Plaintiff and the Virginia Subclass.

504.   By failing to disclose and by actively concealing the defect in the Fire Risk Vehicles, which it marketed as safe, reliable, and of high quality, Ford engaged in unfair and deceptive business practices in violation of the Virginia CPA.

505.   The Spontaneous Fire Risk would be material to a reasonable consumer, such as the Virginia Subclass, and it is material to Plaintiff.

506.   Ford's deceptive act or practices described herein concerning the Spontaneous Fire Risk and the Fire Risk Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Virginia Subclass, and did in fact deceive and mislead Plaintiff.

507.   Ford failed to disclose material information about the Spontaneous Fire Risk and the Fire Risk Vehicles and the recall repair, which Ford possessed and of which consumers, like Plaintiff and the Virginia Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Risk and the Fire Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Virginia Subclass, and did in fact deceive and mislead Plaintiff.

- 146 -

508.   Plaintiff and the Virginia Subclass members could not have discovered the existence of the Spontaneous Fire Risk, or Ford's deception and responsibility for the Spontaneous Fire Risk, until shortly before this class action was commenced.

509.   Ford knew or should have known that its conduct violated the Virginia CPA.

510.   Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiff and the Virginia Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires or smoke in 23 Fire Risk Vehicles; and (iii) Ford's own investigation of fires in the Fire Risk Vehicles.

511.   As alleged above, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Risk Vehicles that were either false or misleading.

512.   Ford owed Plaintiff and the Virginia Subclass a duty to disclose the true safety and reliability of the Fire Risk Vehicles because Ford:

　　　a.　　Possessed exclusive knowledge about the defects in the Fire Risk Vehicles and the true nature of the recall repair;

　　　b.　　Intentionally concealed the foregoing from Plaintiff and the Virginia Subclass;

　　　c.　　Made incomplete representations about the safety and reliability of the Fire Risk Vehicles, while purposefully withholding

- 147 -

material facts from Plaintiff and the Virginia Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the Fire Risk well prior to the issue of its recall notice in 2022.

513.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Virginia Subclass. Because Ford omitted the Spontaneous Fire Risk, Fire Risk Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the known serious safety defect. Had Fire Risk Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

514.   Ford's violations of the Virginia CPA present continuing risk and harm to Plaintiff, the Virginia Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate fix for the defective engines. Furthermore, Ford's "fix" raises additional safety concerns and reduces the vehicles' fuel efficiency.

515.   Pursuant to Va. Code Ann. § 59.1-204, Plaintiff and the Virginia Subclass seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff. Because Ford conduct was committed willfully

and knowingly, Plaintiff and the Virginia Subclass are entitled to recover, for each

Plaintiff, the greater of (a) three times actual damages or (b) $1,000.

516.   Plaintiff and the Virginia Subclass also seek an order enjoining Ford's

unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees,

and any other just and proper relief available under Va. Code Ann. § 59.1-204.

## COUNT XXV

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER VIRGINIA LAW
### (Va. Code Ann. § 8.2-314)

### (Alleged by Plaintiff Drummond on behalf of the Virginia Subclass)

517.   Plaintiff Drummond ("Plaintiff" for the purposes of this claim) and

the Virginia Subclass reallege and incorporate by reference all paragraphs as

though fully set forth herein.

518.   Plaintiff brings this action on behalf of himself and the Virginia

Subclass.

519.   Ford is a "merchant" and "seller" of motor vehicles.

520.   Under Virginia law, an implied warranty of merchantability attaches

to the Fire Risk Vehicles. Va. Code Ann. § 8.2-314.

521.   The Fire Risk Vehicles were not merchantable when sold or leased

because they are prone to a spontaneous and unreasonable risk of fire due to the

Spontaneous Fire Risk described herein. Without limitation, the Fire Risk Vehicles

- 149 -

share a common defect in that they all suffer from an issue in the engine

compartment that makes the vehicles susceptible to a risk of spontaneous fire,

causing an unreasonable risk of death, serious bodily harm, and property damage

to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of

damage and harm to their homes or other nearby property, passengers, and

bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles

unmerchantable and unfit for their ordinary use of driving when they were sold or

leased, and at all times thereafter.

522.    The engine defect existed at the time the Fire Risk Vehicles

containing the Spontaneous Fire Risk left the possession or control of Ford.

523.    Based upon the dangerous product defect, Ford failed to meet the

expectations of a reasonable consumer. The Fire Risk Vehicles failed their

ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and

therefore do not function as a reasonable consumer would expect.

524.    Plaintiff and the other Virginia Subclass members were and are third-

party beneficiaries to Ford's contracts with Ford-certified/authorized retailers who

sold or leased the Fire Risk Vehicles to Plaintiff and Virginia Subclass members.

525.    It was reasonable to expect that Plaintiff and the Virginia Subclass

members would be affected by the Fire Risk Vehicles, and they are therefore

entitled to the protections of the implied warranty of merchantability.

- 150 -

526.   Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to Ford, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

527.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the other Virginia Subclass members have been damaged in an amount to be determined at trial.

**11.     Washington**

**COUNT XXVI**

**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(Rev. Code Wash. §§ 19.86.010, *et seq.*)**

**(Alleged by Plaintiff Adams on behalf of the Washington Subclass)**

528.   Plaintiff Adams ("Plaintiff" for the purposes of this claim) and the Washington Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

529.   Plaintiff brings this action on behalf of herself and the Washington Subclass.

530.   Ford committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of RCW § 19.96.010.

531.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.96.010.

532.   In the course of its business, Ford concealed the Spontaneous Fire Risk in the Fire Risk Vehicles and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Risk Vehicles.

533.   Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Risk Vehicles to Plaintiff and the Washington Subclass.

