UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY PACHECO, et al.,

              Plaintiffs,

v.

FORD MOTOR COMPANY,

              Defendant.

_____/

Case No. 2:22-cv-11927

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING**
**MOTION TO COMPEL ARBITRATION [58] AND STAYING CASE**

Ford moved to compel some of the Plaintiffs' claims to mandatory arbitration.
ECF No. 58. Because an arbitrator must determine the claims' arbitrability, the
Court will grant the motion and stay the case pending a determination of arbitrability
as to the six Arbitration Plaintiffs.

**BACKGROUND**[1]

A. *Factual History*

Ford made hybrid Ford Escapes, Ford Mavericks, and Lincoln Corsairs. ECF
No. 45, PageID.1750. Some of the models had a defective 2.5L HEV or PHEV engine—
Escapes from 2020–23, Mavericks from 2022–23, and Corsairs from 2021–23 ("the
class vehicles"). *Id.* According to Plaintiffs, the engines were built with improperly
machined crankshafts. *Id.* at PageID.1823. As a result, the class vehicles face a risk

---

[1] Because Ford's motion to compel came at the pleadings stage, the Court recounts
the facts as laid out in the complaint and makes reasonable inferences in Plaintiffs'
favor.

of suffering a "block breach" (a blown engine) and an ignition of oil and fumes that can lead to an engine fire. *Id.* at PageID.1750–1751.

Ford estimated that up to 125,322 class vehicles are among the "affected vehicles" and that 1% of vehicles suffer the defect. Ford attributed the issue to "isolated engine manufacturing issues." ECF No. 45-30, PageID.2293. And Ford therefore instituted a three-part recall.

First, Ford issued NHTSA Recall 22V-484 (a.k.a. the "July 2022 recall") for certain 2020–22 Escapes, 2022 Mavericks, and 2021–22 Corsairs. ECF No. 45, PageID.1755. Ford drilled holes in the Under Engine Shield and removed some of the blinds in the Active Grille Shudder system. *Id.* at PageID.1815–1816. The Active Grille Shudder system improves fuel economy, and Plaintiffs alleged that removing blinds made their vehicles less fuel efficient. *Id.* at PageID.1769.

Second, Ford instituted NHTSA Recall 23V-380 (a.k.a. the "June 2023 recall"), and provided steps a vehicle owner should take in the event of engine difficulty. *Id.* at PageID.1821–1826. For some cars (*all* of the 2023 Escapes and Corsairs), Ford replaced the engine long block without waiting for engine difficulties. *Id.* at PageID.1826.

Third, Ford launched a Customer Satisfaction Program, and provided a free engine long block replacement in the event of a related failure for up to 100,000 miles or ten years of the warranty start date for all class vehicles. *Id.* at PageID.1826–1828. It also provided a software update. If updated internal diagnostics detected impending failure of the crankshafts, Ford would replace the engines.

Plaintiff James Capps was driving his 2021 Escape when he experienced engine difficulty and a catastrophic engine fire. *Id.* at PageID.1762–1765. Plaintiff Joseph Vaillancourt was driving his 2021 Escape when his car unexpectedly entered "limp mode" and reduced power. *Id.* at PageID.1765–1768. After those issues, Vaillancourt replaced his engine long block. *Id.* at PageID.1767. The other Arbitration Plaintiffs alleged no manifestation of the defective parts, but all alleged that their cars face the same risk of engine failure and spontaneous fire. *Id.* at PageID.1750–1751. Each of them has or had class vehicles that received the NHTSA Recall 22V-484 "fix," including new holes in the engine shield and removed grille shudders. ECF No. 45, PageID.1783 (Dyne), 1790 (King), 1791–1792 (Sutton), 1793 (Adams).

### B. Procedural Background

Plaintiffs filed their first complaint in 2022. ECF No. 1. Later that year, Ford moved to dismiss. ECF No. 16. In its motion, Ford noted:

> Because Plaintiffs have not attached their lease or sale contracts and have refused to furnish the VINs for their vehicles, Ford has been unable to determine whether any of Plaintiffs' claims are subject to an arbitration agreement that Ford would be entitled to enforce. . . . For this reason, Ford reserves the right to compel arbitration to the extent any such agreements are revealed during discovery.

*Id.* at PageID.731–732 n.3. Further discovery into arbitration was rendered moot when Judge Steeh granted the motion to dismiss a few months later. ECF No. 22. Plaintiffs appealed, *see* ECF No. 24, but Judge Steeh issued an indicative ruling under Federal Rule of Civil Procedure 62.1 and ultimately vacated his prior order and

reopened the case. ECF Nos. 34, 39. Shortly thereafter, the case was reassigned to the undersigned, and Plaintiffs filed a new complaint. ECF No. 45.