534.   By failing to disclose and by actively concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, which it marketed as safe, reliable, and of high quality, Ford engaged in unfair and deceptive business practices in violation of the Washington CPA.

535.   The Spontaneous Fire Risk would be material to a reasonable consumer, such as the Washington Subclass, and it is material to Plaintiff.

- 152 -

536.   Ford's deceptive act or practices described herein concerning the Spontaneous Fire Risk, the Fire Risk Vehicles, and the nature of the recall repair were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Illinois Subclass, and did in fact deceive and mislead Plaintiff.

537.   Ford failed to disclose material information about the Spontaneous Fire Risk, the recall repair and the Fire Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the Washington Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Risk and the Fire Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the Washington Subclass, and did in fact deceive and mislead Plaintiff.

538.   Plaintiff and the Washington Subclass members could not have discovered the existence of the Spontaneous Fire Risk, or Ford's deception and responsibility for the Spontaneous Fire Risk, until shortly before this class action was commenced.

539.   Ford knew or should have known that its conduct violated the Washington CPA.

540.   Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiff and the Washington

- 153 -

Subclass members based on (i) its own pre-sale durability testing; (ii) the direct

and public reports of fires or smoke in 23 Fire Risk Vehicles; and (iii) Ford's own

investigation of fires in the Fire Risk Vehicles.

541.   As alleged above, Ford made material statements about the safety and

reliability of the Fire Risk Vehicles that were either false or misleading.

542.   Ford owed Plaintiff and the Washington Subclass a duty to disclose

the true safety and reliability of the Fire Risk Vehicles because Ford:

a.   Possessed exclusive knowledge about the risks of the Fire Risk Vehicles and the nature of the recall repair;

b.   Intentionally concealed the foregoing from Plaintiff and the Washington Subclass;

c.   Made incomplete representations about the safety and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Washington Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the Fire Risk well prior to the issue of its recall notice in 2022.

543.   Ford's deceptive acts and practices alleged herein directly and

proximately caused actual damages and an ascertainable monetary loss to Plaintiff

and the Washington Subclass. Because Ford omitted the Spontaneous Fire Risk,

Fire Risk Vehicle owners were deprived of the benefit of their bargain since the

vehicles they purchased were worth less than they would have been if they were

free from the known serious safety defect. Had Fire Risk Vehicle owners been

- 154 -

aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

544.   Ford's violations of the Washington CPA present continuing risk and harm to Plaintiff, the Washington Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate fix for the defective engines. Furthermore, Ford's "fix" raises additional safety concerns and reduces the vehicles' fuel efficiency.

545.   Ford is liable to Plaintiff and the Washington Subclass for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under RCW § 19.86.090.

**COUNT XXVII**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
UNDER WASHINGTON LAW
(Rev. Code Wash. § 62A.2-314)**

**(Alleged by Plaintiff Adams on behalf of the Washington Subclass)**

546.   Plaintiff Adams ("Plaintiff" for the purposes of this claim) and the Washington Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

547.   Plaintiff brings this action on behalf of herself and the Washington Subclass.

548.   Ford is a "merchant" and "seller" of motor vehicles.

549.   Under Washington law, an implied warranty of merchantability attaches to the Fire Risk Vehicles. RCW § 62A.2-314.

550.   The Fire Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Risk described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue in the engine compartment that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

551.   The engine defect existed at the time the Fire Risk Vehicles containing the Spontaneous Fire Risk left the possession or control of Ford.

552.   Based upon the dangerous product defect, Ford failed to meet the expectations of a reasonable consumer. The Fire Risk Vehicles failed their ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and therefore do not function as a reasonable consumer would expect.

- 156 -

553.   Plaintiff and the Washington Subclass have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between them. Nonetheless, privity is not required here because Plaintiff and the Washington Subclass are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Fire Risk Vehicles and have no rights under the warranty agreements provided with the Fire Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers.

554.   It was reasonable to expect that Plaintiff and the Washington Subclass members would be affected by the Fire Risk Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability.

555.   Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to Ford, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

556.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Washington Subclass have been damaged in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State-specific Subclasses, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A.      Certification of the proposed Nationwide Class and State-specific Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.      Restitution, including at the election of Nationwide Class and State-specific Subclass members, recovery of the purchase price of their Fire Risk Vehicles, or the overpayment for their vehicles;

C.      Damages, costs, and disgorgement in an amount to be determined at trial;

D.      An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E.      An award of costs and attorneys' fees;

F.      An order enjoining Ford's deceptive acts or practices; and

G.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

- 158 -

DATED: October 7, 2022                    Respectfully Submitted,

                                          */s/ Steve W. Berman*
                                          Steve W. Berman
                                          Thomas E. Loeser
                                          Abigail D. Pershing
                                          **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                          1301 Second Avenue, Suite 2000
                                          Seattle, WA 98101
                                          Telephone: (206) 623-7292
                                          Facsimile: (206) 623-0594
                                          steve@hbsslaw.com
                                          toml@hbsslaw.com
                                          abigailp@hbsslaw.com

                                          E. Powell Miller (P39487)
                                          Sharon S. Almonrode (P33938)
                                          Dennis A. Lienhardt (P81118)
                                          **THE MILLER LAW FIRM PC**
                                          950 W. University Drive, Suite 300
                                          Rochester, MI 48307
                                          Telephone: (248) 841-2200
                                          epm@millerlawpc.com
                                          ssa@millerlawpc.com
                                          dal@millerlawpc.com

                                          *Attorneys for Plaintiffs*

011111-11/2044975 V2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7, 2022, the foregoing document was electronically filed using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ Steve W. Berman*
Steve W. Berman

011111-11/2044975 V2