Within a month of the new complaint, Ford moved for limited early discovery regarding arbitrability. ECF No. 47. It requested copies of Plaintiffs' sales agreements, so that it could ascertain whether they contained arbitration clauses. *Id.* at PageID.2367. Plaintiffs resisted the motion and argued that Ford waived any right to arbitration by filing its motion to dismiss. ECF No. 48, PageID.2401. The Court granted early discovery but refrained from deciding the waiver question. ECF No. 53, PageID.2510, 2514.

After receiving early discovery that indicated some plaintiffs signed binding arbitration agreements, Ford moved under 9 U.S.C. §§ 3 and 4 of the Federal Arbitration Act to compel plaintiffs Brian Sutton, Jeffrey King, Victoria Adams, Raymond Dyne, III, James Capps, and Joseph Vaillancourt ("the Arbitration Plaintiffs") to arbitrate their claims and for the Court to stay the case as to those plaintiffs during the pendency of arbitration. ECF No. 58, PageID.2591.[2] Plaintiffs Dyne and King purchased their class vehicles under sales agreements that included the following language:

> Arbitration is a method of resolving any claim, dispute, or controversy (collectively, a "Claim") without filing a lawsuit in court. Either you or Creditor ("us" or "we") (each, a "Party") may choose at any time, including after a lawsuit is filed, to have any Claim related to this contract decided by arbitration. Neither party waives the right to

---

[2] Ford's motion originally also targeted Plaintiffs Alvarado, Murray, Nishon, and Pacheco, but Ford withdrew its motion to compel as to those plaintiffs in light of new contract law enacted in the State of California. ECF No. 67, PageID.2934; *see generally Ford Motor Warranty Cases*, 570 P.3d 857 (Cal. 2025).

arbitrate by first filing suit in a court of law. Claims include but are not limited to the following: 1) Claims in contract, tort, regulatory or otherwise; 2) Claims regarding the interpretation, scope, or validity of this provision, or arbitrability of any issue except for class certification; 3) Claims between you and us, your/our employees, agents, successors, assigns, subsidiaries, or affiliates; 4) Claims arising out of or relating to your application for credit, this contract, or any resulting transaction or relationship, including that with the dealer, or any such relationship with third parties who do not sign this contract.

ECF No. 58-10, PageID.2680; ECF No. 58-11, PageID.2690. Plaintiffs Adams, Capps,

Sutton, and Vaillancourt signed sales agreements that stated:

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, the contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Provision shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action.

ECF No. 58-2, PageID.2617–2618; ECF No. 58-4, PageID.2632–2633; ECF No. 58-8,

PageID.2663; ECF No. 58-9, PageID.2671.

The Arbitration Plaintiffs opposed the motion to compel arbitration.

ECF No. 64.[3]

---

[3] Based on the parties' briefing, a hearing is not necessary. Accordingly, the Court will resolve the motion on the briefs without a hearing. *See* Fed. R. Civ. P. 78(b); E.D. Mich. L.R. 7.1(f)(2); Practice Guidelines for Judge Stephen J. Murphy, III.

## DISCUSSION

Ford's motion to compel arbitration implicitly raises the question of the Court's jurisdiction. Motions to compel arbitration are properly brought under Rule 12(b)(6) rather than Rule 12(b)(1) because arbitration clauses do not divest the Court of subject matter jurisdiction. *High v. Cap. Senior Living Props. 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789, 795 (E.D. Mich. 2008); *see also Seldin v. Seldin*, 879 F.3d 269, 272 (8th Cir. 2018); *Hardie v. United States*, 19 F. App'x 899, 906–07 (Fed. Cir. 2001) ("Arbitration agreements are properly viewed as contractual arrangements for resolving disputes, not as documents divesting a court of jurisdiction."). In fact, a court must have subject matter jurisdiction over the "underlying dispute" between the parties to compel arbitration. *See Vaden v. Discover Bank*, 556 U.S. 49, 62–63 (2009) (quotation omitted). Thus, the Court must first assess its jurisdiction, *see Naji v. Lincoln*, 665 F. App'x. 397, 399 (6th Cir. 2016) ("It is a federal court's unflagging duty to verify that it has jurisdiction over the case before it . . . ."), before deciding the motion to compel arbitration.

## I.   <u>Article III Standing</u>

The Court's jurisdiction is in doubt. *See* ECF No. 51, PageID.2416 (motion to dismiss). Article III limits the Court's jurisdiction to deciding only "Cases" and "Controversies." U.S. Const. art. III, § 2. For a case or controversy to exist, the plaintiff must have "standing." Standing requires that the plaintiff suffered an "injury in fact," "trace[able]" to the defendant's actions, and "redress[able]" by a favorable decision from the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61

(1992) (quotation omitted). Ford argued that all Plaintiffs lack standing. *See* ECF No. 51, PageID.2416.

The case lingers in the pleadings stage, so the Court must take the facts in the complaint as true. *Tyler v. Hennepin County*, 598 U.S. 631, 637 (2023). And Plaintiffs' burden, "[a]t this initial stage," is only to plead the requirements for standing plausibly. *Id.* at 637–38.

### A. Injury in Fact

All the Arbitration Plaintiffs allege that they suffered an injury related to their Ford vehicles. One suffered a spontaneous engine fire. ECF No. 45, PageID.1763–1764. One alleged mysterious engine issues and a replacement of the engine long block. *Id.* at PageID.1767. The rest alleged that their vehicles contained the defect at issue and argued three categories of injury: (1) overpayment for their vehicle at the time of sale, (2) diminished resale value for their vehicle as a result of the defect, and (3) reduced fuel efficiency and increased cost to fuel their vehicles as a result of Ford's July 2022 "fix," which removed blinds from their vehicles' Active Grille Shutter system and drilled holes in their engine shields. ECF No. 55, PageID.2537–2538. All Arbitration Plaintiffs plausibly alleged that their own vehicle has or had defective parts.

The Sixth Circuit has applied a form of the so-called "overpayment theory" of damages to support standing. *See Speerly v. Gen. Motors, LLC*, No. 23-1940, 2025 WL 1775640, at *3 (6th Cir. June 27, 2025) (en banc). The clearest form of the rule is that, when a consumer purchases a product from a line that universally suffers from a

design defect, they suffer an injury in fact regardless of whether their product has yet to suffer a problem from the defect. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) ("Because *all* Duet owners were injured at the point of sale upon paying a premium price for the Duets as designed, even those owners who have not experienced a mold problem are properly included within the certified class.") (emphasis added); *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 581 (6th Cir. 2013) (dealing with an allegedly defective line of medication that universally did not contain an ingredient). Unsurprisingly then, the products assessed under that rule have generally suffered from a universal design defect. *See, e.g.*, *Loreto*, 515 F. App'x at 581; *Crawford v. FCA US LLC*, No. 2:20-cv-12341, 2021 WL 3603342, at *2 (E.D. Mich. Aug. 13, 2021) (Murphy, J.) (noting that all plaintiffs alleged a defect); *Roe v. Ford Motor Co.*, No. 18-cv-12528, 2021 WL 2529825, at *1 (E.D. Mich. June 21, 2021) (observing that all eleven plaintiffs had faulty water pumps).

But Ford says that this is not a universal defect case. Rather, it represented that only one percent of the cars have the defect at all. ECF No. 51, PageID.2442. And Ford takes Plaintiffs to allege not that their engines have the defective parts, but only that they are of a model year some of which have the defective parts and thus were injured by association. *See id.* at PageID.2440, 2443. If that is the case, Plaintiffs' authorities become distinguishable, and another line of persuasive cases and opinions becomes more apposite.

8

For example, the Seventh Circuit recently "cabined overpayment-based injuries to exclude products containing only a 'potential risk of harm.'" *Speerly*, 2025 WL 1775640, at *3 (quoting *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 530 (7th Cir. 2024)). And the Eighth Circuit bars plaintiffs without manifest defects from piggybacking on the injuries of those with manifest defects for standing. *Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 988 (8th Cir. 2021). Recently, Judge Nalbandian explained why, in his view, any "benefit-of-the-bargain theory of injury is inherently speculative and insufficient to permit Article III standing for class members who never experienced [an] alleged defect." *Speerly*, 2025 WL 1775640, at *30 (Nalbandian, J., concurring).

At the pleadings stage, Plaintiffs need not prove that the elements of standing are more probable than not. Rather, the same standard applies to facts illustrating standing as applies to the merits—plausibility. *Tyler*, 598 U.S. at 637. The line of cases that is most apposite therefore depends on whether Plaintiffs have plausibly pleaded a universal defect.

Here, the Arbitration Plaintiffs plausibly pleaded a universal defect. The Arbitration Plaintiffs alleged the defect as "Spontaneous Stall/Fire Risk" and explained that their cars have engines that "can suffer a 'block breach' and eject significant quantities of engine oil and/or fuel vapor that can accumulate near ignition sources, resulting in a spontaneous stall and under hood smoke and fires." ECF No. 45, PageID.1750–1751. And each Arbitration Plaintiff alleged that his or her car "is a Stall/Fire Risk Vehicle that suffers from the Spontaneous Stall/Fire

Risk." *Id.* at PageID.1763 (Capps),[4] 1766 (Vaillancourt), 1782 (Dyne), 1790 (King), 1791 (Sutton), 1792 (Adams).

The cause of the block breaches appears to be improperly machined crankshafts used in the vehicles' engines. *Id.* at PageID.1823. Given some ambiguity in how Plaintiffs drafted their complaint and argued their present motion, it is possible to read the complaint to allege that all of Plaintiffs' cars suffer from the defect. *Id.* at PageID.1750; *see* ECF No. 55, PageID.2539 ("As to Plaintiffs' overpayment claim, Plaintiffs alleged (and Ford has admitted) that their vehicles suffer from a defect that may cause the vehicles to catch fire."). It is also reasonable to read their brief to argue, in the alternative, that even if not all of Plaintiffs' vehicles are defective, association with the defective cars led to diminished overpayment/resale value. ECF No. 55, PageID.2539–2540. If Plaintiffs plausibly alleged the former, the Court need not address whether the latter argument is supportable as a matter of law, because the case would be a routine overpayment-theory case.

Looking to the complaint, Plaintiffs did not allege only that their cars *might* suffer from a defect that can cause engine failure. They alleged that their cars "can" suffer the identified engine failure as a result of the faulty crankshafts. ECF No. 45, PageID.1750–1751. If a car *can* suffer a blown engine from specific faulty crankshafts, it is reasonable to infer that the car *has* the faulty crankshafts. ECF No. 55,

---

[4] As noted above, Capps's car allegedly spontaneously combusted and burst into flames. ECF No. 45, PageID.1763–1764.

PageID.2539 (Plaintiffs arguing that "[i]t is reasonable to infer that a vehicle that *has* a defect that may cause it to burst into flames is worth less than one that does not suffer from this defect.") (emphasis added). Taking inferences in Plaintiffs' favor, the Court concludes that they have pleaded a routine overpayment theory case—that every one of their cars has the defect whether it has manifested or not.

Merely pleading facts, however, is not enough; Plaintiffs must *plausibly* plead those facts. Ford estimated that only 1% of the class vehicles have the bad crankshafts. ECF No. 45-30, PageID.2291. If Ford's estimate is accurate, it is not likely that any given owner of a class vehicle has a defective car. But Plaintiff's burden is not to show that their injury is *likely*, rather, at this stage, Plaintiffs must show only that their injury is *plausible*.

Plaintiffs did. First, Ford applied its recall protocols to all the class vehicles. That application suggests that Ford at least believes it is possible that the Plaintiffs' cars have the defect. All that is necessary, then, is further facts that "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Without faulting Ford for pursuing an ameliorative recall, at least as far as the recalls were concerned, the possibility that Plaintiffs' cars were defective was sufficiently plausible for Ford to pursue universal actions. ECF No. 45, PageID.1826–1828. And, according to the complaint, Ford elected to replace the engine long blocks in *every* 2023 Escape and 2023 Corsair. ECF No. 45, PageID.1826. Moreover, the 1% estimate came from Ford itself and further acknowledged that up to 125,322 vehicles were affected. ECF No. 45-30, PageID.2291. It is plausible that

11

the Arbitration Plaintiffs owned one of the affected vehicles, especially considering that one suffered catastrophic engine failure and at least one other suffered suspicious engine difficulties.

Moreover, when a recall has not fully remediated a loss, a plaintiff retains their injury in fact. *See Crawford*, 2021 WL 3603342, at *2. Plaintiffs alleged not only that the recalls failed to remediate their injury, but they also further alleged that the recalls further diminished their vehicles' value. *See, e.g.*, ECF No. 45, PageID.1769. At the present stage, the Arbitration Plaintiffs have carried their burden of plausibly pleading injury in fact.

### B. Traceability

Ford also argued that none of Arbitration Plaintiffs' injuries—to wit, a defective Ford engine in their Ford vehicles—are traceable to Ford. ECF No. 51, PageID.2446. Ford first argued that if none of the Plaintiffs have an injury, then they lack an injury traceable to Ford. *Id.* at PageID.2446–2447. True, having an injury in fact is an antecedent to having an injury traceable to Ford. But if, as Arbitration Plaintiffs have plausibly pleaded, their cars suffer from a defect introduced by Ford that was insufficiently repaired by Ford, and that issue would have led to overpayment for the cars as they actually existed, the injury is traceable to Ford.

Ford next argued that Dyne "disposed" of his vehicle, so he will never be able to prove a traceable injury. *Id.* at PageID.2447. The word "disposed" contemplates many possible meanings. It might mean obliterated without a trace, and it might mean sold to someone else. *See, e.g.*, ECF No. 55-5, PageID.2574 (averring that one

of the Plaintiffs "disposed" of his car by trading it in). It is not inevitable that with the purchase agreements, VIN numbers that the Plaintiffs have, and information about where their cars went, they could never sustain a burden to show whether their cars were actually defective. That is doubly true when documents suggest that Ford once felt capable of tracing the defective parts to "specific vehicles." ECF No. 45-30, PageID.2291 ("The Ford process is capable of tracing engine production to the vehicle in which the engine is installed.").

Ford also attacked the standing of Capps—the Arbitration Plaintiff who owned a car that Ford admitted had a chance of engine fire and suffered an engine fire—because he no longer has his car. ECF No. 51, PageID.2447–2448. The same analysis set forth above applies here, and the Court is not convinced that circumstantial evidence could never demonstrate the required link between Ford and Capp's fire to satisfy Article III.

Ford also argued that certain insurers who paid out a claim related to Capps's vehicle is the real party in interest. *Id.* at PageID.2449. First, Ford relied on communications not in the complaint and not embraced by the complaint to make its argument. *Id.* Second, the complaint includes insufficient material to determine whether Capps's entire loss was reimbursed by his insurer. *Cf. Exec. Jet Aviation, Inc. v. United States*, 507 F.2d 508, 514 (6th Cir. 1974) (holding that where an insured has been only partially compensated by its insurer for his losses, both the insured and insurer are parties in interest). Ford's argument is premature.

C. *Standing Conclusion*

At the current juncture, the Arbitration Plaintiffs have plausibly pleaded standing sufficient for the Court to exercise jurisdiction. Taking the complaint as a whole, taking its well-pleaded allegations as true, and making all reasonable inferences in favor of Plaintiffs, the Court concludes that the Arbitration Plaintiffs alleged an injury in fact—owning vehicles with engines containing defective parts that can lead to a catastrophic failure. That failure is traceable to Ford as the manufacturer of the engine. The constitutional constraints on judicial power are satisfied for now.

But the standing analysis is not set in stone given that the parties' relative burdens of proof and persuasion will mature. When Plaintiffs "must affirmatively prove" that their proposed classes meet the prerequisites for certification and the Court must "probe behind the pleadings," they may or may not be able to certify a class of all owners of the relevant models without showing commonality or typicality of standing and injury. *Speerly*, 2025 WL 1775640, at *3 ("The Supreme Court has not decided whether an unnamed class member's lack of standing poses an Article III problem."). And they may ultimately be able or unable to produce enough evidence to survive summary judgment. *See* Fed. R. Civ. P. 56. But, on the pleadings, and when facing a motion to compel to arbitration only specific individuals, the Court need not address those questions.

14

II.    Arbitration

Having determined its Article III jurisdiction, the Court must next assess Ford's motion to compel the Arbitration Plaintiffs to mandatory arbitration. The Court will first address the Arbitration Plaintiffs' challenge to the contracts' delegation clauses. The Court will then address whether Ford waived its right to arbitrate through its conduct.

A. *Existence of a Valid Delegation Clause*

The Arbitration "Plaintiffs directly challenge the validity of the delegation clause," ECF No. 64, PageID.2754, so the Court must address that challenge. *Becker*, 39 F.4th at 355. The Court concludes that the cited contracts validly delegated threshold questions of arbitrability to an arbitrator.

"Generally, when asked to compel arbitration under a contract, a court determines whether the parties agreed to arbitrate their dispute." *Swiger v. Rosette*, 989 F.3d 501, 505 (6th Cir. 2021). "The FAA, however, allows parties to agree that an arbitrator, rather than a court, will determine 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Id.* (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)) (citation modified). "Such an agreement, commonly known as a delegation clause, requires clear and unmistakable evidence that the parties agreed to have an arbitrator decide arbitrability." *Id.* (citation modified). "A valid delegation clause precludes courts from resolving any threshold

15

arbitrability disputes, even those that appear wholly groundless." *Id.* (quotation and quotation marks omitted). Indeed, as the Sixth Circuit recently explained:

> The practical effect of a delegation provision is that if arbitrability is challenged, then the arbitrator, not the court, must address the challenge. Such a challenge may come in the form of a coverage challenge or as an enforceability challenge. Regardless, the outcome is the same: a valid delegation provision removes judicial purview and transfers the question of arbitrability to an arbitrator.

*Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 355 (6th Cir. 2022).

"Only a specific challenge to a delegation clause brings arbitrability issues back within the court's province." *Swiger*, 989 F.3d at 505. In other words, "[a]ttacking a delegation provision as invalid turns the question away from arbitrability of gateway issues to the validity of an arbitrator's authority to arbitrate arbitrability. . . . If the validity of a delegation provision is challenged in response to a motion to compel arbitration, then the court, rather than the arbitrator, must address those challenges." *Becker*, 39 F.4th at 355.

       i.    <u>Can Ford enforce the delegation agreement?</u>

Generally, the Arbitration Plaintiffs contended first that they did not enter a delegation agreement *with Ford*. Instead, they entered it with third-party dealers. ECF No. 64, PageID.2763. That argument is not novel and has been routinely rejected by courts in this circuit. *See Bernardoni v. FCA US LLC*, No. 23-12881, 2024 WL 3103316, at *4 (E.D. Mich. June 20, 2024) (collecting cases). Because each of the Arbitration Plaintiffs unmistakably entered a delegation provision, an arbitrator will need to decide the question of whether the arbitration agreement applies to the dispute.

To begin, Dyne and King agreed to have claims "regarding the interpretation, scope, or validity of [the arbitration] provision, or arbitrability of any issue except for class certification" be decided by an arbitrator. ECF No. 58, PageID.2602. In *Cunningham v. Ford Motor Co.*, No. 21-cv-10781, 2022 WL 2819115 (E.D. Mich. July 19, 2022), the court determined that an identical provision provided "'clear and unmistakable evidence that the parties agreed to have an arbitrator decide' arbitrability," including whether Ford could enforce the arbitration provisions. *Id.* at *4; *cf. Straub v. Ford Motor Co.*, No. 21-cv-10634, 2021 WL 5085830, at *3 (E.D. Mich. Nov. 2, 2021) (concluding with identical language that an arbitrator had to decide whether Ford could enforce the arbitration provision for reasons other than the delegation). That case is well reasoned and persuasive; an arbitrator must decide the arbitrability issue for Dyne and King.

Next, Adams, Capps, Pacheco, and Vaillancourt agreed to arbitrate claims or disputes about "the interpretation and scope of [the] Arbitration Provision, and the arbitrability of the claim or dispute." ECF No. 58, PageID.2601. In *Bernardoni*, the court determined that an identical provision provided "clear and unmistakable evidence of the parties' intent to have an arbitrator decide all questions about the scope, applicability, and enforceability of the arbitration clause," including if FCA could enforce the clauses. 2024 WL 3103316, at *4 (quoting *Harper v. General Motors, LLC*, No. 21-cv-12907, 2023 WL 2586298, at *5 (E.D. Mich. Mar. 21, 2023)); *see also Battle v. Gen. Motors, LLC*, No. 22-cv-10783, 2024 WL 51025, at *3 (E.D. Mich. Jan. 4, 2024). Those cases are well reasoned and persuasive, and the Court agrees that an

17

arbitrator must decide the arbitrability issue for Adams, Capps, Pacheco, and Vaillancourt.

The Arbitration Plaintiffs' core argument—that they agreed to arbitrate and delegate with dealerships and not Ford—conflicts with *Swiger v. Rosette*, 989 F.3d 501 (6th Cir. 2021), and the hearty weight of in-circuit authority. To resist that conclusion, Arbitration Plaintiffs cited *Harrison v. General Motors LLC*, 651 F. Supp. 3d 878 (E.D. Mich. 2023), and *Wilkinson v. General Motors, LLC*, No. 24-cv-11007, 2025 WL 1672898 (E.D. Mich. June 13, 2025). But they misread *Harrison*. There, the court rejected the challenge to the delegation clause, and Arbitration Plaintiffs' quote referred to different arbitration language signed by only one plaintiff in that case. *Harrison*, 651 F. Supp. 3d. at 888, 890–91. And the parties in *Wilkinson* agreed that the arbitration agreement did *not* contain a delegation provision. 2025 WL 1672898, at *4. Moreover, Plaintiffs' citation to out-of-circuit authorities that applied a test different from the *Swiger* framework, which is binding on the Court, is not of substantial value.

The Arbitration Plaintiffs also argued that the arbitration provisions were ambiguous. ECF No. 64, PageID.2760. Given that the agreements at issue contain clear and unmistakable evidence of an intent to arbitrate, Plaintiffs' argument falls short.

     ii.   <u>Fraud</u>

Arbitration Plaintiffs also made a conclusory argument that "when Plaintiffs entered into these agreements (with dealerships), they did not know all the material

18

facts, and they never would have agreed to delegate arbitrability had they known about the defect." ECF No. 64, PageID.2761–2762. That argument is wholly unpersuasive. First, arbitration agreements, by their nature, contemplate the possibility of future disputes. Second, the language here is not restricted to exclude products liability cases. Third, Plaintiffs cited no allegation and developed no argument that the *dealers* (the other party to the agreements) knew of the supposed material facts at the time of contracting. The Court will not undo a valid arbitration clause based on a cursory allegation of fraud.

### B. *Waiver/Forfeiture of Arbitration*

Plaintiffs also argued that Ford waived its right to arbitrate. The Federal Arbitration Act, provides that a "written agreement to arbitrate disputes arising out of a transaction in interstate commerce shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 416 (6th Cir. 2011) (quoting 9 U.S.C. § 2). The FAA "manifest[s] a liberal federal policy favoring arbitration agreements" *id.* (citation modified), and that policy requires that "a court must hold a party to its arbitration contract just as the court would to any other kind." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022). As a result, courts determine waiver of the right to arbitrate as they would waiver of other contractual rights. *See id.* at 419. Waiver is canonically described as "the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993).

The Arbitration Plaintiffs argued that Ford waived its right to compel arbitration through its litigation conduct. ECF No. 64, PageID.2743. The briefing here is not the first time that the Arbitration Plaintiffs have argued that Ford waived its right. In their response in opposition to Ford's motion for limited early discovery, the Arbitration Plaintiffs relied heavily on *In re Chrysler Pacifica Fire Recall Products Liability Litigatio*n, 715 F. Supp. 3d 1003 (E.D. Mich. 2024), *rev'd and remanded sub nom. In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, No. 24-1137, 2025 WL 1904525 (6th Cir. July 10, 2025). ECF No. 48, PageID.2401–2403. But the Court already explained that there was reason to doubt that case's approach, which rejected the role of knowledge in the arbitration-waiver analysis:

> Lack of knowledge of the right to arbitration appears to be a relevant defense to waiver. Cases that mention knowledge imply that one cannot waive a contractual right to arbitration that he does not know he possesses, even if knowledge is not expressly identified as part of the Sixth Circuit's arbitration-waiver test. *See Schwebke v. United Wholesale Mortg. LLC*, 96 F.4th 971, 976–77 (6th Cir. 2024) (addressing a lack-of-knowledge argument by noting that Defendant "concedes that it had 'imputed knowledge' of the employment agreement"); *Solo*, 947 F.3d at 976 ("Similarly, a finding of waiver might be inappropriate if the party belatedly seeking arbitration was unaware of information rendering a claim arbitrable."). To be sure, the required knowledge likely may be actual or imputed, *see Schwebke*, 96 F.4th at 976, and it is plausible that knowledge of a possible right to arbitration could require early investigation to avoid waiver. *Speerly v. Gen. Motors, LLC*, 115 F.4th 680, 713–14 (6th Cir.), *reh'g en banc granted, opinion vacated*, 123 F.4th 840 (6th Cir. 2024); *but see Fisher*, 2025 WL 582451, at *7. Arbitration contracts are to be treated like other contracts, *see Morgan*, 596 U.S. at 418, and a knowledge-requiring approach mirrors traditional conceptions of waiver—*e.g.*, "the intentional relinquishment or abandonment of a *known* right." *Id.* at 417 (cleaned up and emphasis added); *see also Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899 (6th Cir. 2006); *Keys v. Pace*, 358 Mich. 74, 84 (1959) ("The short answer to the arguments of waiver . . . is that a litigant cannot be held . . . to have waived his right thereto, because of facts he does not know, unless, as a

20

matter of judicial policy, we are ready to say he 'should' know them."). It
is then unsurprising that the knowledge-requiring general rule is
reflected in the arbitration-waiver tests articulated by other circuits—
*e.g.*, the Eighth Circuit's discussed in *Morgan*. 596 U.S. at 415.

ECF No. 53, PageID.2513. Nevertheless, the Arbitration Plaintiffs persisted in their

reliance on *In re Chrysler Pacifica* in opposition to the present motion. But instead of

relying on *In re Chrysler Pacifica* for the idea that knowledge is irrelevant, the

Arbitration Plaintiffs used *In re Chrysler Pacifica*'s test for determining knowledge.

ECF No. 64, PageID.2750. That renewed reliance was misplaced.

On appeal in that case, the Sixth Circuit mirrored the Court's prior analysis

recounted above and laid to rest the notion that a party can waive its right to

arbitration without knowing that the right exists. *In re Chrysler Pacifica Fire Recall*

*Prods. Liab. Litig.*, No. 24-1137, 2025 WL 1904525, at *3 (6th Cir. July 10, 2025). It

also provided useful guidance on how a district court can determine when a party had

sufficient knowledge of an arbitration agreement to waive its rights.

The Sixth Circuit implicitly determined that the proper time for the defendant

to move for arbitration was after "it received the relevant sales agreement," because

at any time earlier "it would not have known which plaintiffs it could compel to

arbitration." *Id.* at *4. The Sixth Circuit rejected the district court's assumption that

it "taxe[d] credulity to posit that [defendant] was not aware of the standard sales

documents its dealers were using," because the district court "had no evidence that

allowed it to make that purported factual finding." *Id.* Thus, a general "belief that

arbitration agreements are ubiquitous throughout the industry is [in]sufficient

evidence to support a factual finding about . . . knowledge." Moreover, the fact that

not all of the plaintiffs there were subject to arbitration provisions fundamentally undermined the conclusion that Chrysler knew or should have known of its rights. *Id.*

The Sixth Circuit's opinion in the *Chrysler* case is on all fours with this one, and accordingly, the Court will not rely on it to support a find that Ford waived its arbitration rights here.

The Arbitration Plaintiffs suggested that Ford should have moved to discover the agreements as soon as possible. ECF No. 64, PageID.2752. But the Court will not apply that proposed rule here. First, Plaintiffs did not develop the argument. Second, earlier in the litigation, when Ford sought early discovery, the Arbitration Plaintiffs argued against "allowing Ford to embark on a fishing expedition for potential arbitration provisions." *See* ECF No. 53, PageID.2514. Yet now, the Arbitration Plaintiffs essentially suggested that a party must do all it could "reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration." *See Maggie King, Inc. v. ABC Bus Cos., Inc.*, No. 23-cv-748, 2024 WL 323585, at *5 (D. Minn. Jan. 29, 2024). As the Court previously explained, it will not accept that heads-I-win, tails-you-lose approach.

Second, the Arbitration Plaintiffs cited no binding authority for their rule, and the Sixth Circuit did not mention such an obligation in *In re Chrysler Pacifica*. As Judge Leitman recently explained:

> [T]he Court does not believe FCA's failure to move for early discovery before filing its motion to dismiss rises to the level of a waiver of its right to compel arbitration. FCA was up against a deadline for moving to dismiss, . . . and there would have been no guarantee that a motion to

conduct early discovery would have been heard, much less decided in FCA's favor, before that deadline expired. It was not unreasonable for FCA to protect its rights by filing the motion to dismiss when it did. At a minimum, the filing of the motion to dismiss under these circumstances is not so flatly inconsistent with an intent to arbitrate that it should be deemed a waiver.

*Fisher v. FCA US LLC*, 769 F. Supp. 3d 587, 599 (E.D. Mich. 2025). That analysis is highly persuasive and directly on point. The Court's conclusion is further bolstered because Ford indicated early on that it was interested in arbitration, sought to preserve its right, and identified the information that it lacked that it needed to move to arbitrate. ECF No. 16, PageID.730–731 n.3. The Court does not find that Ford slept on its rights by not moving for discovery at the earliest opportunity.

In sum, Ford did not waive its right to arbitrate. Plaintiffs identified no evidence that Ford had the requisite knowledge of the right to arbitrate to have waived it. The Court will thus grant the motion to compel arbitration, including threshold questions of arbitrability.

III.  <u>Docket Management</u>

Ford requested a stay of the case as to the Arbitration Plaintiffs. ECF No. 58, PageID.2591. The Court must grant the request. 9 U.S.C. § 3; *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). That action will freeze the case as to more than a third of Plaintiffs.

The Court must then determine how best to proceed with the remaining Plaintiffs. "A district court has broad discretion to manage its docket." *Am. C.L. Union of Ky. v. McCreary County*, 607 F.3d 439, 451 (6th Cir. 2010). The Court will use its discretion to also stay the case regarding the non-arbitration Plaintiffs. Doing so will

conserve judicial resources and promote efficiency. Proceeding piecemeal and then requiring the Arbitration Plaintiffs to play catch-up, *see* ECF No. 58, PageID.2608 n.3 (arguing that "any plaintiff-specific argument mooted by the stay and compulsion to arbitration should be preserved and reinstated for adjudication at that time"), is inefficient.

To limit the delay to the non-arbitration Plaintiffs, however, the Court will not postpone the case until all arbitration fully concludes. Instead, as soon as arbitrators determine arbitrability, the Court will proceed with those Plaintiffs whose claims are not arbitrable. Upon a determination of arbitrability for the six Arbitration Plaintiffs, all Plaintiffs must promptly move to lift the stay. Although only six Plaintiffs will be compelled to arbitration, that limited referral further supports the proposition that the delay should not be too onerous.

During the pendency of the stay, the Court will instruct the Clerk of Court to administratively close the case for statistical purposes only. *Rodriguez v. Hirshberg Acceptance Corp.*, 62 F.4th 270, 274 (6th Cir. 2023) ("Administrative closures are a tool of docket management. Existing outside the Federal Rules of Civil Procedure, administrative closures primarily serve as a method to shelve pending, but dormant, cases.") (citation modified).

## CONCLUSION

On the pleadings, the Arbitration Plaintiffs plausibly alleged their standing because they plausibly alleged that their vehicles suffered from the defect. The Court thus has jurisdiction to consider Ford's motion to compel six Plaintiffs to an arbitrator

to determine threshold questions of arbitrability and arbitrate those Plaintiffs' claims if proper. The agreements contain a valid delegation clause, and Ford did not waive its right to enforce arbitration. So, the Court will grant Ford's motion and stay the case as to the Plaintiffs in arbitration. As a matter of docket management, and to avoid piecemeal litigation, the Court will stay the rest of the case and administratively close it until it is determined which Plaintiffs will remain in arbitration and which will return to the Court for adjudication of their claims.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Defendant Ford Motor Company's Motion to Compel Arbitration [58] regarding Plaintiffs Brian Sutton, Jeffrey King, Victoria Adams, Raymond Dyne, III, James Capps, and Joseph Vaillancourt is **GRANTED.**

**IT IS FURTHER ORDERED** that the case is **STAYED** pending a determination in arbitration whether the above-listed Plaintiffs' claims must proceed in arbitration. Once the arbitrators have determined arbitrability or non-arbitrability for each above-named Plaintiff, Plaintiffs must promptly **INFORM** the Court of the arbitrators' determinations and **MOVE** to lift the stay.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to

**ADMINISTRATIVELY CLOSE** the case during the pendency of the stay.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: August 7, 2025